Landon Newell (UT #14738)
Hanna Larsen (UT #18458)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
Tel: (801) 486-3161
landon@suwa.org
hanna@suwa.org

Attorneys for Plaintiff
*Southern Utah Wilderness Alliance*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **SOUTHERN UTAH WILDERNESS ALLIANCE,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF THE INTERIOR**, **UNITED STATES BUREAU OF LAND MANAGEMENT**, and **CHRISTINA PRICE**, in her official capacity as Deputy State Director, Division of Lands and Minerals,<br><br>Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br><br>Case No. 2:23-cv-00804<br><br>Judge ___ |

## **INTRODUCTION**

1.      This lawsuit challenges four separate decisions made in 2018-2019 by the Bureau

of Land Management ("BLM") to offer, sell and issue for development 145 oil and gas leases

covering approximately 215,325 acres of public lands in Utah without fully and adequately analyzing the environmental and public health impacts of those decisions.[1]

2.    All of the challenged leasing decisions were approved during the Trump administration, pursuant to that administration's so-called "energy dominance" agenda. That agenda sought to lease as much public lands as possible for oil and gas development, as quickly as possible, and with as little public involvement and environmental analysis as possible.

3.    Shortly after Donald J. Trump took office in January 2017, BLM implemented new policies on a national scale to "streamline" oil and gas leasing to align with the President's energy dominance agenda. Among other things, BLM's agenda took steps to: (1) eliminate opportunities for public engagement in the agency's leasing decisions, (2) eliminate the agency's obligation to fully analyze site-specific impacts of leasing and development, and (3) eliminate any additional BLM-perceived "burden" on oil and gas leasing and development.

4.    BLM's Utah state office aggressively implemented the Trump administration's energy dominance agenda. From 2017-2020, the number of leases BLM offered for sale in Utah increased more than seven-fold compared to a similar timeframe during the Obama administration.

5.    BLM's rushed, thinly analyzed, energy dominance leasing decisions have consistently—and with few exceptions—been set aside as unlawful by federal courts, including this Court. *See, e.g.*, *Rocky Mountain Wild v. Bernhardt*, 506 F. Supp. 3d 1169 (D. Utah 2020) (J.

---

[1] The leases at issue in this lawsuit are listed in Exhibit 1. The challenged leasing documents are listed in Exhibit 2. A map of the challenged leases is provided in Exhibit 3.

Barlow).[2] As a result of legal and administrative challenges, millions of acres of Trump-era

leases have been cancelled and thousands of leases suspended and/or forced to be reexamined by

BLM. *See, e.g.*, Juliet Eilperin and Darryl Fears, *Judge voids nearly 1 million acres of oil and*

*gas leases, saying Trump policy undercut public input*, The Washington Post (Feb. 28, 2020);[3]

Bureau of Land Mgmt., Analysis for Greenhouse Gas Emissions Related to Oil and Gas Leasing

in Utah, DOI-BLM-UT-0000-2021-0001-EA (Jan. 2021) (supplemental leasing analysis

prepared for more than 500 leases in Utah because of successful legal challenges) [herein,

"Supplemental GHG EA"].[4]

6.      The Biden administration has revoked and rescinded all aspects of the Trump

administration's energy dominance agenda as contrary to federal laws and principles of informed

agency decision-making.

7.      The Trump-era leases at issue in this litigation are located on public lands

throughout eastern Utah's Book Cliffs and Uinta Basin regions. Also included in this litigation

are leases scattered across the Colorado Plateau including adjacent to and near the Green River

---

[2] *See, e.g., Mont. Wildlife Fed'n v. Bernhardt*, 2020 WL 2615631 (D. Mont. 2020); *W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042 (D. Idaho 2020); *WildEarth Guardians v. Bernhardt*, 502 F. Supp. 3d 237 (D.D.C. 2020); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 444 F. Supp. 3d 832 (S.D. Ohio 2020); *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880 (D. Mont. 2020); *W. Watersheds Project v. Bernhardt*, 543 F. Supp. 3d 958 (D. Idaho 2021); *Bd. of Cnty Commissioners of Cnty of San Miguel v. U.S. Bureau of Land Mgmt.*, --- F. Supp. 3d. ---, 2022, WL 472992 (D. Colo. 2022); *Bd. of Cnty Commissioners of Cnty of San Miguel v. U.S. Bureau of Land Mgmt.*, 584 F. Supp. 3d 949 (D. Colo. 2022).
[3] Article available at https://www.washingtonpost.com/climate-environment/2020/02/27/judge-voids-nearly-1-million-acres-oil-gas-leases-saying-trump-policy-undercut-public-input/ (last visited Oct. 31, 2023).
[4] The Supplemental GHG EA is available at https://eplanning.blm.gov/public_projects/2002778/200390662/20032939/250039138/2021-01-14-DOI-BLM-UT-0000-2021-0001-EA%20GHG%20Supplemental%20EA_Final.pdf (last visited Oct. 31, 2023).

and White River, within BLM-identified lands with wilderness characteristics ("LWC"), core conservation areas for the imperiled Graham's and White River beardtongue, and important habitat for greater sage-grouse, among other sensitive public lands.



(The Dragon Canyon LWC – an area in Utah's Book Cliffs region encompassed by several leases at issue in this litigation. Ray Bloxham/SUWA).



(The White River LWC – an area encompassed by several leases at issue in this litigation. Ray Bloxham/SUWA).

8.    BLM did not analyze the direct, indirect, or cumulative impacts of its leasing decisions, nor did it analyze middle-ground alternatives, in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 552-559, 702-706; and the regulations and policies that implement these laws.

9.    Accordingly, Plaintiff seeks a declaration that BLM's decisions to offer these leases for oil and gas development were arbitrary, capricious, and contrary to law, and an order vacating the leasing decisions and underlying leases.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief); and the APA, 5 U.S.C. §§ 701-706.

11.     Venue in the District of Utah is appropriate under 28 U.S.C. § 1391(e) because it is where a substantial part of the events or omissions giving rise to the claims occurred and the federal public lands at issue are situated in this district.

12.     Plaintiff has standing under Article III of the U.S. Constitution because the challenged actions cause its members recreational and aesthetic harm, which will be remedied by a favorable ruling from this Court.

13.     The challenged actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, 706.

14.     Plaintiff has exhausted any and all required administrative remedies.

## PARTIES

15.     Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE ("SUWA") is a nonprofit environmental membership organization dedicated to the preservation of outstanding wilderness found throughout Utah, and the management of wilderness-quality lands in their natural state for the benefit of all Americans. SUWA has offices in Salt Lake City and Moab, Utah, and Washington D.C. SUWA has approximately 13,000 members across the nation, including thousands of members in Utah. SUWA's members use and enjoy federal public lands in and around the public lands at issue in this lawsuit for a variety of purposes, including solitude, viewing native flora and fauna, rafting and canoeing, cultural appreciation, hiking and

backcountry recreation, and aesthetic appreciation. SUWA promotes national recognition of the

regions' unique character through research and public education and supports administrative and

legislative initiatives to permanently protect the federal public lands in Utah's wildest places.

SUWA brings this action on its own behalf and on behalf of its members.

16.     Defendant UNITED STATES DEPARTMENT OF THE INTERIOR ("Interior

Department") is responsible for overseeing the management of approximately five hundred

million acres of federal public land across the United States, including those managed by BLM

in Utah, for a variety of competing resources, including the protection of the natural and human

environment.

17.     Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is an

agency of the United States in the Interior Department. BLM is responsible for managing

publicly-owned lands and minerals, in accordance with federal law. BLM is the agency that

manages and leased the public lands in Utah at issue in this case.

18.     Defendant CHRISTINA PRICE is sued in her official capacity as Deputy State

Director, Division of Lands and Minerals, of BLM's Utah State Office. Deputy State Director

Price is responsible for overseeing Utah BLM's minerals program, including the BLM field

offices where the oil and gas leasing decisions at issue in this lawsuit are located. Deputy State

Director Price's predecessor, Kent Hoffman, denied SUWA's lease sale protests and signed each

of BLM's leasing decisions at issue in this lawsuit.

19.     The Interior Department, BLM, and Ms. Price are collectively referred to as

"Defendants" or "Federal Defendants."

## LEGAL FRAMEWORK

### I.     Administrative Procedure Act

20.    The APA provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." *Id.*

21.    Pursuant to the APA, a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be[] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or] without observance of procedure required by law." *Id.* § 706(2)(A), (C), (D).

### II.    National Environmental Policy Act[5]

22.    NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA has two primary objectives: (1) to foster informed decision-making by requiring agencies to consider the environmental impacts of their proposed actions, and (2) to ensure that agencies inform the public that they have considered environmental concerns in their decision making. *See id.* § 1500.1(c).

