Stephen H.M. Bloch (UT #7813)
Landon Newell (UT #14738)
Hanna Larsen (UT #18458)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
(801) 486-3161
steve@suwa.org
landon@suwa.org
hanna@suwa.org

*Attorneys for Plaintiff*
*Southern Utah Wilderness Alliance*

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| **SOUTHERN UTAH WILDERNESS ALLIANCE**,<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF THE INTERIOR** *et al.*,<br><br>Defendants,<br><br>and,<br><br>**ANSCHUTZ EXPLORATION CORPORATION** and **STATE OF UTAH**,<br><br>Intervenor-Defendants. | **RESPONSE TO INTERVENOR-DEFENDANTS' MOTIONS TO DISMISS (ECF NOS. 42, 45)**<br><br>Case No. 2:23-cv-00804-TC-DBP<br><br>Judge Tena Campbell<br>Chief Magistrate Judge Dustin B. Pead |

Defendant-Intervenor Anschutz Exploration Corporation ("AEC") has moved to dismiss this litigation under Federal Rule of Civil Procedure 12(b)(1) on the grounds that this case is not ripe for judicial review and that Plaintiff Southern Utah Wilderness Alliance ("SUWA") has not

established standing.[1] *See* Mot. to Dismiss at 2 (ECF No. 42). Specifically, AEC alleges that (1) there is no final agency action to review, and (2) SUWA "has not alleged facts showing that its members will suffer concrete and particularized injuries from oil-and-gas development involving the challenged leases." *Id.* These arguments lack merit.

*First*, this case is ripe for judicial review because the challenged leasing decisions are final agency actions and both AEC and the Bureau of Land Management ("BLM") are treating them as such. *Second*, as detailed in the Declaration of Ray Bloxham (attached as Ex. 1), SUWA has standing to bring this action on behalf of itself and its members.

AEC's motion should be denied.

## BACKGROUND

This case challenges four decisions by BLM to offer, sell, and issue oil and gas leases in eastern Utah without fully and adequately analyzing the environmental and public health impacts of those decisions. Amend. Compl. ¶ 1, Ex. 2 (ECF Nos. 16, 16-2). SUWA is challenging these decisions pursuant to the National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), and the Administrative Procedures Act ("APA"). *See* Amend. Compl. ¶¶ 158-190.

The lease sales at issue in this case (along with many others) were also challenged in *WildEarth Guardians v. Haaland*, 1:20-cv-0056-RC (D.D.C.). There, the plaintiffs alleged BLM failed to take a sufficiently hard look at greenhouse gas ("GHG") emissions and climate change when deciding to issue the leases. *See generally*, Complaint, *WildEarth Guardians v. Haaland*,

---

[1] Defendant-Intervenor State of Utah also filed a Motion to Dismiss. *See generally* Utah Mot. to Dismiss (ECF No. 45). However, because its Motion simply "joins with AEC in asserting that the court should dismiss this case for lack of subject matter jurisdiction," and does not raise its own arguments, all further references and citations to a "Motion to Dismiss" refer to AEC's Motion. *See* Utah Mot. to Dismiss at 2.

2

1:20-cv-0056-RC (D.D.C. Jan. 9, 2020) (ECF No. 1). That case, along with two others, was resolved via settlement agreement wherein BLM agreed to "conduct additional NEPA analysis for the…leasing decisions challenged" and ultimately "issue one or more decisions." Stipulated Settlement Agreement at 3, *WildEarth Guardians v. Haaland*, No. 1:21-cv-00175-RC (D.D.C. Mar. 4, 2022) (ECF No. 71-1) ("WEG Settlement") (attached as Ex. 2). That NEPA analysis is currently in progress. *See generally*, Bureau of Land Mgmt., *Supplemental Environmental Assessment Analysis for Greenhouse Gas Emissions Related to Oil and Gas Leasing in Seven States from February 2015 to December 2020*, DOI-BLM-HQ-3100-2023-0001-EA, ePlanning (last updated Jan. 3, 2023) ("7-State GHG EA").[2]

Importantly, the leasing decisions at issue in the *WildEarth Guardians* cases <u>remain in effect</u> while BLM conducts the supplementary NEPA analysis. *See* WEG Settlement at 3. This means that the leases and leasing decisions at issue in this case remain valid and BLM is in fact actively processing applications for permits to drill ("APDs") on those leases both in Utah and across the West.