---

[5] NEPA and its implementing regulations have undergone several revisions in the past few years. However, the challenged decisions were made pursuant to the NEPA statutory and regulatory provisions in effect prior to September 2020 (and subsequent revisions), so the citations herein are to those in effect at the time BLM made its decisions. *See Ctr. for Biological Diversity v. U.S. Dept. of the Interior*, 72 F.4th 1166, 1178, n.6 (10th Cir. 2023) ("[The agency's] actions are subject to the previous [NEPA] regulations because the actions were all completed prior to the effective date of the new [NEPA] regulations and because [the agency] applied the prior [NEPA] regulations.") (citations omitted).

23. NEPA achieves its purpose through action forcing procedures that require agencies to take a hard look at environmental consequences of their actions and authorizations.

24. NEPA require agencies to "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." *Id.* § 1501.2.

25. Federal agencies must comply with NEPA before there are "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(v); *see also* 40 C.F.R. § 1501.2.

26. To accomplish these purposes, NEPA requires that all federal agencies prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Known as an environmental impact statement ("EIS") this statement must, among other things, rigorously explore and objectively evaluate all reasonable alternatives, analyze all direct, and indirect, and cumulative environmental impacts, and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. § 1502.14.

27. An agency may also prepare an EA to determine whether an EIS is necessary. *Id.* §§ 1501.3, 1508.9. An EA must include a discussion of alternatives and the environmental impacts of the action. *Id.* § 1508.9.

28. NEPA's requirement to "study, develop, and describe alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources…" is independent of whether an agency prepares an EA or EIS. 42 U.S.C. § 4332(2)(E).

29.    If an agency decides not to prepare an EIS, an EA must "provide sufficient evidence" to support a Finding of No Significant Impact. 40 C.F.R. § 1508.9(a)(1). Such evidence must demonstrate that the action "will not have a significant effect on the human environment." *Id.* § 1508.13.

30.    NEPA requires agencies to take a hard look at the direct, indirect, and cumulative impacts of a proposed action. *Id.* §§ 1508.7, 1508.8.

31.    Direct impacts are those impacts "caused by the action and [that] occur at the same time and place." *Id.* § 1508.8(a).

32.    Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).

33.    Cumulative impacts are "the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7.

34.    In the Tenth Circuit:

A meaningful cumulative impact analysis must identify five things: (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1056 (10th Cir. 2011) (citations omitted).

### III. BLM's Three-Stage Process for Oil and Gas Leasing and Development on Public Lands

35.    BLM manages onshore oil and gas development through a three-stage process: (1) land use planning, (2) leasing, and (3) approval of drilling proposals.

36.    First, BLM develops a land use plan, known as Resource Management Plan ("RMP"), specifying which lands will be open and which will be closed to oil and gas leasing, and stipulations and conditions that may be placed on any such development. *See* 43 U.S.C. § 1712(a). An RMP does not mandate leasing any specific lands for oil and gas development.

37.    Second, BLM may offer leases for the development of specific tracts of public lands. *See* 43 C.F.R. § 1610.5-3; *id.* §§ 3120-3120.7-3. BLM has considerable discretion to determine which lands will be leased and is not obligated to offer any particular tract of public land that has been nominated for leasing. The issuance of a surface occupancy lease gives the lessee a right to use some of the land for oil and gas development. *Id.* § 3101.1-2.

38.    Third, lessees must submit, and BLM must approve, applications for permits to drill before a lease may be developed. *Id.* § 3162.3-1(c). If a lease was issued without non-waivable no-surface occupancy stipulations then BLM cannot outright prohibit surface development on that lease. *Id.* § 3101.1-2.

## PROCEDURAL BACKGROUND

39.    This lawsuit challenges four BLM leasing decisions: the December 2018 lease sale for BLM's Moab and Vernal field offices, the March 2019 lease sale for BLM's Vernal field office, and the September 2019 lease sale for BLM's Moab field office.[6]

---

[6] *See generally* Exhibit 2 to this complaint (listing the challenged leasing decisions and providing additional information).

40.     Regarding the December 2018 lease sale for BLM's Moab field office, BLM prepared a Determination of NEPA Adequacy ("DNA"), which is not a NEPA document and does not contain NEPA analysis. BLM did not provide the public an opportunity to comment on the DNA, and required the public to protest the leasing decision in a truncated 10-day period.

41.     Regarding the December 2018 lease sale for BLM's Vernal field office, BLM prepared an EA. BLM did not provide the public an opportunity to comment on the EA, and required the public to protest the leasing decision in a truncated 10-day period.

42.     Even though BLM did not provide an opportunity for public comments on its December 2018 leasing decisions, SUWA submitted "scoping" comments to the agency regarding the proposed sales. SUWA also protested both leasing decisions. BLM subsequently denied SUWA's protests.

43.     Regarding the March 2019 lease sale for BLM's Vernal field office, BLM prepared an EA. For this sale, BLM provided an opportunity for the public to comment on the EA.

44.     Regarding the September 2019 lease sale for BLM's Moab field office, BLM prepared an EA. For this sale, BLM provided an opportunity for the public to comment on the EA.

45.     SUWA commented on the March and September 2019 leasing EAs and protested BLM's leasing decisions. BLM subsequently denied SUWA's protests.

## FACTUAL BACKGROUND

### I.    The Climate Crisis; BLM's Failure to Account for Climate Costs

46.    As a result of greenhouse gas ("GHG") emissions, the global climate is rapidly destabilizing with catastrophic results. Rising seas, more extreme heatwaves, increased drought and flooding, larger and more devastating wildfires and hurricanes, and other terrifying changes are now upon humanity. *See generally* Intergovernmental Panel on Climate Change, *Climate Change 2023, Synthesis Report, Summary for Policymakers* (2023).[7] GHG emissions from the production and combustion of fossil fuels, such as coal, oil, and gas, are the predominant drivers of climate change. *Id.* at 4.

47.    Federal public lands used for fossil fuel extraction contribute 24 percent of the United States' GHG emissions. *See* U.S. Geological Survey, *Federal Lands Greenhouse Gas Emissions and Sequestration in the United States for 2005-14*, at 1 (2018).[8]

48.    BLM manages the majority of publicly owned minerals in the United States (nearly 700 million acres). About half of this federal mineral estate contains oil and/or natural gas, and over 23 million acres of federally managed lands are currently leased to private companies for oil and gas. BLM's onshore oil and gas leasing program contributes vast amounts of GHG pollution to the atmosphere.

---

[7] Report available at https://www.ipcc.ch/report/ar6/syr/downloads/report/IPCC_AR6_SYR_SPM.pdf (last visited Oct. 31, 2023). The Intergovernmental Panel on Climate Change is a Nobel Prize-winning scientific body within the United Nations that reviews and assesses the most recent scientific, technical, and socio-economic information relevant to our understanding of climate change.

[8] Report available at https://pubs.usgs.gov/sir/2018/5131/sir20185131.pdf (last visited Oct. 31, 2023).

49.    Carbon dioxide ("$CO_2$") is the leading cause of climate change and the most emitted GHG in the U.S. According to a 2023 U.S. Environmental Protection Agency ("EPA") report, *Inventory of U.S. Greenhouse Gas Emissions and Sinks, 1990-2021*, $CO_2$ comprised 79.4 percent of total U.S. GHG emissions.[9] "The largest source of $CO_2$ and of overall [GHG] emissions is fossil fuel combustion." *Id.* at ES-7. "Within the United States, fossil fuel combustion accounted for 92.2 percent of $CO_2$ gross emissions in 2021." *Id.* at ES-9. $CO_2$ emissions "from fossil fuel combustion accounted for an average of 78.4 percent of $CO_2$-equivalent total gross U.S. emissions" since 1990. *Id.*

50.    Methane ("$CH_4$") is an extremely potent GHG, with a global warming potential at least 86 times greater than $CO_2$ over a 20-year period. Over 100-year period, $CH_4$ has a climate impact approximately 28 times greater than $CO_2$ on a ton-for-ton basis. *Id.* at ES-13. Large amounts of $CH_4$ are released during the extraction, processing, transportation, and delivery of oil and gas, with significant climate impacts. *See id.* at 3-1 ($CH_4$ from energy-related activities equaled 41.6 percent of the nation's $CH_4$ emissions in 2021).

51.    Collectively, these fossil fuel GHG emissions have an enormous environmental and public health impact. For example, the Interagency Working Group on the Social Cost of Greenhouse Gases ("IWG")[10] recently released a report on accounting for and calculating the social costs of $CO_2$ and $CH_4$, collectively referred to as "SC-GHG." *See* IWG, *Technical Support*

---

[9] Report available at https://www.epa.gov/system/files/documents/2023-04/US-GHG-Inventory-2023-Main-Text.pdf (last visited Oct. 31, 2023).
[10] The IWG is made up of numerous Federal agencies including the Interior Department, EPA, and the Council on Environmental Quality.

*Document: Social Cost of Carbon, Methane, and Nitrous Oxide, Interim Estimates under Executive Order 13990* (Feb. 2021) [herein, "TSD for SC-GHG"].[11]

52.    The SC-GHG are estimates of the monetized damages associated with incremental increases in GHG emissions in a given year.