## ARGUMENT

### I.     This Case is Ripe for Judicial Review

Whether a case is ripe for judicial review turns on two factors: "(1) the fitness of the issue for judicial review, and (2) the hardship to the parties of withholding judicial review." *United States v. Cabral*, 926 F.3d 687, 693 (10th Cir. 2019) (citing *Abbott Labs. v. Gardner*, 387 U.S.

---

[2] Project page available at: https://eplanning.blm.gov/eplanning-ui/project/2022218/510 (last visited Oct. 17, 2024).

3

136, 148-49 (1967)) (internal quotation marks omitted). In examining these factors, particularly in the APA context, the court may also consider:

> (1) whether the issues in the case are purely legal; (2) whether the agency action involved is "final agency action" within the meaning of the [APA]; (3) whether the action has or will have a direct and immediate impact upon the plaintiff and (4) whether the resolution of the issues will promote effective enforcement and administration by the agency.

*S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1158 (10th Cir. 2013) (quoting *Coal. for Sustainable Res., Inc. v. U.S. Forest Serv.*, 259 F.3d 1244, 1250 (10th Cir. 2001)). AEC's Motion to Dismiss focuses on the second of these supplemental factors – whether the agency action at issue here is "final agency action."[3] *See* Mot. to Dismiss at 5-6.

The APA only allows judicial review for "final agency action[s]" and actions "made reviewable by statute." 5 U.S.C. § 704. An agency's action is final if two requirements are met: "[f]irst, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by

---

[3] AEC's Motion does not mention the other three supplemental factors. *See* Mot. to Dismiss at 5-6. Nonetheless, they all weigh in SUWA's favor. *First*, the issues presented in this case are purely legal because judicial review of the merits is governed by the APA and limited to the evidence contained in the administrative record. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994). *Second*, SUWA has been and will continue be directly and immediately impacted because AEC has been submitting APDs on its leases at issue in this litigation and BLM is actively processing those APDs which, once approved, will result in environmental impacts. *See e.g.*, *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 718-19 (10th Cir. 2009); (holding that plaintiffs were harmed by BLM's failure to conduct NEPA analysis at the leasing stage); *see also* § II, *infra*. *Third*, resolution of the issues in this case will promote effective enforcement and administration of BLM's legal obligations. Given the strength of SUWA's claims (which differ from those resolved by the WEG Settlement), it is possible, and indeed likely, the Court will find the leasing decisions violate the law for reasons other than BLM's flawed GHG analysis.

which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

Here, the leasing decisions clearly meet both prongs of the *Bennett v. Spear* test.

### A. The leasing decisions mark the consummation of BLM's decisionmaking processes

The consummation of the decisionmaking process occurs when "the <u>initial decisionmaker</u> has arrived at a definitive position on the issue that inflicts an actual, concrete injury." *Farrell-Cooper Mining Co. v. United States Dep't of the Interior*, 864 F.3d 1105, 1114 (10th Cir. 2017) (citation omitted) (emphasis in original). In the case of oil and gas leasing, courts, including the Tenth Circuit, have been clear that "issuing an oil and gas lease without a [no-surface occupancy] stipulation constitutes a[n] [irretrievable commitment of resources]." *N.M. ex rel. Richardson*, 565 F.3d at 718 (citation omitted). Thus, a lease sale decision record ("lease sale DR") represents BLM's definitive position regarding whether to issue oil and gas leases for specific parcels and consummates BLM's decisionmaking process at the leasing stage.[4]

#### i. By processing APDs, BLM is treating the leasing decisions as final

The law is clear that issuing oil and gas leases constitutes an "irretrievable commitment of resources." *N.M. ex rel. Richardson*, 565 F.3d at 718. In this case (and unlike the cases relied upon in AEC's Motion to Dismiss), final, formal leasing decisions have been issued and BLM is

---

[4] BLM manages oil and gas development on federal lands in three stages: "[f]irst, BLM develops an area-wide resource management plan, specifying what areas will be open to development and the conditions placed on such development. Second, BLM may grant leases for the development of specific sites within an area, subject to the requirements of the plan. Finally, after exploring the leased lands, a lessee may file an application for permit to drill ("APD"), which requires BLM review and approval." *N.M. ex rel. Richardson*, 565 F.3d at 689 n.1.

actively working to approve APDs on several of AEC's leases. As explained above, the WEG Settlement did not vacate, set aside, or otherwise invalidate the lease sale DRs and thus, the decisions remain in effect. WEG Settlement at 3. Consequently, BLM retains full authority to approve any APDs submitted for any of the leases in the *WildEarth Guardians* litigation. *Id.*[5] And BLM has indeed done so.