53.    The TSD for SC-GHG explained that "[a] robust and scientifically founded assessment of the positive and negative impacts that an action can be expected to have on society provides important insights in to policy-making process." *Id.* at 3. The report concluded that the social cost of $CO_2$ (in 2020 dollars) ranged between $14 to $152 and the social cost of $CH_4$ (in 2020 dollars) ranged between $670 to $3,900 per metric ton, depending on which discount rate is used. *See id.* at 5, tbls. ES-1 and ES-2.

### A.  The Trump Administration and BLM's Energy Dominance Agenda

54.    Two months after taking office, President Trump issued Executive Order No. 13783, entitled "Promoting Energy Independence and Economic Growth." *See generally* Exec. Order No. 13783, 82 Fed. Reg. 16093 (March 28, 2017). This Executive Order required administrative agencies, including BLM, to "review all existing . . . orders, guidance documents, policies, and any other similar agency actions . . . that potentially burden the development or use of domestically produced energy resources, with particular attention to oil [and] natural gas." *Id.*

55.    Soon thereafter, the Secretary of the Interior issued Secretarial Order No. 3354, entitled "Supporting and Improving the Federal Onshore Oil and Gas Leasing Program and Federal Solid Mineral Leasing Program." *See generally* Sec'y of the Interior, Order No. 3354

---

[11] Available at https://www.whitehouse.gov/wp-content/uploads/2021/02/TechnicalSupportDocument_SocialCostofCarbonMethaneNitrousOxide.pdf (last visited Oct. 31, 2023).

(July 5, 2017).[12] This order directed BLM to "identify additional steps to enhance exploration and development of Federal onshore oil and gas resources." *Id.* § 3(b). It required further that BLM "identify any provisions in [its] existing policy and guidance documents that would impede BLM's plans to carry out quarterly oil and gas lease sales or its efforts to enhance exploration and development of Federal onshore oil and gas resources." *Id.* § 4(b)(1).

56.    In response to Executive Order 13783 and Secretarial Order 3354, BLM issued Instruction Memorandum No. 2018-034, entitled "Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews" (Jan. 31, 2018) [herein, "IM 2018-34"].[13] IM 2018-34 replaced BLM's longstanding oil and gas leasing policy and established a new framework for how BLM would implement the Trump administration's energy dominance agenda. Among other things, IM 2018-34: (1) eliminated or significantly restricted opportunities for public involvement in oil and gas leasing decisions, and (2) encouraged BLM to rely on existing NEPA analyses rather than prepare site-specific NEPA analysis in order to "streamline" oil and gas leasing and development. *See id.* §§ II, III.B.5, III.D.

57.    With these perceived "burdens" on oil and gas leasing and development eliminated, BLM offered and sold the leases challenged in this lawsuit.

---

[12] Available at https://www.doi.gov/sites/doi.gov/files/uploads/doi-so-3354.pdf (last visited Oct. 31, 2023).
[13] Available at https://www.blm.gov/policy/im-2018-034 (last visited Oct. 31, 2023).

**B. BLM's Failure to Analyze and Disclose the SC-GHG Prior to Offering the Challenged Leases for Development**

**i. SUWA's Prior Litigation Over Several of These Same Lease Sales**

58.     In September 2019, SUWA challenged BLM's decision to sell many of the same oil and gas leases at issue in this lawsuit. *See Living Rivers v. Hoffman*, Complaint for Declaratory and Injunctive Relief, Case No. 4:19-cv-00074-DN (D. Utah) (ECF No. 2) (filed Sept. 12, 2019).[14]

59.     SUWA alleged that BLM's leasing decisions violated NEPA because they failed to analyze the indirect and cumulative GHG emissions and climate change impacts of selling the leases for development. *See id.* ¶¶ 99-109.

60.     Soon thereafter, BLM suspended all of the challenged leases because it determined that it had to prepare a supplemental GHG and climate change leasing analysis. *See Living Rivers v. Hoffman*, Unopposed Motion to Stay Case, Case No. 4:19-cv-00074-DN (D. Utah) (ECF No. 15) (filed Nov. 14, 2019).

61.     Based on BLM's decision to suspend the leases and to prepare a supplemental leasing analysis, SUWA voluntarily dismissed its lawsuit.

**ii. BLM's Supplemental GHG and Climate Change Analysis; Failure to Fully Analyze the SC-GHG**

62.     Six days before the Trump administration left office, BLM finalized its supplemental GHG leasing analysis which, like the underlying decisions reexamined therein,

---

[14] The *Living Rivers* case involved the 2018 leasing decisions at issue in this case, but not the 2019 decisions.

was prepared—again—through the lens of the energy dominance agenda. *See generally* Supplemental GHG EA.

63.    The Supplemental GHG EA analyzed, to some extent, the climate change impacts of selling the leases for oil and gas development.[15]

64.    BLM explained that based on the analysis in the Supplemental GHG EA, the agency would, *inter alia*, decide whether to "1) lift the suspension on a particular lease, 2) modify a lease and lift the suspension, or 3) cancel a lease." *Id.* at 6.

65.    SUWA commented on the draft EA. *See* S. Utah Wilderness All., *et al*., Comment Letter on the Supplemental Analysis for Greenhouse Gas Emissions Related to Oil and Gas Leasing in Utah, DOI-BLM-UT-0000-2021-0001-EA (Oct. 27, 2020).[16] Among other issues, SUWA explained that BLM was required to analyze and disclose the SC-GHG. *Id.* at 53-58.

66.    The final Supplemental GHG EA did not analyze and disclose the SC-GHG. BLM justified its failure to do so as follows:

> This EA provides no quantitative monetary estimate of any benefits or costs. NEPA does not require an economic cost-benefit analysis, although NEPA does require consideration of "effects" that include "economic" and "social" effects. Quantifying only the costs . . . by using the [SC-GHG], but not the benefits (as measured by the economic value of the proposed oil and gas development and production . . .), would yield information that is inaccurate and not useful for the decision-maker.
>
> The [SC-GHG] was developed for the express purpose of "allowing agencies to incorporate the social benefits of reducing [$CO_2$] emissions into cost-benefit analyses of regulatory actions that impact cumulative global emissions" . . . The

---

[15] The Supplemental GHG EA involved the 2018 leases at issue in this litigation, but not the 2019 leases.

[16] SUWA's comment letter is available at https://eplanning.blm.gov/public_projects/2002778/200390662/20028661/250034862/2020-10-27-GHG2020_SUWA_ePlanning_Comment.pdf (last visited Oct. 31, 2023).

action considered here is not a rulemaking and does not require a regulatory-impact analysis.

Supplemental GHG EA at 13, tbl. 3 (internal citations and alterations omitted).

67.    As discussed below, this justification has been rejected by federal courts, the Interior Department, and the Biden administration as contrary to federal laws and principles of informed agency decision-making.

68.    Following completion of the Supplemental GHG EA, BLM lifted the suspensions on all of the previously challenged leases.

### iii.    Biden Administration and Interior Department Directives to Analyze the SC-GHG

69.    The Biden administration has revoked and rescinded all Trump-era energy dominance agenda orders and directives because they violated federal laws and/or were otherwise contrary to the principles of informed agency decision-making and public involvement in agency decision-making processes. *See* Exec. Order No. 13990, 86 Fed. Reg. 7037, 7041 (Jan. 20, 2021) (revoking Executive Order No. 13783); Sec'y of the Interior, Order No. 3398 § 4 (April 16, 2021) (revoking Secretarial Order No. 3354);[17] U.S. Dep't of the Interior, Instruction Memorandum No. 2021-027, Oil and Gas Leasing – Land Use Planning and Lease Parcel Reviews (April 30, 2021) (revoking and superseding IM 2018-34);[18] *see also W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042 (D. Idaho 2020) (vacating provisions of IM 2018-034 and oil and gas leases issued pursuant to those provisions).

---

[17] Available at https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3398-508_0.pdf (last visited Oct. 31, 2023).
[18] Available at https://www.blm.gov/policy/im-2021-027 (last visited Oct. 31, 2023).

70.     From day one, the Biden administration has made it a priority for all federal agencies to do their part to tackle the climate crisis: it is "essential" that agencies "capture the full costs of [GHG] emissions as accurately as possible, including by taking global damages into account." Executive Order No. 13990, 86 Fed. Reg. at 7040.

> Doing so facilitates sound decision-making [and] recognizes the breadth of climate impacts . . . The [SC-GHG] are estimates of the monetized damages associated with incremental increases in [GHG] emissions. ... An accurate social cost is essential for agencies to accurately determine the social benefits of reducing [GHG] emissions when conducting cost-benefit analyses of regulatory and other actions.

*Id.*

71.     Put simply, federal agency decision-making such as oil and gas leasing and permitting on public lands must "account for corresponding climate costs." Exec. Order No. 14008, 86 Fed. Reg. 7619, 7625 (Jan. 27, 2021).