As of the date of this filing, there are fourteen pending APDs on leases at issue in this case, <u>all of which were submitted by AEC</u>.[6] *See* Bureau of Land Mgmt., *APDs under Litigation*, https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/operations-and-production/permitting/apds-under-litigation (select tab for "Utah: Vernal Field Office") (last visited Oct. 17, 2024) (screenshot attached as Ex. 3). BLM has also recently <u>approved</u> ten APDs on Utah leases in the broader *WildEarth Guardians* litigation that are not at issue here,[7] further demonstrating that BLM retains its authority to not only consider submitted APDs, but also approve them.[8] *Id.* (select tabs for "Utah: Price Field Office," and "Utah: Vernal Field Office").

---

[5] The WEG Settlement requires that BLM post notice of any such APDs on the following website: https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/operations-and-production/permitting/apds-under-litigation.

[6] AEC's 14 APDs were submitted on the following five leases: UTU-093656, UTU-093659, UTU-093668, UTU-09669, UTU-093725.

[7] UTU-091068, UTU-091342, UTU-093475, UTU-03476, UTU-093479.

[8] BLM's Utah office is not alone in approving APDs on leases subject to the WEG Settlement. For example, BLM's Carlsbad Field Office (New Mexico) has received 462 APDs for leases in the *WildEarth Guardians* litigation and has, to date, approved 47 of them. Bureau of Land Mgmt., *APDs under Litigation*, https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/operations-and-production/permitting/apds-under-litigation (last visited Oct. 17, 2024) (select tab for "New Mexico: Carlsbad Field Office"). Collectively, across all seven states, BLM has approved or is in the process of approving hundreds of APDs on leases subject to the WEG Settlement.

Of the fourteen pending APDs, six are associated with AEC's "Drumlin Well Pad Project," which BLM is actively considering for approval. *See* Bureau of Land Mgmt., *Anschutz Proposes the Drumlin Pad*, ePlanning (last updated Aug. 21, 2024).[9] BLM held a public comment period on the Drumlin Pad project this past summer and SUWA submitted timely comments on that proposal. And while AEC states that its suspension of "operations and production on its challenged leases…remains in effect pending BLM's supplemental [7-state GHG] NEPA analysis," Mot. to Dismiss at 5-6 n.5, that is only half of the story. While AEC's challenged leases were suspended due to the *WildEarth Guardians* litigation and settlement, the Motion to Dismiss leaves out the conditions in which the individual lease suspensions expire:

> [t]he individual lease suspensions will expire when <u>one of the following</u> conditions is first met:
>
> 1. The first day of the month following the issuance of a final decision on the supplemental NEPA analysis related to the WildEarth Guardians litigation [*i.e.*, a final decision on the 7-State GHG EA]. Upon lifting of the suspension, the BLM Utah State Office will notify you of the term remaining on the lease.
> 2. The first day of the month <u>following the submission of technically complete APD, a federal well on the subject lease</u> in accordance with 43 CFR 3171.[footnote omitted] Leases without a submitted APD will remain in suspension.
> 3. The authorized officer determines the suspensions would no longer be in the interest of conservation.

Letter from Bureau of Land Mgmt. to Anschutz Exploration Corp., *Decision: Suspension of Operations or Production Granted*, 2 (Aug. 4, 2023) ("Suspension Decision") (attached as Ex. 4) (emphases added).

---

[9] Project page available at: https://eplanning.blm.gov/eplanning-ui/project/2032124/510 (last visited Oct. 17, 2024).