72.      In response to these orders, recognizing the "profound climate crisis" our nation faces, the Interior Secretary directed all Interior Department agencies to "address the climate crisis." Sec'y Order No. 3399 § 1 (April 16, 2021).[19] This includes utilizing the NEPA process to "help decision makers identify opportunities to reduce GHG emissions, improve environmental outcomes, and contribute to protecting communities from the climate crisis." *Id.* § 5.b. Specifically:

> When considering the impact of GHG emissions from a proposed action, [Interior Department agencies] should use appropriate tools, methodologies, and resources available to quantify GHG emissions and compare GHG quantities across alternatives. . . The [SC-GHG] are estimates in dollars of the long-term damage done by these GHGs in a given year. Estimates of SC-GHG can be a useful measure to assess the climate impacts of GHG emissions for Federal proposed actions, in addition to rulemakings.

---

[19] Available at https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3399-508_0.pdf (last visited Oct. 31, 2023).

*Id.*

73.     Around this same time, the IWG released its aforementioned TSD for SC-GHG report. BLM has recently recognized that the estimates provided by the IWG are "the best currently available[.]" Bureau of Land Mgmt., BLM Utah 2023 Fourth Quarter Competitive Oil and Gas Lease Sale, DOI-BLM-UT-0000-2023-0003-EA, at 65 (Aug. 2023) [herein, "2023 Fourth Quarter Leasing EA"].[20]

74.     Following on the heels of these directives and the IWG's TSD for SC-GHG report, in November 2021, the Interior Department released its comprehensive report on the federal oil and gas program. *See* U.S. Dep't of the Interior, Report on the Federal Oil and Gas Leasing Program, Prepared in Response to Executive Order 14008 (Nov. 2021).[21] The Interior Department concluded that its then-existing leasing program—the same program under which BLM sold the leases challenged here—"fail[ed] to provide a fair return to taxpayers, even before factoring in the resulting climate-related costs that must be borne by taxpayers." *Id.* at 3.

75.     The 2021 report made several recommendations for improving the oil and gas program, each designed to account for "new stressors and new opportunities for our public lands and waters, including . . . tackling climate change[.]" *Id.* at 4. This included, among others, designing a more responsible leasing process that ensures a fair financial return to American taxpayers. *See id.* at 7-12.

---

[20] Available at https://eplanning.blm.gov/public_projects/2022373/200540513/20084492/250090674/Protest%20Period%20Q4%20DOI-BLM-UT-0000-2023-0003-EA.pdf (last visited Oct. 31, 2023).
[21] Available at https://www.doi.gov/sites/doi.gov/files/report-on-the-federal-oil-and-gas-leasing-program-doi-eo-14008.pdf (last visited Oct. 31, 2023).

76.     To implement these directives and the Interior Department's recommendations, in each of its recent Utah oil and gas leasing proposals, BLM has analyzed and disclosed the SC-GHG of selling the parcels for development. For example, at its most recent Utah sale, BLM estimated the SC-GHG of selling just six parcels for development ranged between $128 million to $1.4 billion, depending on which discount rate was used. *See* 2023 Fourth Quarter Leasing EA at 66 tbl. 23.

77.     BLM did not and has not fully analyzed and disclosed the SC-GHG in any of the leasing documents challenged in this lawsuit. By failing to analyze the SC-GHG, BLM provided an economically skewed analysis of costs and benefits of oil and gas leasing and development.

## II.     BLM's Failure to Analyze Middle-Ground Alternatives

78.     For each lease sale at issue in this lawsuit, consistent with the Trump-era energy dominance agenda goal of limiting environmental analysis, BLM analyzed just two polar opposite alternatives: offer all parcels for development or offer no parcels for development.

79.     During each lease sale process, SUWA recommended middle-ground alternative(s) that fell between the two extremes considered by BLM. The following is a non-exhaustive list of SUWA's recommendations:

- BLM should consider an alternative that would avoid exceedances of federal air quality standards and reduce GHG emissions.

- BLM should consider an alternative that avoids leasing in LWC areas.

- BLM should consider an alternative that requires no-surface occupancy stipulations for all parcels in LWC areas.

- BLM should consider a phased development-leasing alternative wherein it would require operators to first explore and develop outside of LWC prior to allowing the operator to develop in LWC areas.

- BLM should consider a mitigation alternative wherein it would attach additional mitigation measures and best management practices to each lease.

- BLM should consider an alternative in which it would defer from leasing or adjust parcel boundaries to avoid lands that contain high probability for the presence of cultural sites.

80.     SUWA explained in detail how each alternative satisfied the Tenth Circuit Court of Appeal's "rule of reason" standard—that is, SUWA explained how each alternative was reasonable, within BLM's statutory mandate and would satisfy the agency's stated purpose and need for the proposed action.

81.     Nonetheless, BLM did not analyze any of SUWA's recommended alternatives. Instead, in each instance, BLM offered the same justification for having analyzed just the polar opposites: those alternatives encompassed any decision BLM was empowered to make, including leasing some parcels but not others.

82.     That exact rationale has been rejected by this Court as unlawful because it "confuses the power to act with the requirement to analyze." *Rocky Mountain Wild*, 506 F. Supp. 3d at 1186.

83.     In *Rocky Mountain Wild*, the plaintiffs challenged BLM's decision to consider only the lease everything and lease nothing alternatives (and to reject middle-ground alternatives) in its NEPA analysis for the December 2017 and June 2018 lease sales in Utah. *See id.* at 1185-88. Members of the public, including SUWA, recommended various middle-ground alternatives. *Id.* at 1186. BLM rejected the recommended alternatives for the following reason:

> BLM determined that the Proposed Action (lease all parcels) and No Action (lease no parcels) alternatives encompassed the full range of alternatives. The BLM has the ability to select part of each considered alternative in the Decision Record (lease some parcels, not lease other parcels).
> . . .

23

[When rejecting SUWA's alternative to defer leasing in LWC and the Nine Mile Canyon Area of Critical Environmental Concern ("ACEC"), BLM stated:] This alternative is already within BLM's decision authority in the two alternatives analyzed in detail. . . . For example, if BLM's decision maker preferred to defer leasing in the ACECs, then the BLM would select in the Decision Record the Proposed Action for the parcels that are outside the ACEC and would select the No Action for the parcels within the ACEC.
. . .

[When rejecting SUWA's alternative to defer leasing within the Dinosaur National Monument viewshed, BLM stated:] [T]his alternative is already within BLM's decision authority in the two alternatives analyzed in detail[.]

Bureau of Land Mgmt., December 2017 Competitive Oil and Gas Lease Sale, DOI-BLM-UT-G010-2017-0028-EA, App. G at 244 (Jan. 2018).[22]

84.      The Court held that BLM's evaluation of "just two polar opposite alternatives" was illegal. *Rocky Mountain Wild*, 506 F. Supp. 3d at 1185. Specifically, "[s]imply stating that [the agency] has the power to choose to lease fewer than all of the parcels under consideration is not analysis." *Id.* at 1186. Rather, "BLM is required to analyze all reasonable alternatives to the proposed action, which includes those alternatives that are significantly distinguishable from the alternatives already considered." *Id.* (internal alterations and citations omitted).

85.      BLM proffered the same (or nearly identical) justification for each lease sale challenged in this lawsuit. For example (non-exhaustive):

- For the December 2018 lease sale, BLM did not analyze SUWA's recommended alternative because: "[T]his alternative is contained within the scope of the proposed and no action alternatives."

---

[22] Available at
https://eplanning.blm.gov/public_projects/nepa/80165/130450/158729/Final_Vernal_EA.pdf
(last visited Oct. 31, 2023). The quoted text is from the December 2017 leasing EA at issue in *Rocky Mountain Wild*. It is cited here to provide the full context of BLM's (illegal) justification for rejecting the publicly nominated middle-ground alternatives in that case to highlight the similarities to BLM's justification for the lease sales challenged in this lawsuit.

- For the March 2019 lease sale, BLM did not analyze SUWA's recommended alternative because: "This alternative is functionally the same as the No Action alternative in which all parcels would be deferred. Since each parcel is an independent . . . action the BLM at the end of the EA process could choose either the proposed action or the no action alternative on a parcel specific basis."

- For the September 2019 lease sale, BLM did not analyze SUWA's recommended alternatives because: "BLM's No Action alternative would eliminate any potential impacts to the areas that would be analyzed in [SUWA's] suggested 'leasing outside [LWC]' and 'cultural resource preservation' alternatives."

86.    Notably, following the *Rocky Mountain Wild* decision, BLM has analyzed three alternatives, at a minimum, in its NEPA analysis for each subsequent lease sale in Utah. *See generally* Bureau of Land Mgmt., BLM Utah 2022 First Competitive Oil and Gas Lease Sale, DOI-BLM-UT-0000-2021-0007-EA (June 2022);[23] Bureau of Land Mgmt., BLM 2023 Third Quarter Competitive Oil and Gas Lease Sale Environmental Assessment, DOI-BLM-UT-0000-2023-0001-EA (Sept. 2023);[24] 2023 Fourth Quarter Leasing EA.