Because AEC has submitted six technically complete APDs for the Drumlin Well Pad Project (thereby enabling BLM to commence its NEPA review of the Project),[10] those leases (UTU-093656 and UTU-093659) are no longer suspended, in accordance with the Suspension Decision. *See* 43 C.F.R. § 3165.1(f) ("Suspensions will lift when the basis provided for the suspension no longer exists, when lifting the suspension is in the public interest, or as otherwise stated by the authorized officer in the approval letter") (emphasis added). Consequently, when BLM completes its NEPA analysis and approves the Drumlin Well Pad Project, AEC will have approved APDs on those leases and will be authorized to begin drilling.

### ii. The Motion to Dismiss relies on inapposite, easily distinguished cases

AEC relies on the inapposite *Los Alamos Study Grp. v. U.S. Dep't of Energy*, 794 F. Supp. 2d 1216 (D.N.M. 2011), as well as the inapplicable *Gordon v. Norton*, 322 F.3d 1213 (10th Cir. 2003) cases to argue that the lease sale DRs are not final because of the pending 7-State GHG EA required by the WEG Settlement. Mot. to Dismiss at 5. Both cases are inapposite and easily distinguishable.

*Los Alamos* involved a challenge to a supplemental analysis that the Department of Energy ("DOE") undertook to determine whether a prior environmental impact statement ("EIS") and record of decision for a project at Los Alamos National Laboratory was still valid, whether it should be supplemented, or whether an entirely new EIS should be prepared in light of new geologic information. 794 F. Supp. 2d at 1221. DOE ultimately determined that it should

---

[10] While an APD cannot be approved until BLM has complied with NEPA, BLM's determination of an APD's completeness is entirely independent of its NEPA analysis and decision. *See* 43 C.F.R. § 3171.4 ("While cultural, biological, or other inventories and environmental assessments (EA) or environmental impact statements (EIS) may be required to approve the APD, they are not required before an APD package is considered to be complete.").

prepare a supplemental EIS. *Id.* Plaintiffs in that case sued over DOE's decision and did so before the supplemental EIS was complete. *Id.* at 1222. The court found that DOE had not "made an irreversible and irretrievable commitment of resources" because design work for the project was ongoing during the preparation of the supplemental EIS, and that "neither a final [supplemental EIS] nor a final approval for construction ha[d] been issued," so there was no final agency action. *Id.* at 1228 (internal quotation marks omitted).

In contrast, here, BLM has unquestionably made an irreversible and irretrievable commitment of resources by finalizing the leasing decisions and issuing leases. *N.M. ex rel. Richardson*, 565 F.3d at 718. Furthermore, there are concrete plans to develop the leases, and, unlike in *Los Alamos*, the project proponents (here, AEC and other lessees) are not prohibited from following through on those plans while the supplemental NEPA analysis for the 7-State GHG EA is pending, nor is BLM inhibited from approving APDs during that timeframe. AEC is obviously well-aware of this fact because it has submitted multiple APDs on leases at issue in both this litigation and the wider *WildEarth Guardians* litigation <u>years</u> after the WEG Settlement was finalized. *See* § I.A.i, *supra.* Because of this, it is reasonable and foreseeable to expect that AEC will have approved APDs and potentially already drilled on the leases at issue here even if the final 7-State GHG EA subsequently invalidates those leases. So, in contrast to *Los Alamos*, the current matter involves an irretrievable commitment of resources that allow AEC (and other lessees) to take reasonable and foreseeable actions that harm SUWA's interests.

AEC also cites *Gordon v. Norton* as an example where an "agency sued under the ESA was 'still in the decision-making process and was continuing to gather information,' so agency action was not final." Mot. to Dismiss at 5. In *Gordon*, the United States Fish and Wildlife

Service ("FWS") was sued pursuant to the ESA over its approach to a series of wolf depredation incidents on a Wyoming ranch. 322 F.3d at 1216. As part of its handling of the depredation incidents, FWS wrote a letter to the ranch owners explaining how FWS intended to manage wolves in and around the ranch, as well as FWS's efforts to minimize depredation of livestock, which plaintiffs later relied on to support their ESA claims *Id.* at 1216, 1220-21. However, the court held that there was no final agency action, and thus no ripe ESA claim, because FWS "ha[d] not yet formally interpreted its regulations pertaining to the control of depredating wolves." *Id.* at 1220. In other words, the FWS letter to the ranch merely "support[ed] FWS' contention that it was still in the decision-making process and was continuing to gather information on wolf activity and depredations." *Id.*

*Gordon* is inapplicable to the current case because there FWS had not made any decision regarding wolf depredation that could be construed as final agency action under the APA. But here, BLM has made final decisions (the lease sale DRs) that are clearly and routinely considered final agency actions both by the agency itself and federal courts. *See, e.g.*, *Palma*, 707 F.3d at 1159; *N.M. ex rel. Richardson*, 565 F.3d at 718; *Bd. of Cnty. Comm'rs of Rocky Mt. Wild v. United States Bureau of Land Mgmt.*, 584 F. Supp. 3d 949, 966-67 (D. Colo. 2022).