### III.    BLM's Failure to Analyze and Disclose the Direct, Indirect, and Cumulative Impacts of its Leasing Decisions

87.    Consistent with the Trump-era energy dominance agenda, BLM's leasing analyses challenged in this lawsuit only cursorily analyzed (if at all) impacts to resource values including water resources, LWC, Graham's and White River beardtongue, and greater sage-grouse, among others.

---

[23] Available at https://eplanning.blm.gov/public_projects/2015573/200495437/20062742/250068924/2022-06-29_2022-1st-DOI-BLM-UT-0000-2021-0007-_Final.pdf (three alternatives analyzed) (last visited Oct. 31, 2023).
[24] Available at https://eplanning.blm.gov/public_projects/2022049/200536425/20086229/250092411/BLM0040311%20BLM%20UT%202023%20Q3%20OG%20DOI-BLM-UT-0000-2023-0001-EA.pdf (three alternatives analyzed) (last visited Oct. 31, 2023).

88.    SUWA raised the issues discussed below in its comments on each leasing proposal. BLM provided cursory responses but did not make any substantive changes or prepare additional analysis in response to SUWA's concerns.

### A.  Water Resources

89.    None of the challenged leasing decisions fully analyzed or disclosed the impacts of oil and gas leasing and development to water resources, including surface and groundwater. In each instance, BLM determined that detailed analysis was not warranted at the leasing stage. But, BLM had the necessary information to analyze and disclose these impacts and therefore had to do so before an irretrievable commitment of resources occurred.

### i.    Failure to Quantify Water Use

90.    Oil and gas development consume enormous quantities of water. In a recent leasing analysis not challenged here, BLM recognized that the drilling of a single well can consume between 1.5 to 16 million gallons of water. *See* 2023 Fourth Quarter Leasing EA at 40. However, the New York Times has reported that "[f]racking a single oil or gas well can now use as much as 40 million gallons of water or more." Hiroko Tabuchi and Blacki Migliozzi, *'Monster Fracks' Are Getting Far Bigger. And Far Thirstier*, New York Times (Sept. 25, 2023).[25]

91.    In its NEPA analyses for the challenged leasing decisions, BLM concluded that hundreds of *foreseeable* wells would be drilled on the leases. For example, for the December 2018 lease sale in the Vernal field office, BLM anticipated 292 wells would be drilled on leases

---

[25] Article available at https://www.nytimes.com/interactive/2023/09/25/climate/fracking-oil-gas-wells-water.html?partner=slack&smid=sl-share (last visited Oct. 31, 2023).

sold at that sale. *See* Bureau of Land Mgmt., December 2018 Competitive Oil and Gas Lease Sale, DOI-BLM-UT-G010-2018-0044-EA, at 27 (Sept. 2018) [herein, "VFO December 2018 EA"].[26] Additionally, for the March 2019 sale, BLM anticipated 400 wells would be drilled on the leases sold at that sale. *See* Bureau of Land Mgmt., March 2019 Competitive Oil and Gas Lease Sale, DOI-BLM-UT-G010-2019-0006-EA, App. F at *1 (Sept. 2019) [herein, "March 2019 EA"].[27] Thus, for just these two sales, there were—according to BLM—692 foreseeable wells.

92.    BLM also acknowledged that water is necessary to drill the foreseeable wells, regardless of when or where they would be drilled on the respective lease(s). *See* VFO December 2018 EA, App. F § b ("Water required for the drilling and completion of the proposed gas wells would be hauled by truck from a combination of the permitted water sources.");[28] March 2019 EA, App. F § b (same).

93.    But, BLM's leasing "analyses" stopped there, with no mention of how much water the wells would collectively consume or the environmental impacts of that water use, even though BLM is obligated to analyze and disclose these impacts. *See Diné Citizens Against Ruining Our Envtl. v. Bernhardt*, 923 F.3d 831, 858 (10th Cir. 2019) ("BLM [is] required to . . .

---

[26] Available at https://eplanning.blm.gov/public_projects/nepa/116589/166216/202535/2019-02-08_VFO_Final_EA.pdf (last visited Oct. 31, 2023).

[27] The March 2019 EA is available at https://eplanning.blm.gov/public_projects/nepa/117406/20002909/250003463/2019-09-04_VFO_DOI-BLM-UT-G010-2019-0006-EA-Final.pdf (last visited Oct. 31, 2023). Appendix F to that EA is available at https://eplanning.blm.gov/public_projects/nepa/117406/20002917/250003471/VFO_Appendix_F_Reasonable_Foreseeable_Development_FINAL.pdf (last visited Oct. 31, 2023).

[28] The VFO December 2018 EA Appendix F is available at https://eplanning.blm.gov/public_projects/nepa/116589/160412/196125/Appendix_F_Reasonable_Foreseeable_Development.pdf (last visited Oct. 31, 2023).

consider the cumulative impacts on water resources associated with drilling the . . . foreseeable [oil and gas] wells."). As this Court recently held in a similar context:

> It is one thing for BLM to find that, as a matter of agency expertise, it should not use a particular tool to [analyze impacts]. But it is unacceptable for the information and analysis that is included on the topic to be spread out and disjointed in such a way that the public is unlikely to find the related pieces and put them together or to have confidence that the agency considered the interrelated qualitative and quantitative information as a whole. It is in the analysis [of potential impacts] from the proposed action . . . that the agency shows that it has taken a hard look at the . . . effects of the project.

*Utah Physicians for a Healthy Envtl. v. U.S. Bureau of Land Mgmt.*, 528 F. Supp. 3d 1222, 1232 (D. Utah 2021) (J. Barlow).

94.    Piecing together BLM's disjointed data, it is clear that the drilling of the foreseeable wells will consume enormous quantities of water. Incorporating the water estimates from BLM's recent 2023 Fourth Quarter Leasing EA to illustrate this point, under BLM's low per-well water estimate (1.5 million gallons), the 692 foreseeable wells will consume over one *billion* gallons of water.[29] Under BLM's high per-well estimate (16 million gallons), the 692 foreseeable wells will consume over 11 *billion* gallons of water.[30] Under the New York Times reported high of 40 million gallons per-well they will consume over 27 *billion* gallons of water.[31]

95.    SUWA's calculations provided here are only for two of the lease sales challenged in this lawsuit, so the actual amount of foreseeable consumed water related to oil and gas drilling on the challenged leases would be significantly higher.

---

[29] $1,500,000 \frac{gallons}{well} \times 692 \ wells = 1,038,000,000 \ gallons.$

[30] $16,000,000 \frac{gallons}{well} \times 692 \ wells = 11,072,000,000 \ gallons.$

[31] $40,000,000 \frac{gallons}{well} \times 692 \ wells = 27,680,000,000 \ gallons.$

96.     Nonetheless, despite the decades-long drought in the American Southwest—which is only predicted to worsen as a result of climate change—and the billions of gallons of *foreseeable* water use from developing the leases, BLM did not analyze and disclose water use or its accompanying environmental impacts. Instead, in each instance, BLM stated—without supporting record evidence or data—that water resources were "present, but not affected to a degree that detailed analysis is required."

ii.     **Failure to Analyze Impacts to Water Resources Including the White River**

97.     The challenged leasing decisions not only failed to quantify water use, or put that quantity into some sort of useful perspective, they also failed to fully analyze and disclose the direct, indirect, and cumulative impacts to water resources including, but not limited to, the White River.

98.     "For 100 miles between the town of Rangely, Colorado, and the river's confluence with the Green River, the White River cuts a rugged, scenic trough into the high desert plains of the Uinta Basin." Bureau of Land Mgmt., Floating the White River (undated).[32] "This is a place to paddle, watch wildlife, and occasionally leave the river for an unforgettable hike. This is one of the quiet places, where solitude and a sense of adventure are still very much a part of the outdoor experience." *Id.*

---

[32] Available at
https://www.blm.gov/sites/blm.gov/files/documents/files/white%20river%20for%20web.pdf
(last visited Oct. 31, 2023).

99.     As show on the following map, BLM sold leases at its December 2018 and March 2019 lease sales that are located immediately adjacent to or near the White River, including in the White River Natural Area.



White River & White River Natural Area

100.     BLM did not analyze the foreseeable impacts of these separate leasing decisions to the White River on their own or collectively.

101.     Instead, BLM's data—to the extent it exists—is disjointed, appearing in several different sections of the respective EA, leaving it to the public to piece together the potential extent and significance of impacts. For example, the December 2018 sale included four parcels in the White River Natural Area and four additional parcels outside the Natural Area but adjacent

to or near the White River. *See* VFO December 2018 EA at 13, 17.[33] Comparing these parcel

numbers to Appendix F of the EA, it can be calculated that there are 64 *foreseeable* wells on

these parcels with a total of 319.5 acres of *foreseeable* surface disturbance. The EA does not

calculate these numbers, let alone analyze their significance.