\*\*\*

In sum, because the lease sale DRs constitute an "irretrievable commitment of resources" and are still in effect, thereby ensuring BLM retains its authority to approve any APDs submitted on the challenged leases (which are subsequent decisions that inherently rely on the leasing decisions), the lease sale DRs clearly represent the consummation of BLM's decisionmaking process for each of the lease sales. The fact that BLM is conducting a supplemental analysis for

10

GHG impacts from the underlying leases <u>while simultaneously analyzing whether to approve APDs on several of the same leases</u> (and approving APDs on other leases in Utah and across the West) only underscores this conclusion.

> **B.     The lease sale DRs determine rights and obligations subjecting lessees to legal consequences**

It is well-settled that issuing an oil and gas lease meets the second *Bennett* factor because such a lease determines rights (and obligations) for a lessee, as well as serve as an action from which legal consequences will flow. *See* 43 C.F.R. § 3101.12 ("A lessee will have the right to use only so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold subject to applicable requirements, including stipulations attached to the lease…and [other] such reasonable measures…"); *N.M. ex rel. Richardson*, 565 F.3d at 718 (holding that issuing an oil and gas lease constitutes an irretrievable commitment of resources <u>precisely because</u> "[a lessee] cannot be prohibited from surface use of the leased parcel once its lease is final"); *Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d 1285, 1299 (D. Colo. 2007) (finding that BLM's decision to offer leases for sale in a particular area was an action that had legal consequences under the *Bennett* test).

In terms of final agency action and the second *Bennett* factor, the leasing decisions at issue in this lawsuit are no different than those challenged in *New Mexico ex rel. Richardson* and *Wilderness Society v. Wisely*. There, as here, each of BLM's decisions determined the rights and obligations of the lessees (including AEC) and were inherently actions from which legal consequences flow because the lease parcels proposed for sale in those decisions were promptly leased.

For instance, Bissell Oil Operating Company owns leases UTU-93979, UTU-93980, UTU-93981, and UTU-93982 (collectively, "Bissell leases"), which are also at issue in this litigation and are part of the WEG settlement. *See* Bureau of Land Mgmt., Serial Register Pages for leases UTU-93979, UTU-93980, UTU-93981, UTU-93982 (last updated Oct. 17, 2024) (attached as Ex. 5). Unlike AEC, Bissell did not request that its leases be suspended so they remain active. *See id.* (noting that the leases are not suspended); Suspension Decision at 1 (explaining that AEC requested suspensions for its leases). As such, Bissell is required to pay annual rentals (a legal requirement) and if it fails to do so, the lease automatically terminates by operation of law (a legal consequence). 43 C.F.R. 3103.22 ("Rentals must be paid on or before the lease anniversary date…Failure to make the required payment on or before the lease anniversary date will cause a lease to terminate automatically by operation of law").

It is telling that, despite citing the *Bennett* test, AEC's Motion to Dismiss does not even attempt to refute the fact that an oil and gas lease determines the rights and obligations of a lessee and is an action from which legal consequences flow. Mot. to Dismiss at 5. Instead, AEC repeatedly argues without explanation that SUWA's claims cannot be ripe because, according to them, there is no final agency action. *See id.* at 5-6.

Critically, as explained above, the leases remain in effect such that AEC (and other lessees) are able to move forward with developing their leases. That is because the WEG Settlement did not eliminate any of the rights and obligations of the lessees nor did it obviate any legal consequences stemming from the leases. *See generally*, WEG Settlement. Lessees, including AEC, are thus undisturbed in their ability to develop their leases at issue in this case

12

and BLM is actively processing AEC's APD submissions (*e.g.*, the Drumlin Well Pad Project) without waiting for the 7-State GHG EA to be completed.