102.    Likewise, the EAs did not fully analyze the cumulative impacts to the White

River, including the Natural Area. For example, applying the same approach taken above to the

March 2019 sale, it can be pieced together that there are four leases adjacent to or near the White

River.[34] Referencing Appendix F of the EA, it can then be calculated that on the four leases there

are 18 *foreseeable* wells, which will cause 74 acres of *foreseeable* surface disturbance. Thus, the

December 2018 and March 2019 sales included 82 *foreseeable* wells, which are predicted to

result in 393.5 acres of *foreseeable* surface impacts adjacent to or near the White River. The EAs

do not calculate these numbers, let alone analyze and disclose their foreseeable cumulative

impacts/significance.

## B.  Lands with Wilderness Characteristics

103.    Many of the leases at issue in this lawsuit encompass BLM-identified LWC areas.

These LWC areas and the leases challenged herein are shown on the following map.

---

[33] The parcels numbers are: 152, 153, 154, 155, 156, 180, 233, and 234.
[34] The parcel numbers are: 177, 178, 179, and 211,



104.    Despite a pattern and practice of repeatedly offering leases in the same LWC units, BLM did not analyze and disclose the cumulative impacts to LWC from its leasing decisions. For example, as shown on the above map, the December 2018 and March 2019 sales both included parcels in the Wolf Point and the White River LWC units (among others). But, neither EA analyzed the cumulative impacts of both sales to those LWC units. Instead, the grand total of BLM's cumulative impact "analysis" was to state the percentage of the LWC unit that is currently leased for oil and gas. *See, e.g.*, VFO December 2018 EA at 42-43; March 2019 EA at 71-73.

105.    BLM *could have* calculated and analyzed the potential foreseeable impacts to these LWC units but failed to do so, leaving the public to piece together BLM's data and try to understand the significance of the proposed actions. For example, the December 2018 sale included seven parcels in the White River LWC, and one in the Wolf Point LWC. *See* VFO December 2018 EA at 17, tbl. 3-3. The March 2019 sale included one and three parcels in these units, respectively. *See* March 2019 EA at 21, tbl. 3.

106.    Next, referencing the parcel numbers in Appendix F for each EA, it can be calculated that there are 73 *foreseeable* wells, causing 354.5 acres of *foreseeable* surface disturbance, on these parcels. But, the EAs do not disclose these numbers or analyze their impacts/significance. Instead, BLM merely provided the percentage of the units that were currently leased for oil and gas development.

### C.  Graham's and White River Beardtongue

107.    To avoid the need to list Graham's and White River beardtongue as threatened or endangered under the Endangered Species Act ("ESA"), BLM and other federal, state and private entities crafted a conservation agreement for both species. *See generally Rocky Mountain Wild v. Walsh*, 216 F. Supp. 3d 1234 (D. Colo. 2016) (providing additional background on the agreement).

108.    The heart of the agreement was the establishment of "conservation areas" wherein development would be subject to certain surface disturbance thresholds. *See* Utah School and Inst. Trust Lands Admin, *et al.*, Conservation Agreement and Strategy for Graham's

33

Beardtongue (*Penstemon grahamii*) and White River Beardtongue (*P. scariosus var. albifluvis*), 15-17 (April 2014) [herein, "Conservation Agreement"].[35]

109.    The conservation areas and beardtongue habitat areas are shown on the following map, overlaid with the challenged oil and gas leases at issue in this lawsuit.



110.    As shown on the map, BLM sold leases for development throughout the conservation areas at the December 2018 and March 2019 sales. However, BLM did not analyze and disclose the impacts of these leasing decisions to the beardtongue species and conservation

---

[35] Agreement available at https://trustlands.utah.gov/wp-content/uploads/2016/04/Penstemon-Conservation-Agreement_2014Jul22_final-signed-3.pdf (last visited Oct. 31, 2023).

areas, including whether the respective surface disturbance thresholds would be exceeded by reasonably foreseeable oil and gas development on the leases.

111.    Like water resources and LWC, the data and information existed for BLM to perform this analysis related to foreseeable impacts. For example, the December 2018 sale included 19 parcels in Graham's beardtongue habitat, 14 of which were in conservation areas. *See* VFO December 2018 EA, at 37-38, tbl. 4-8. The EA also provides well estimates for each lease. *See id.*, App. F at *6-8. Cross-referencing the two tables, it is possible to calculate that there were 74 *foreseeable* wells on the 19 Graham's beardtongue parcels. *Compare* VFO December 2018 EA at 37-38, tbl. 4-8, *with id.*, App. F at *6-8. Next, the total *foreseeable* surface disturbance for these wells can be calculated by comparing the 74 wells to BLM's "surface disturbance for estimated number of wells" column in appendix F—for a total of 370 acres of surface disturbance in Graham's beardtongue habitat, including in the conservation areas. *See id.*

112.    Instead of connecting these dots, or providing any analysis, the EA merely states: "Specific mitigation and disturbance caps would be applicable to parcels within the Conservation Areas established by the [Conservation Agreement]." VFO December 2018 EA at 37.

113.    The March 2019 sale repeated these same mistakes. That sale included 23 leases in the Graham's beardtongue habitat including conservation areas, with 113 *foreseeable* wells on those leases for a total of 553 acres of *foreseeable* surface disturbance.[36] *Compare* March 2019 EA at 40, tbl. 3-9 (listing the parcels in Graham's beardtongue habitat), *with id.*, App. F § 2

---

[36] There were additional parcels in the White River beardtongue conservation areas. *See* March 2019 EA at 40, tbl. 3-9 (listing the parcels in White River beardtongue habitat).

(columns: "Reasonably Foreseeable Number of Oil Wells" and "Surface Disturbance for Estimated Number of Wells (Acres)"). But, once again, BLM failed to connect the dots.

114.    Like the December sale, the sum total of BLM's "analysis" in the March 2019 EA is the statement: "Specific mitigation and disturbance caps would be applicable to parcels within the Conservation Areas established by the Conservation Agreement." March 2019 EA at 57-58.

115.    For both sales, BLM's approach, similar to the other resources discussed above, was to provide bits of data scattered throughout the EAs and then, in effect, force the public to do the agency's work for it by piecing together the data to figure out the extent of potential impacts and their significance.

116.    BLM made similar mistakes with regard to analyzing the disclosing the cumulative impacts of leasing and development to these species. For example, as part of the December 2018 and March 2019 sales, using the numbers provided above, BLM sold at least 42 leases in beardtongue habitat including in the conservation areas. Based on BLM's own data, there were 187 *foreseeable* wells that would be drilled on the 42 leases, the development of which would cause 903 acres of *foreseeable* surface disturbance in beardtongue habitat including in the conservation areas. But, BLM never calculated these numbers nor did it analyze or disclose their cumulative impacts or significance, including whether 903 acres of *foreseeable* surface disturbance would exceed the surface disturbance thresholds set in the Conservation Agreement.

### D. Greater Sage-Grouse

### i. The 2015 and 2019 RODs; Interior Guidance

117.    For several decades, BLM, states, and private entities have spent hundreds of millions of dollars working to avoid the need to list the greater sage-grouse as a threatened or endangered species under the ESA. These decisions have been the subject of extensive litigation in federal courts.

118.    Relevant here, in 2015, BLM amended 98 land use plans across the western U.S., including in Utah to protect greater sage-grouse habitat, primarily from oil and gas development. *See generally* Bureau of Land Mgmt., BLM Sage-grouse Plans.[37] The amendments applied to each Utah RMP governing the public lands at issue in this litigation. *See generally* Bureau of Land Mgmt., Utah Greater Sage-Grouse Approved Resource Management Plan Amendment (Sept. 2015) ("2015 ROD").[38]

119.    The heart of the plan amendments was two-fold: *first*, the amendments established greater sage-grouse management areas, referred to as Sagebrush Focal Areas ("SFA"), Priority Habitat Management Areas ("PHMA"), and General Habitat Management Areas ("GHMA"). *See id.*, at I-3, fig, 1-2 (showing these habitat areas in Utah). Oil and gas leasing and development in these habitat management areas were significantly restricted and subject to detailed procedural requirements and surface disturbance thresholds, with SFAs being the most restrictive and GHMAs the least. *See id.* at I-11, tbl. I-6.

---

[37] Available at https://www.blm.gov/programs/fish-and-wildlife/sagegrouse/blm-sagegrouse-plans (last visited Oct. 31, 2023).
[38] Available at
https://eplanning.blm.gov/public_projects/lup/103346/143744/177014/Utah_ARMPA.pdf (last visited Oct. 31, 2023).

120.    Relevant here, PHMA is defined as BLM-managed lands "having the highest value to maintaining sustainable [greater sage-grouse] populations." *Id.* at I-5. GHMA is defined as BLM-managed lands "where some special management will apply to sustain [greater sage-grouse] populations." *Id.* at I-6.

121.    *Second*, the amendments prioritized new oil and gas leasing and development *outside* of PHMA and GHMA, to achieve net conservation gains and certain surface disturbance buffers. Specifically:

> When analyzing leasing and authorizing development of fluid mineral resources . . . in PHMA and GHMA . . . priority will be given to development in non-habitat areas first and then in the least suitable habitat for [greater sage-grouse].