***

In short, each of the lease sale decisions are final agency actions because both prongs of the *Bennett* test are met: they represent the culmination of BLM's decisionmaking process at the oil and gas leasing stage and they determined and continue to determine the rights and obligations of the lessees. Therefore, SUWA's claims are ripe and this Court has subject-matter jurisdiction to decide this case.

## II. SUWA Has Standing to Bring this Lawsuit

AEC claims that SUWA lacks standing. *See* Mot. to Dismiss at 6-11. This argument also lacks merit. In the Tenth Circuit, when an organization sues on behalf of its members, the organization has standing if:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Diné Citizens Against Ruining Our Env't v. Bernhardt* ("*Diné CARE*"), 923 F.3d 831, 840 (10th Cir. 2019) (citation omitted). Additionally, a member has standing to sue in their own right if:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* (citation omitted).

"When evaluating a plaintiff's standing at the stage of a motion to dismiss on the pleadings, both the trial and reviewing courts must accept as true all material allegations of the

complaint, and must construe the complaint in favor of the complaining party." *Palma*, 707 F.3d at 1152 (citation and internal quotation marks omitted). Courts "also must construe the statements made in the affidavits in the light most favorable to the petitioner." *Id.* (citation omitted).

Here, AEC focuses solely on the first standing prong, arguing that SUWA lacks standing because it has not suffered an "injury-in-fact." Mot. to Dismiss at 7. This is so, AEC claims, because (1) in the <u>future</u> "BLM might modify or cancel the challenged leases based on its supplemental analysis," and (2) SUWA "has not alleged facts showing that its members' predicted injuries from <u>future</u> oil-and-gas development would stem from those members' 'geographic nexus to, or actual use of the site of the agency action.'" *Id.* (citations omitted; emphasis added).

AEC is wrong for two reasons. *First*, a party's Article III standing is established at the time its lawsuit is filed, not some unidentified later date. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.5 (1992) ("standing is to be determined as of the commencement of suit"); *Palma*, 707 F.3d at 1153 ("standing is determined at the time the action is brought . . . and we generally look to when the complaint was filed, not to subsequent events to determine if a plaintiff has standing") (cleaned up).

AEC's argument overlooks this point and instead confuses the doctrine of Article III standing with ripeness.[11] *See Palma*, 707 F.3d at 1157 ("When determining standing, a court asks whether these persons are the proper *parties* to bring the suit . . . [in contrast,] [w]hen determining ripeness, a court asks whether this is the correct *time* for the complainant to bring

---

[11] As discussed above, AEC's ripeness argument also lacks merit.

14

the action." (emphases in original)). Nonetheless, SUWA is the proper party to bring this lawsuit because the issuance of the challenged leases "constitute[d] an irretrievable commitment of resources" that increased the risk of environmental harm to SUWA's and its members' interests. *N.M. ex rel. Richardson*, 565 F.3d at 718; *see also Palma*, 707 F.3d at 1159 (holding that "[f]ederal courts have repeatedly considered the act of issuing a lease to be final agency action which may be challenged in court" and collecting cases).

*Second*, the "injury in fact" prong of Article III standing requires SUWA to demonstrate harm that is (1) concrete and particularized, and (2) actual or imminent, not conjectural or hypothetical. *Diné CARE*, 923 F.3d at 840 (citation omitted). The Court's review of this standing prong "breaks down into two parts." *Id.* (citation omitted).

> Appellants must show that (1) "in making its decision without following [NEPA's] procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm," and (2) "the increased risk of environmental harm injures [the litigant's] concrete interests by demonstrating either its geographical nexus to, or actual use of the site of the agency action."

*Id.* "As a general rule . . . environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Palma*, 707 F.3d at 1155 (cleaned up). "[I]f that harm . . . affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice." *Id.* (citation omitted). Thus, at this stage of litigation, a party can satisfy these factors through an "affidavit or other evidence specific facts" and the statements contained therein "will be taken to be true." *Lujan*, 504 U.S. at 561.