*Id.* at 2-25.

122.    The Interior Department subsequently issued detailed guidance for implementing the prioritization requirement. *See generally* U.S. Dep't of the Interior, Instruction Memorandum No. 2016-143, Implementation of Greater Sage-Grouse Resource Management Plan Revisions or Amendments – Oil & Gas Leasing and Development Sequential Prioritization (Sept. 1, 2016) [herein, "IM 2016-143"].[39] The prioritization sequence included:

- First: BLM should consider leasing lands outside of PHMA and GHMA.

- Next: BLM should only consider leasing lands in GHMA, "after considering lands outside of both GHMAs and PHMAs. When considering the GHMA lands for leasing, [BLM] will ensure that a decision to lease those lands would conform to the conservation objectives and provisions in the [greater sage-grouse plan amendments]."

---

[39] Available at https://www.blm.gov/sites/blm.gov/files/Implementation%20of%20Greater%20Sage-Grouse%20Resource%20Management%20Plan%20Revisions%20or%20Amendments%20-%20Oil%20%26%20Gas%20Leasing%20and%20Development%20Sequential%20Prioritization.pdf (last visited Oct. 31, 2023).

- Lastly: BLM should only consider leasing in PHMA "after lands outside of GHMAs and PHMAs have been considered, and [expressions of interest] for lands within GHMA have been considered. When considering the PHMA lands for leasing, [BLM] will ensure that a decision to lease those lands would conform to the conservation objectives and provisions in the [greater sage-grouse plan amendments]."

*Id.* § A.

123.    Notably, the challenged leasing decisions did not comply with IM 2016-143, the 2015 ROD, or the prioritization sequence. Instead, pursuant to the Trump administration's energy dominance agenda, following the 2016 election, the Interior Department and BLM rushed to re-write the rules governing oil and gas leasing and development in greater sage-grouse habitat. First, in 2017, the Interior Department replaced IM 2016-143, with a new interpretation of the prioritization sequence that would allow BLM "to move forward expeditiously with new oil and gas leasing and development" in greater sage-grouse management areas. U.S. Dep't of the Interior, Instruction Memorandum No. 2018-26, Implementation of Greater Sage-Grouse Resource Management Plan Revisions or Amendments – Oil & Gas Leasing and Development Prioritization Objective (Dec. 27, 2017) [herein, "IM 2018-26"].[40] Specifically, the new guidance claimed—without record evidence—and—despite the 2015 ROD remaining unchanged and in effect at that time—that:

BLM does not need to lease and develop outside of [greater sage-grouse] habitat management areas before considering any leasing and development within [greater sage-grouse] habitat.

*Id.* at 2.

---

[40] Available at https://wgfd.wyo.gov/WGFD/media/content/PDF/Habitat/Sage%20Grouse/Oil_and_Gas_Prioritization_IM_2018-26.pdf (last visited Oct. 31, 2023).

124.     In 2019, BLM finalized new RMP amendments for greater sage-grouse, replacing the 2015 ROD. *See generally* Bureau of Land Mgmt., Record of Decision and Approved Utah Greater Sage-Grouse Resource Management Plan Amendment (March 2019) ("2019 ROD").[41] Among other changes, the 2019 ROD eliminated all GHMAs and SFAs, added "exceptions" to the restrictions designed to protect the species, and allowed for "disturbance/density cap exceedances" in greater sage-grouse habitat. *See id.* at 3-4.

125.     The 2019 ROD and IM 2018-26 were subsequently held to be unlawful and vacated and/or enjoined by federal courts.

### ii.     The March 2019 Lease Sale

126.     BLM sold the leases at issue in this lawsuit subject to the Trump-era greater sage-grouse plan revisions and guidance. As shown on the following map, nearly all of the March 2019 leases are in GHMA or PHMA, as designated in the 2015 ROD.

---

[41] Available at https://eplanning.blm.gov/public_projects/lup/103346/168792/205436/2019_ROD_and_Utah_Approved_GRSG_RMPA_FINAL_03-14-2019.pdf (last visited Oct. 31, 2023).



Greater Sage-Grouse Management Areas

127.    The March 2019 EA explained that 95 of the 96 parcels analyzed therein were located within greater sage-grouse PHMA and/or GHMA.[42] *See* EA at 30. It also made clear that BLM did not follow the prioritization sequence required by the 2015 ROD and IM 2016-143. For example, the EA states that BLM's leasing decision was "in conformance with the minerals decisions of the [2015 ROD], *except those decisions that were amended by the 2019 [ROD]*"— that is, the prioritization requirement. *Id.* at 8 (emphasis added). Further, the EA clarified that "[i]n keeping with the guidance in . . . [IM 2018-26], the process ensured that *no parcels, that contained or were affected by [greater sage-grouse] habitat, were excluded from consideration.*" *Id.*, App. G at *2 (emphasis added).[43]

128.    Additionally, the March 2019 EA tiered to and otherwise incorporated the analysis in the final EIS for the 2019 ROD. *See* EA at 8; *id.*, App. G at 2. BLM issued the leases subject to the 2019 ROD stipulations and notices, not those found in the 2015 ROD. *See* EA at 8 ("The Proposed Action is in conformance with the minerals decisions of the [2019 ROD] . . . Under the Proposed Action, parcels to be offered would be leased subject to stipulations prescribed by the [2019 ROD].").

129.    But, critically, IM 2018-26 and the 2019 ROD were unlawful and subsequently vacated and/or enjoined by federal courts. *See W. Watersheds Project v. Schneider*, 417 F. Supp. 3d 1319 (D. Idaho 2019) (enjoining BLM from implementing the 2019 ROD); *Mont. Wildlife*

---

[42] Exhibit 1 to this complaint lists 83 leases for the March 2019 sale, not 96. This is because 13 of the March 2019 leases either did not sell at the lease auction or did sell and were issued but then terminated by operation of law when the respective lessee failed to pay its annual lease rentals.

[43] Appendix G to the March 2019 EA is available at https://eplanning.blm.gov/public_projects/nepa/117406/20002918/250003472/VFO_Appendix_G_Greater_Sage_Grouse_Prioritization_Process_FINAL.pdf (last visited Oct. 31, 2023).

*Fed'r v. Bernhardt*, 2020 WL 2615631 (D. Mont. May 22, 2020) (vacating IM 2018-26 and certain lease sales and leases that were conducted and issued pursuant to that IM).

130.    Because the March 2019 leases were sold pursuant to the 2019 ROD and IM 2018-26, they were issued subject to the stipulations and notices required therein, which were significantly less protective compared to those that would have been required by the 2015 ROD and IM 2016-143 (assuming the leases would have been offered for sale in the first place). *See W. Watersheds Project*, 417 F. Supp. 3d at 1333 ("the 2019 [ROD] contained substantial reductions in protections for the sage grouse (compared to the 2015 [ROD])"); *Mont. Wildlife Fed'r*, 2020 WL 2615631, at *6 ("The differences between [IM 2016-143] and [2018-26] [are] significant").

131.    Thus, the March 2019 EA followed Interior Department guidance and procedures that were quickly held to be unlawful.

132.    BLM subsequently recognized that it cannot justify a leasing decision that relied on the 2019 ROD and IM 2018-26. *See* Bureau of Land Mgmt., September 2019 Utah Oil and Gas Competitive Lease Sale, DOI-BLM-UT-0000-2019-0003-OTHER_NEPA (citing the *Western Watersheds Project* decision and stating: "Therefore, the issuance of the leases would not be lawful" and, as a result, "the BLM rejected the bids for the 21 leases within [greater sage-grouse habitat].");[44] *see also Mont. Wildlife Fed'r*, 2020 WL 2615631, at *11 (holding that because BLM relied on IM 2018-26, "the errors here occurred at the beginning of the oil and gas lease sale process, infecting everything that followed.").

---

[44] Available at https://eplanning.blm.gov/eplanning-ui/project/121035/510 (last visited Oct. 31, 2023).

133.     In addition, the March 2019 EA also failed to analyze and disclose the direct, indirect, and cumulative impacts of selling leases for development in PHMA and GHMA. Instead, similar to the problems discussed above for water resources, LWC, and beardtongue, BLM recognized that there were *foreseeable* wells and surface disturbance in PHMA and GHMA, but did not calculate that disturbance and/or analyze their impacts or significance including, but not limited to, whether the applicable surface disturbance thresholds and buffers would be exceeded.

134.     For example, as noted above, 95 of the 96 parcels offered at the March 2019 sale were in greater sage-grouse habitat, including PHMA and GHMA. BLM estimated 400 *foreseeable* wells would be drilled on the parcels, resulting in more than 1,900 acres of *foreseeable* surface disturbance. *See* March 2019 EA at 55, App. F § 2 (estimating 1,907 acres of foreseeable disturbance). But, BLM's "analysis" stopped there.