As such, SUWA provides the declaration of Mr. Ray Bloxham to confirm the organization's standing. Mr. Bloxham is SUWA's Field Director and also an active member of

SUWA. *See generally* Bloxham Decl. As set forth in Mr. Bloxham's declaration, among other facts:

- For more than two decades, Mr. Bloxham has worked to protect the public lands encompassed by the challenged leases;

- Mr. Bloxham has visited and/or seen each of the challenged leases including, but not limited to, hiking and camping throughout the southern Uinta Basin (where the majority of the challenged leases are located), and rafting the Green River and White River which pass adjacent to or near the many of the challenged leases;

- The issuance of the leases increased the risk of environmental harm and continues to harm Mr. Bloxham's personal, aesthetic, recreational, and professional interests;

- Within the next year, Mr. Bloxham plans to return to the public lands encompassed by the challenged leases; and

- A decision by the Court to set aside BLM's decisions and vacate the challenged leases would remedy Mr. Bloxham's harms.

*See id.* ¶¶ 8-30.

Courts have routinely found similar allegations of harm to be sufficient to establish standing. *See Palma*, 707 F.3d at 1156 ("A plaintiff who has repeatedly visited a particular site, has imminent plans to do so again, and whose interests are harmed by a defendant's conduct has suffered injury in fact that is concrete and particularized"); *Diné CARE*, 923 F.3d at 840-44 (discussing numerous standing declarations containing similar statements to those made here by Mr. Bloxham and concluding that the plaintiffs had standing. The court explicitly noted that plaintiffs need not have visited every single lease/APD location to sufficiently demonstrate standing).

Finally, Mr. Bloxham's declaration likewise satisfies the second and third prongs of the standing test: there is a casual connection between Mr. Bloxham's injury and BLM's decision to issue the challenged leases for development, and it is likely that a favorable decision by the Court to set aside BLM's leasing decisions would redress his injury. *See* Bloxham Decl. ¶¶ 25-30. In a footnote, AEC claims that SUWA does not meet these elements because BLM has not completed the 7-State GHG EA which, according to AEC, means there is no causation or potential for redressability. *See* Mot. to Dismiss at 9, n.8. Again, this confuses the doctrines of ripeness with Article III standing.

To establish causation, SUWA "need only trace the risk of harm to the agency's alleged failure to follow NEPA's procedures." *Diné CARE*, 923 F.3d at 843 (cleaned up). Here, SUWA has alleged that BLM issued in the challenged decisions in violation of NEPA, and that SUWA and its members were and continue to be harmed by BLM's uninformed decisionmaking. *See* Amend. Compl. ¶¶ 158-190; Bloxham Decl. ¶¶ 25-30. "This is sufficient to establish causation." *Diné CARE*, 923 F.3d at 844.

Similarly, to establish redressability, "[u]nder NEPA, a plaintiff need not establish that the ultimate agency decision would change upon NEPA compliance. Rather, the plaintiff must only show that its injury would be redressed by a favorable decision requiring compliance with NEPA procedures." *Id.* (cleaned up). SUWA has done so here. *See* Bloxham Decl. ¶¶ 25-30. SUWA is challenging BLM's irretrievable commitment of resources—that is, its decisions to offer, sell, and issue the challenged leases. BLM has never rescinded those decisions. To the contrary, as explained above, BLM continues to maintain that the leasing decisions and leases

remain valid. Consequently, AEC has submitted APDs to develop several of the leases and BLM is actively preparing the NEPA analysis to authorize that development.

If the Court sets aside BLM's leasing decisions as contrary to law, the leases could no longer be developed including those that are subject to already filed APDs. SUWA therefore has established redressability. *See Diné CARE*, 923 F.3d at 844 (holding that plaintiffs had established redressability because "[a] favorable decision ordering compliance with NEPA's procedures would 'avert the possibility that the [BLM] may have overlooked significant environmental consequences of its actions,' thereby redressing Appellants' alleged harms.") (citation omitted).

For these reasons, SUWA clearly has standing to bring this lawsuit and AEC's arguments to the contrary lack merit.

## CONCLUSION

In sum and based on the foregoing, it is clear that (1) SUWA's claims are ripe for judicial review because each of the challenged decisions are final agency actions and (2) SUWA has standing to bring this litigation. The Court should deny AEC and the State of Utah's Motions to Dismiss.

Respectfully submitted October 18, 2024.

                                             */s/ Hanna Larsen*
                                             Hanna Larsen
                                             Stephen H.M. Bloch
                                             Landon Newell

                                             *Attorneys for Plaintiff Southern Utah*
                                             *Wilderness Alliance*