135.     BLM did not explain the significance of selling leases that would cause more than 1,900 acres of foreseeable disturbance, but instead asserted baldly that, "it is unlikely that all 1,907 acres of assumed disturbance would be within [greater sage-grouse] habitat." March 2019 EA at 55. Likewise, BLM's cumulative impacts "analysis" is merely a statement regarding the percentage of currently leased PHMA and never mentions or discusses GHMA (because the 2019 ROD had eliminated all GHMA).

## FIRST CAUSE OF ACTION

*NEPA Violation: Failure to Take a Hard Look at the Indirect Effects of GHG Emissions*

136.     SUWA incorporates by reference all preceding paragraphs.

137.    NEPA requires federal agencies' environmental analyses to consider "*any* adverse environmental effects which cannot be avoided." 42 U.S.C. § 4332(2)(C)(ii) (emphasis added). Federal agencies must "identify and develop methods and procedures … which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations." *Id.* § 4332(2)(B).

138.    NEPA requires federal agencies, to take a "hard look" at the indirect impacts of proposed major federal actions. 42 U.S.C. § 4332(C)(i)-(ii); 40 C.F.R. § 1508.25(c)(2). Federal regulations define impacts or effects under NEPA to include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health. 40 C.F.R. § 1508.8.

139.    Indirect impacts are "caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable." *Id.* § 1508.8(b).

140.    Consistent with the Trump-era energy dominance agenda, Federal Defendants touted the purported economic benefits of selling the challenged leases for development. However, they declined to use any method to quantify the climate change impacts of GHG emissions from the extraction and combustion of oil and gas from the leases, thereby effectively estimating these impacts at zero.

141.    This failure by Federal Defendants to take a "hard look" at the indirect impacts, including socioeconomic and environmental costs, of GHG emissions resulting from additional oil and gas development violated NEPA and its implementing regulations. 42 U.S.C. § 4332(2); 40 C.F.R. § 1508.25(c)(2). Federal Defendants' decisions were thus "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law" under the APA, 5 U.S.C. § 706(2)(A).

## SECOND CAUSE OF ACTION

*NEPA Violation: Failure to Analyze a Reasonable Range of Alternatives*

142.    SUWA incorporates by reference all preceding paragraphs.

143.    Pursuant to NEPA, Federal Defendants must analyze a range of reasonable alternatives in EAs. 42 U.S.C. §§ 4332(2)(C)(iii), (E); 40 C.F.R. § 1508.9(b). An alternative is reasonable if it meets two criteria: (1) it falls within the agency's statutory mandate; (2) it satisfies the agency's stated purpose and need for the proposed action. *See, e.g.*, *High Country Conserv. Advocates v. U.S. Forest Serv.*, 951 F.3d 1217, 1224 (10th Cir. 2020); *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 709 (10th Cir. 2009).

144.    The federal laws governing BLM's oil and gas leasing on public lands contain broad statutory mandates, including those found in the Mineral Leasing Act of 1920 and the Federal Land Policy and Management Act of 1976. Consistent with those statutes, in each challenged leasing decision BLM established an exceedingly broad purpose and need for the proposed action—that is, to "respond" to expressions of interest to lease parcels for oil and gas development.

145.    For each challenged leasing decision, SUWA proposed middle-ground alternatives that fell within the Federal Defendants' broad statutory mandates and would have satisfied the stated purpose and need for the proposed action.

146.    Nonetheless, Federal Defendants rejected SUWA's middle-ground alternatives and analyzed just the polar opposite alternatives: the proposed action (lease everything) and the

no-action (lease nothing) alternatives. BLM did so because, according to the agency, these two extremes encompassed any decision BLM was empowered to make, including leasing some parcels but not others.

147.    This exact rationale has been rejected by this Court as unlawful because it "confuses the power to act with the requirement to analyze." *Rocky Mountain Wild*, 506 F. Supp. 3d at 1186. "Simply stating that [BLM] has the power to choose to lease fewer than all of the parcels under consideration is not analysis." *Id.* Rather, "BLM is required to analyze all reasonable alternatives to the proposed action, which includes those alternatives that are significantly distinguishable from the [polar opposite alternatives of leasing everything and lease nothing]." *Id.* (internal alterations and citations omitted).

148.    Federal Defendants' failure to analyze a reasonable range of alternatives, including the middle-ground alternatives recommended by SUWA, violated NEPA and its implementing regulations. 42 U.S.C. § 4332(2)(C)(iii), (E); 40 C.F.R. § 1508.9(b). BLM's decisions were therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA. 5 U.S.C. § 706(2)(A).

## THIRD CAUSE OF ACTION

*NEPA Violation: Failure to Analyze and Disclose Direct, Indirect, and Cumulative Impacts*

149.    SUWA incorporates by reference all preceding paragraphs.

150.    NEPA requires federal agencies to take a "hard look" at all foreseeable potential direct, indirect, and cumulative impacts before committing "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(v); *see also* 40 C.F.R. §§ 1508.9, 1508.25.

151.    In the oil and gas leasing context, an irreversible and irretrievable commitment of resources occurs at the point of lease issuance. *N.M. ex rel. Richardson*, 565 F.3d at 718. "Because BLM could not prevent the impacts resulting from surface use after a lease issued, it was required to analyze any *foreseeable* impacts of such use before committing the resource." *Id.* (emphasis added). *See also* Bureau of Land Mgmt., H-1624-1 – Planning for Fluid Mineral Resources (P), § I.2, pg. I-2 (Feb. 20, 2018) ("By law, these impacts must be analyzed before the agency makes an irreversible commitment. In the fluid minerals program, this commitment occurs at the point of lease issuance.").[45]

152.    The challenged leasing decisions did not analyze the direct and indirect impacts of selling parcels for development to water resources, including the White River, LWCs, Graham's and White River beardtongue, and greater sage-grouse, among other resources. Instead, at most, BLM scattered bits of data throughout the relevant EAs and left it to the public to piece everything together, even though the impacts were calculable and foreseeable. Additionally, BLM deferred its analysis of these foreseeable impacts to the drilling stage—past the point of irreversible commitment of resource.

153.    The challenged leasing decisions also did not analyze and disclose cumulative impacts to these resource values. Specifically, the decisions and supporting analysis did not identify:

- The area in which the effects of the proposed project will be felt.

- The impacts that are expected in that area from the proposed project.

---

[45] Handbook available at https://www.blm.gov/sites/blm.gov/files/H-1624-1%20rel%201-1791.pdf (last visited Oct. 31, 2023).

- Other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area.

- The impacts or expected impacts from these other actions.

- The overall impact that can be expected if the individual impacts are allowed to accumulate.

*See San Juan Citizens All. v. Stiles*, 654 F.3d at 1056 (requiring consideration of these five factors for a meaningful cumulative impact analysis).

154.    Instead, as detailed above, the EAs left the task of calculating foreseeable cumulative impacts and extrapolating that data to the public and, at most, provided only cursory percentages regarding the amount of leased lands in a particular resource (*e.g.*, LWC, White River Natural Area, beardtongue habitat, greater sage-grouse). For other resources (*e.g.*, water resources,), BLM did not analyze or disclose their impacts because—without providing supporting data or record evidence—the agency concluded that the resource value was "present, but not affected to a degree that detailed analysis is required."

155.    Federal Defendants' failure to analyze and disclose the direct, indirect, and cumulative impacts of its leasing decisions violated NEPA and its implementing regulations. 42 U.S.C. § 4332(2)(C)(v); 40 C.F.R. §§ 1508.7, 1508.8(a), (b). BLM's decisions were therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA. 5 U.S.C. § 706(2)(A).

## **PRAYER FOR RELIEF**

SUWA respectfully requests that this Court enter judgment in SUWA's favor and against the Federal Defendants and provide the following relief:

1. Declare that Federal Defendants violated NEPA and acted arbitrarily, capriciously, and contrary to law by issuing the leasing decisions at issue in this litigation.

2. Declare unlawful and vacate the leasing decisions and accompanying NEPA analyses and documents at issue in this litigation.[46]

3. Set aside and vacate all 145 leases at issue that were offered, sold, and/or issued at the aforementioned sales.[47]

4. Enjoin Federal Defendants from approving or otherwise acting on any applications for permit to drill on any of the leases that are subject to this litigation until Defendants have fully complied with NEPA and its implementing regulations.

5. Retain continuing jurisdiction over this matter until Federal Defendants fully remedy the violations of law complained of herein, in particular to ensure that Defendants take a hard look at the direct, indirect, and cumulative impacts of leasing, and middle-ground alternatives thereto.

6. Award SUWA the costs it has incurred in pursuing this action, including attorneys' fees, as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and other applicable provisions. And,

7. Provide such other relief as the Court deems just and proper.

Respectfully submitted this 3rd day of November, 2023.

/s/ Landon Newell
Landon Newell
Hanna Larsen
Attorneys for Plaintiff
Southern Utah Wilderness Alliance

---

[46] The challenged decisions are listed in Exhibit 2.
[47] The challenged leases are listed in Exhibit 1.