*Southern Utah Wilderness Alliance v. U.S. Department of the Interior*
Case No. 2:23-cv-00804-TC-DBP

**Exhibit 1** to SUWA's Response to Defendant-Intervenors'
Motions to Dismiss

Declaration of Ray Bloxham

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| **SOUTHERN UTAH WILDERNESS ALLIANCE**, <br><br> Plaintiff, <br><br> v. <br><br> **UNITED STATES DEPARTMENT OF THE INTERIOR** *et al.*, <br><br> Defendants, <br><br> and, <br><br> **ANSCHUTZ EXPLORATION CORPORATION** and **STATE OF UTAH**, <br><br> Intervenor-Defendants. | **DECLARATION OF RAY BLOXHAM** <br><br> Case No. 2:23-cv-00804-TC-DBP <br><br> Judge Tena Campbell <br> Chief Magistrate Judge Dustin B. Pead |

I, **RAY BLOXHAM**, declare as follows:

1.      I am the Field Director for the Southern Utah Wilderness Alliance ("SUWA") and have served in this position since 1999. This position requires that I spend considerable time on-the-ground visiting public lands in Utah.

2.      I am an active member of SUWA and have been a member since 1999.

3.      SUWA based in Salt Lake City, Utah, has more than 11,000 members, many of whom reside in Utah. SUWA's mission is the preservation of the outstanding wilderness and other sensitive public lands and resources at the heart of the Colorado Plateau, and the management of these lands in their natural state for the benefit of all Americans. SUWA

promotes local and national recognition of the region's unique character through research and public education; supports both administrative and legislative initiatives to permanently protect Utah's wild places within the National Park and National Wilderness Preservation System or by other protective designations where appropriate; builds support for such initiatives on both the local and national levels; and provides leadership within the conservation movement through uncompromising advocacy for wilderness preservation.

4.     SUWA members and staff have a well-demonstrated interest in the preservation and protection of Utah's remarkable Bureau of Land Management ("BLM")-managed public lands and resources, as well as in the BLM's compliance with federal laws and regulations. SUWA members and staff benefit from BLM's compliance with federal laws and agency regulations. They expect that BLM will comply with all federal laws and agency regulations. SUWA has taken an active role in providing critical information to the BLM regarding the agency's day-to-day management activities, including oil and gas leasing and development.

5.     SUWA members and staff participate in information gathering and dissemination, education and public outreach, commenting on proposed government actions and other activities relating to the management of and impacts to BLM-managed lands and resources, including those at issue here.

6.     SUWA members and staff use and enjoy the public lands at issue in the above-captioned matter. SUWA members and staff also use and enjoy the immediately adjacent lands and lands in the larger region. SUWA members and staff use and enjoy these lands for numerous activities including, but not limited to, hiking, wildlife viewing, solitude, and aesthetic

appreciation. They also use and enjoy the immediately adjacent lands and lands in the larger region for similar activities and reasons.

7.     SUWA members and staff's recreational, aesthetic, health and other interests are directly affected and harmed by BLM's decision in the above-captioned matter.

8.     I use and enjoy the public lands and natural resources on BLM-managed lands for many purposes including health, recreational, and aesthetic, and have used and enjoyed for these same purposes the public lands at issue in the above-captioned matter as well as lands adjacent thereto. I take great pleasure from my visits to these areas and intend to return as often as possible, but certainly within the next year.

9.     For more than two decades, I have visited, recreated on and worked to protect the BLM-managed lands encompassed by the challenged leases. For example, as part of the BLM's Vernal Field Office Resource Management Plan ("Vernal RMP") planning process in the early 2000s, I conducted on-the-ground wilderness characteristics inventories for the Bitter Creek,[1]

---

[1] The Bitter Creek lands with wilderness characteristics ("LWC") area encompasses, is near, or provides views of, at a minimum, the following leases at issue in this lawsuit: UTU-93664; UTU-93665; UTU-93666; UTU-93671; UTU-93672; UTU-93673; UTU-93674; UTU-93675; UTU-93676; UTU-93677; UTU-93678; UTU-93679; UTU-93696; UTU-93697; UTU-93740; UTU-93911; UTU-93923; UTU-93924; UTU-93965.

Dragon Canyon,[2] Lower Bitter Creek,[3] Seep Canyon,[4] Sunday School Canyon,[5] Sweet Water,[6] White River,[7] and Wolf Point[8] areas—areas impacted by BLM's leasing decisions at issue here. During these inventories, I documented the wilderness characteristics in each area including, but not limited to, its naturalness (*i.e.*, lack of existing development, infrastructure) outstanding solitude and opportunities for primitive types of recreation (*e.g.*, hiking, camping).

10.     SUWA and I provided this information to BLM as part of the Vernal RMP planning process. BLM subsequently confirmed that many of these areas possess wilderness characteristics. And, I have subsequently revisited each area on several occasions since the Vernal RMP planning process was completed in 2008.

11.     In 2014-2015, I re-inventoried many of these same areas to again document or

---

[2] The Dragon Canyon LWC area encompasses, is near, or provides views of, at a minimum, the following leases at issue in this lawsuit: UTU-93669; UTU-93670; UTU-93674; UTU-93687; UTU-93688; UTU-93689; UTU-93690; UTU-93692; UTU-93693; UTU-93940.

[3] The Lower Bitter Creek LWC area encompasses, is near, or provides views of, at a minimum, the following leases at issue in this lawsuit: UTU-93651; UTU-93661; UTU-93662; UTU-93663; UTU-93664; UTU-93718; UTU-93725; UTU-93899; UTU-93900; UTU-93901; UTU-93902; UTU-93903; UTU-93904; UTU-93906; UTU-93910; UTU-93957.

[4] The Seep Canyon LWC area encompasses, is near, or provides views of, at a minimum, the following leases at issue in this lawsuit: UTU-93666; UTU-93681; UTU-93908; UTU-93909; UTU-93911; UTU-93912; UTU-93913; UTU-93923; UTU-93959; UTU-93966.

[5] The Sunday School Canyon LWC area encompasses, is near, or provides views of, at a minimum, the following leases at issue in this lawsuit: UTU-93647; UTU-93648; UTU-93652; UTU-93653; UTU-93893; UTU-93894; UTU-93895; UTU-93902; UTU-93903; UTU-93904; UTU-93905; UTU-93906; UTU-93907; UTU-93908; UTU-93909.

[6] The Sweet Water LWC area encompasses, is near, or provides views of, at a minimum, the following leases at issue in this lawsuit: UTU-93923; UTU-93924; UTU-93965; UTU-93966.

[7] The White River LWC area encompasses, is near, or provides views of, at a minimum, the following leases at issue in this lawsuit: UTU-93656; UTU-93657; UTU-93658; UTU-93659; UTU-93660; UTU-93668; UTU-93694; UTU-93695; UTU-93919; UTU-93920; UTU-93921; UTU-93922.

[8] The Wolf Point LWC area encompasses, is near, or provides views of, at a minimum, the following leases at issue in this lawsuit: UTU-93649; UTU-93897; UTU-93898.

4

reconfirm their wilderness characteristics, including Sunday School Canyon and White River. I also inventoried additional areas for their LWC values, including the Bad Land Cliffs,[9] Big Wash,[10] Desolation Canyon,[11] Sheep Wash[12]—areas that encompass and/or are near many of the challenged leases.

  12. Once again, SUWA and I provided this information to BLM and the agency subsequently confirmed that many of the areas either retained the wilderness values previously identified or possessed wilderness characteristics.

  13. My on-the-ground wilderness character inventories involve, but are not limited to, driving existing roads and routes that border or cut into each unit, hiking into each unit (usually to a high point so that I can see the broader landscape), photographing the landscapes, and otherwise documenting the naturalness (or lack thereof) that is present in the area. I then compile this information into reports that SUWA provides to BLM. My submissions include maps of where I traveled, photographs (with geotagged locations), and a narrative write-up of the wilderness characteristics present in the area. An example of one of my wilderness inventories is attached as Exhibit A.

  14. The landscapes encompassed by the challenged leases are varied, remarkable and

---

[9] The Bad Land Cliffs LWC area encompasses, is near, or provides views of, at a minimum, the following leases at issue in this lawsuit: UTU-93881; UTU-93882; UTU-94135.
[10] The Big Wash LWC area encompasses, is near, or provides views of, at a minimum, the following leases at issue in this lawsuit: UTU-93881; UTU-93882.
[11] The Desolation Canyon LWC area encompasses, is near, or provides views of, at a minimum, the following leases at issue in this lawsuit: UTU-94135.
[12] The Sheep Wash LWC area encompasses, is near, or provides views of, at a minimum, the following leases at issue in this lawsuit: UTU-93881; UTU-93882.

contain outstanding resource values including, but not limited to, expansive scenic vistas, hiking

and camping, wildlife and riparian habitat, and recreational opportunities. I have taken thousands

of photos of the wilderness values in these areas, and provide the following examples to illustrate

the diverse landscapes threatened by BLM's leasing decisions at issue here.[13]



(Dragon Canyon LWC area)

---

[13] A map of the above-discussed LWC areas was provided in SUWA's Amended Complaint at page 35. However, that map specifically identified only the White River and Wolf Point LWCs. As such, attached hereto as Exhibit B is an updated map that identifies the LWC units discussed herein.



(Bad Land Cliffs LWC area)



(Sheep Wash LWC area)



(Big Wash LWC area)


(White River LWC area)

15.     Additionally, I have visited and/or viewed the areas encompassed by the
challenged leases for other reasons. For example, over the past twenty-five years I have made
countless field visits to each area and surrounding areas at issue in this lawsuit to, among other
reasons, ground truth BLM and State of Utah information, visit areas proposed for oil and gas
development, and monitor and document oil and gas operators' compliance (or lack thereof) with
federal and state law. The following non-exhaustive list highlights a few recent efforts by myself
and SUWA to protect these remarkable landscapes:

A.     In 2015-2016, SUWA and other conservation partners successfully challenged the
United States Fish and Wildlife Service ("FWS") decision not to list the White
River and Graham's beardtongues as threatened or endangered under the
Endangered Species Act. *See generally Rocky Mountain Wild v. Walsh*, 216 F.
Supp. 3d 1234 (D. Colo. 2016). The two flowering plant species are endemic to

9

eastern Utah and northwestern Colorado and are threatened by oil and gas development. *See id.* at 1238.

In anticipation of the litigation and otherwise to collect on-the-ground information, I visited the White River and Graham's beardtongue habitat areas in the southern Uinta Basin region—areas that overlap with many of the LWC areas discussed above. Additionally, I provided a declaration in support of that litigation in which I detailed SUWA's extensive involvement in the FWS' history with regard to the beardtongue species, and my use and enjoyment of the public lands at issue in that litigation (much of which are the same lands at issue here).[14] *See generally* Decl. of Ray Bloxham (June 7, 2016) (ECF No. 46-1) (attached as Ex. C). *See also Rocky Mountain Wild*, 216 F. Supp. 3d at 1239-43 (discussing the extensive litigation history involving both plant species).

B.    In November 2018, SUWA sought State Director Review ("SDR")[15] of BLM's approval of the Foundation Energy Three New Gas Wells project (DOI-BLM-UT-G010-2013-0239-EA),[16] which approved new well pad construction and drilling north of the Bitter Creek LWC area, in the Dragon Canyon LWC area. I had previously visited the project area which included driving on Highway 40 toward Vernal, Utah, and then south on Highway 45 through Wagon Hound Canyon, crossing over the White River, and then proceeding through Davis, Dragon and Atchee Canyons, among other routes—all of which pass through or near many of the leases at issue in this lawsuit.[17] SUWA won its appeal of this project and the decision was remanded to the BLM's Vernal field office (*S. Utah Wilderness All.*, State Director Review UT18-03 (Dec. 19, 2018)).

In 2019, BLM re-approved the same project. SUWA again sought SDR and I once again visited the project area prior to SUWA filing its new challenge. During this visit I travelled the same route detailed above, passing through or near many

---

[14] A map of modeled White River and Graham's beardtongue habitat was provided in SUWA's amended complaint at page 37.

[15] *See* 43 C.F.R. § 3165.3(b).

[16] Available at https://eplanning.blm.gov/eplanning-ui/project/70774/510 (last updated May 25, 2021).

[17] Specifically, these routes pass through, near or within the viewshed of, at a minimum, the following challenged leases:

UTU-93650; UTU-93655; UTU-93674; UTU-93686; UTU-93687; UTU-93688; UTU-93689; UTU-93690; UTU-93692; UTU-93693; UTU-93914; UTU-93915; UTU-93916; UTU-93917; UTU-93918; UTU-93919; UTU-93920; UTU-93921; UTU-93927; UTU-93930; UTU-93933; UTU-93934; UTU-93936; UTU-93937; UTU-93938; UTU-93939; UTU-93946; UTU-93947; UTU-93948; UTU-93963; UTU-93968.

of the leases challenged in this lawsuit. I also viewed the larger landscape from numerous high vantage points, which provided views of the surrounding lands in the White River, Bitter Creek, and Lower Bitter Creek regions (all of which are encompassed by leases challenged in this lawsuit). Once again, SUWA successfully challenged the decision and the State Director remanded it back to the BLM's Vernal field office (*S. Utah Wilderness All.*, State Director Review UT 19-05 (Sept. 14, 2020)).

C.     In October 2019, SUWA sought SDR of BLM's approval of the Gate Canyon Federal 434-18-11-15 project (DOI-BLM-UT-G010-2019-0062-EA),[18] which approved the construction of a well pad and drilling of a gas well on public lands near the Big Wash and Sheep Wash LWC areas (*S. Utah Wilderness All.*, State Director Review UT 19-07). Prior to filing SUWA's challenge, I had traveled to the project area on routes that pass through, near or provide views of leases UTU-93881, -93882, and -94135. This included, but was not limited to, traveling on the Pipeline Road, Five Mile Draw Road, Wells Draw Road, Wrinkle Road and through Gate Canyon and Nine Mile Canyon. SUWA's appeal was eventually dismissed as moot because the lease targeted for development expired by operation of law while the appeal was pending.

16.     I also recreate on the public lands in and near the challenged leases. For example, I have floated the White River on at least five different occasions, most recently in May 2024. On these river trips, I floated through or adjacent to the following 10 leases at issue in this case: UTU-93656, -93657, -93658, -93659, -93684, -93685, -93695, -93921, -93922, and -93935.[19] The White River is a beautiful, scenic river and provides an oasis from the oil and gas development that dominates the surrounding landscape—it is personally one of my favorite locations in all of Utah. I took the following photo on a recent White River trip:

---

[18] Available at https://eplanning.blm.gov/eplanning-ui/project/122590/510 (last updated June 8, 2021).

[19] A map of the leases adjacent to or near the White River was provided in SUWA's Amended Complaint at page 33.



17.     On my White River trips, I also enjoy hiking and exploring many of the river's side canyons and nearby plateaus and buttes. This includes hiking into Goblin City, and my personal favorite: along an unnamed ridge between Saddletree Draw and Atchee Wash that is *within* leases UTU-93657, and -93658 and provides expansive views of the surrounding landscape including the areas encompassed by other leases at issue in this lawsuit.

18.     A highlight of my advocacy to protect the White River reached a satisfying, but sadly temporary, result in 2016. As part of a negotiated settlement (to resolve, in part, other SUWA litigation challenging oil and gas development in the White River area), BLM acquired surface estate on both sides of the White River previously owned by a private individual. The land is located along the river corridor near Southam Canyon and extends to Asphalt Wash. I visited this area while the negotiations were advancing. The expectation at that time was that the

acquired land would be protected from oil and gas development. However, the Trump administration BLM instead sold and issued leases that *encompass* and/or are adjacent to the acquired lands: UTU-93656, -93695, and -93922.

19.     On dozens of occasions (most recently in 2020), I have also floated the Green River, including the segment of river that passes near lease UTU-93646, -93650, and -94003. The White River is a tributary to the Green River. Unfortunately, the sights, sounds and smells of oil and gas development are hard to avoid on the stretch of the Green River flowing near these three leases. I do not want to see, hear, or smell additional oil and gas development along this stretch of the river.

20.     I also enjoy recreating in the Book Cliffs region, by which I mean the larger southern Uinta Basin region located primarily south of the White River, east of the Green River and west of the Colorado state line—the area where the vast majority of the challenged leases are located. I most recently visited this region in August 2024. I have visited this area extensively over the past twenty years (dozens of times). I have hiked dozens, if not hundreds, of different trails, ridges, and buttes in this region, and camped in many different areas.

21.     The wildlife in this region is particularly abundant, and I have enjoyed observing many different species including deer, elk, coyotes, golden eagles, bald eagles, red tailed hawks, black bears, and others. Additionally, there are numerous perennial and ephemeral streams that I have visited such as Bitter Creek, Sweetwater Creek and Willow Creek, each of which flows through leases at issue here.

22.     To the east/northeast of Highway 45, there is an area known as Coyote Basin, located near the Colorado boarder. This area provides important habitat for greater sage-grouse

and is an area that I have visited on several occasions in hopes of observing the iconic species.[20]

Unfortunately, this area has been blanketed by oil and gas leases that are subject to this

litigation.[21] On my most recent visit to the area in August 2024, I traveled Highway 45, before

turning east onto the Stanton Road and continuing to the Colorado boarder. The Stanton Road

passes through lease UTU-93929, -93932, -93938, and adjacent to or near several other

challenged leases. On my visits to Coyote Basin, I have not yet seen a greater sage-grouse but

nonetheless I remain hopeful to spot the species on a future visit.

      23.     I have also visited and/or seen the public lands encompassed by the challenged

leases that are located in Grand County, Utah. This includes leases UTU-94447, -94452, -94454,

and -94455 which encompass public lands immediately adjacent to Interstate 70 ("I70"). I have

driven on I70 countless times including dozens of times this year alone, most recently in October

2024. Each time I pass this way, I have observed the lands encompassed by the leases and,

despite being adjacent to or near I70, the land has its own charm. For example, leases UTU-

94454 and -94455 are located at the base of Thompson Canyon and Blaze Canyon, both of which

are part of the larger, rugged, southern Book Cliffs landscape.

      24.     Additionally, I have floated the Green River segment that flows to the west of

lease UTU-93702, which is a popular recreational river segment for families who want to float

the relatively safer, flatwater Labyrinth Canyon stretch of the Green River. I have also accessed

the Ruby Ranch boat ramp on several occasions by taking the Ruby Ranch Road south from I70.

---

[20] A map of the designated greater sage-grouse habitat areas was provided in SUWA's amended complaint at page 44.
[21] This includes lease UTU-93914, UTU-93915, UTU-93916, UTU-93917, UTU-93918, UTU-93925, UTU-93926, UTU-93927, UTU-93928; UTU-93929, UTU-93930, UTU-93931, UTU-93932, UTU-93933, UTU-93934, UTU-93962, and UTU-93968.

The Ruby Ranch Road passes through lease UTU-93711, and in close proximity to leases UTU-93712, -93714, and -93715. The lands encumbered by these leases are visible from the Ruby Ranch Road.

25.     The development of the leases at issue in this litigation will degrade naturalness, destroy opportunities for solitude, create dust and pollution, increase ambient background noise levels, degrade and destroy wildlife habitat, and consume hundreds of millions of gallons of water in this arid high desert region. This will result from construction of access roads and well pads, noise and greenhouse gas pollution from vehicles and drill rigs, and the industrialization of these remote areas. Such activities will cause immediate, as well as sustained and prolonged damage to the environment. This will impair my and SUWA's members' use and enjoyment of the public lands in these areas, as well as adjacent public lands.

26.     In addition, as shown in the above-provided photographs, a person can see for miles in all directions in these remote, undeveloped regions and thus any new surface disturbance on the leases (*e.g.*, well pads, access roads, drill rigs) will easily be visible from any number of locations or distances.

27.     Development of the leases will directly affect and irreparably harm my health, professional, recreational, and aesthetic interests. I do not want to see, hear, or smell more development activity in these areas including new roads and well pads. Such activities will create industrial noise and lighting in a natural landscape and lead to increased vehicle travel to and from the well pad sites. This will lessen my appreciation and enjoyment of those areas including opportunities for solitude, hiking, camping, and wildlife and plant viewing, among other negative outcomes.

15

28.     SUWA and I continue to advocate for protection of wilderness-quality lands impacted by BLM's challenged leasing decisions through various BLM management decision-making mechanisms. However, preventing the lands from becoming encumbered by private rights is critical to the success of our advocacy.

29.     My interests are further harmed by BLM's failure to prepare the necessary site-specific analysis prior to offering the challenged leases for sale and development. Without that information neither BLM nor the public, including SUWA and myself, understands the true extent of potential direct, indirect, and cumulative impacts to resource values including, but not limited to, the above-discussed LWCs, the White River and Green River, wildlife including greater sage-grouse, plants including Graham's and White River beardtongue, air quality and public health and climate change.

30.     My injuries and harms discussed herein will be remedied by a decision by the Court to remand and set aside BLM's leasing decisions because the leases will no longer exist and/or will no longer be threatened by .potential development.

I declare, under penalty of perjury, that the foregoing is true and correct.


DATED:      October 17, 2024           _____

                                       Ray Bloxham

*Southern Utah Wilderness Alliance v. U.S. Department of the Interior*
Case No. 2:23-cv-00804-TC-DBP

**Exhibit A** to Ray Bloxham Declaration

Bad Land Cliffs Wilderness Inventory Report

## Bad Land Cliffs Wilderness Character Addition

### A. Bad Land Cliffs Wilderness Character Additions Boundary Map and GIS Data

The Southern Utah Wilderness Alliance (SUWA) submits this significant and new information regarding the wilderness characteristics of the Bad Land Cliffs Addition (Addition or unit), including a detailed map (*see* Attachment A) and updated GIS shapefile data to assist the Vernal Bureau of Land Management (BLM) in meeting its mandates under the Federal Land Policy and Management Act (FLPMA) 43 U.S.C. §§ 1711 - 1712, the Wilderness Act of 1964, 16 U.S.C. §§ 1131 *et seq*., and BLM, 6310 – Conducting Wilderness Characteristics Inventory on BLM Lands (Public) (March 15, 2012) (Manual 6310).  Also included with this submission is a photographic documentation map and accompanying photographs.  *See* Attachments B and C.

BLM has never inventoried the Addition, as submitted, in compliance with its new wilderness characteristics inventory guidance manual, Manual 6310, which "supersede[d] all previous guidance on this topic." Manual 6310.01.

### B. Detailed Narrative – Bad Land Cliffs Wilderness Character Addition

### 1. Area Description

The Addition, as submitted, is not a stand-alone wilderness character area, but rather should be considered part of BLM's Badland Cliffs wilderness character unit (Bad Land Cliffs LWC), identified in the Gasco Energy Inc. Uinta Basin Natural Gas Development Project Environmental Impact Statement.  *See* BLM, Form 2, Current Conditions: Presence of Absence of Wilderness Characteristics, Badland Cliffs (May 23, 2012) (Wilderness Character Review). The Addition was excluded from the Bad Land Cliffs LWC by the use of arbitrary boundaries including a section line, cliff rim, fence, and abandoned and reclaiming route (or "way").  *See* Attachment A; Photographs #1-2, 9.

The Addition is a natural extension of the exceptional scenic landscape in the Bad Land Cliffs LWC. It possesses the same naturalness, outstanding opportunities for solitude and primitive and unconfined type of recreation, and supplemental values. *See* Photographs #1-8. In particular, it is an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain; visitors enjoy outstanding solitude, screened from the sights, sounds, and evidence of others; and, visitors can easily engage in outstanding primitive and unconfined type of recreation including hiking, photography, and sightseeing. *Id.*

The wilderness characteristics inventory to be conducted by BLM must comply with Manual 6310 and Appendices A – D. *See* BLM Manual 6310.01; *id.* § 6310.06(B)(4)(a) ("In order to complete the inventory, District or Field Managers *must* document wilderness characteristics inventories according to attached Appendices A – D.") (emphasis added). BLM guidance specifically states,

> Regardless of past inventory, the BLM must maintain and update as necessary, its inventory of wilderness resources on public lands. In some circumstances conditions relating to wilderness may have changed over time, and an area that was once determined to lack wilderness characteristics may now possess them.

Manual 6310.06(A). This acknowledges that BLM must conduct an on-the-ground wilderness characteristics inventory that adheres to the boundaries and descriptions contained herein. *See also* 43 U.S.C. § 1711(a); Manual 6310.06(A). It also means that BLM must document and base its wilderness characteristics inventory decision on the terms, procedures, and definitions contained in its newly established manual, regardless of past wilderness inventories.

### 2. Wilderness Characteristics

The Wilderness Act established our nation's policy "to secure for the American people of present and future generations the benefits of an enduring resource of wilderness." 16 U.S.C. § 1131(a). "Wilderness" is defined "as an area where the earth and its community of life are

untrammeled by man, where man himself is a visitor who does not remain." *Id.* § 1131(c).  To qualify as wilderness, an area must (1) have at least five thousand acres of land in an unimpaired condition, (2) generally appear to have been "affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable," and (3) possess outstanding opportunities for solitude *or* a primitive and unconfined type of recreation.  *Id.*  An area may also contain "supplemental values" such as ecological, geological, or other features of scientific, educational, scenic, or historic value.  *See* id; BLM Manual 6310.06(C)(2)(d).  Supplemental values are not required in order for an area to be identified as lands with wilderness characteristics, but their presence should be documented where they exist.

The Addition on its own, or when viewed in conjunction with the Bad Land Cliffs LWC, easily satisfies these wilderness characteristics requirements.

### a.  **Size**

The Addition, as submitted, exceeds the 5,000-acre minimum requirement, and when correctly considered with the Bad Land Cliffs LWC approximate 7,900-acres, well exceeds the minimum 5,000-acre requirement.  *See* Attachment A.  Notably, the Addition is sufficiently large enough to serve as a stand-alone wilderness character area; however, it should be included as part of the Bad Land Cliffs LWC because the areas are not separated by any substantially noticeable human impact, as required by Manual 6310.  *See* Manual 6310.06(C)(3).

### b.  **Naturalness**

Naturalness is defined for the purposes of BLM wilderness inventories in BLM Manual 6310.  *See* BLM Manual 6310.06(C)(2)(b).  Substantially *un*noticeable impacts include trails, historic properties, archaeological resources, fencing, and stockponds, among others.  *See* Manual 6310.06(C)(2)(b)(ii)(1).  BLM is instructed to use caution "in assessing the effect of

relatively minor human impacts on naturalness" and to "[a]void an overly strict approach to assessing naturalness." *See id.* § 6310.06(C)(2)(b)(ii)(2).  At all times, the agency must apply the "average visitor" standard to determine whether the unit contains "apparent naturalness."  *See id.* at 6310.06(C)(2)(b)(ii)(1).  It cannot permit its expertise or particularized knowledge to influence its judgment and assessments but rather; must see the unit as someone "who is not familiar with the biological composition of natural ecosystems versus human-affected ecosystems" would see it.  *See id.* § 6310,06(C)(2)(b)(ii)(1)(b).

SUWA staff recently conducted an on-the-ground inventory of the Addition to confirm that it appears natural, having been affected primarily by the forces of nature, with man's imprint substantially unnoticeable.  *See* Photographs #1-8.  We also confirmed that the Bad Land Cliffs LWC boundary designated by BLM is arbitrary and otherwise not in compliance with Manual 6310 and Appendices A-D.  *See, e.g.*, Photographs 1-2, and 9.  For example, rather than follow a wilderness inventory road or other identifiable human impact, the boundary arbitrarily crosses natural terrain along a township and range sectional line, follows a cliff rim, or stops at a substantially unnoticeable abandoned route.  *See* Attachment A; Photographs #1-2, 6-7, and 9.  The Addition must then be considered a natural extension of the Bad Land Cliffs LWC.

This submission has been specifically tailored to eliminate all substantially noticeable human impacts; utilizing many of them to form the Addition boundary.  *See* Attachment A; Photographs #1-12.  As a result, the scenery in the Addition is wild and free, breathtaking, without any human impact dominating the view.  *See, e.g.*, Photograph #6.  To the average visitor, nature itself has been the sole architect at work.

Finally, BLM has yet to inventory the Addition through the lens of Manual 6310, which superseded all previous guidance on this topic.  *See* Manual 6310.01.  It must follow this new

guidance manual and the Addition boundary, as submitted, regardless of past inventories. *See*

BLM Manual 6310.06(A) ("Regardless of past inventory, the BLM must maintain and update as

necessary, its inventory of wilderness resources on public lands."); *see also* BLM Manual

6310.06(C)(2)(b) (naturalness criteria).

c.  **Outstanding Opportunities for Solitude or Primitive and Unconfined Type of Recreation**

The Wilderness Act of 1964 Section 2(c)(2) states that an area must "have outstanding

opportunities for solitude or a primitive and unconfined type of recreation." Manual 6310 states

that

> The word "or" in this sentence means that an area only has to possess one or the other. The area does not have to possess outstanding opportunities for both elements, nor does it need to have outstanding opportunities on every acre, even when an area is contiguous to lands with identified wilderness characteristics.

*Id.* 6310.06(C)(2)(c).

The BLM already determined that the Bad Land Cliffs LWC possesses outstanding

opportunities for solitude or primitive and unconfined type of recreation. *See* Wilderness

Character Review at 3.  As a result, the Addition need not possess either wilderness

characteristic if BLM agrees that the existing boundary is arbitrary or otherwise not in

compliance with Manual 6310.  This is due to BLM guidance that not every acre needs to

possess these opportunities, especially when an area is contiguous to lands with identified

wilderness characteristics.  *See* BLM Manual 6310.06(C)(2)(c).

However, the Addition on its own provides for outstanding solitude *and* primitive and

unconfined type of recreation including hiking, photography, and sightseeing.

***Outstanding Opportunities for Solitude***

Visitors to the Addition can quickly and easily enjoy outstanding solitude; screened from the sights, sounds, and evidence of others.  *See* Photographs #1-8; Manual 6310 .06(C)(2)(c)(i) (guidance for determining the presence or absence of outstanding solitude).  It is only required that outstanding solitude be available *somewhere* within the Addition.  *See* Manual 6310.06(C)(2)(c). This low threshold is easily satisfied here.  To begin with, when viewed in context with the surrounding wilderness character landscape, its size, and configuration including highly scenic vistas, rugged topography and numerous locations to become isolated from others, it is clear that the Addition affords countless outstanding opportunities for solitude. *See* Photographs #1-8.

The landscape topography in the Addition, coupled with its remote location, make it a place where a visitor will have a hard time *not* finding outstanding solitude.

### *Outstanding Opportunities for Primitive and Unconfined Type of Recreation*

Visitors to the Addition also can quickly and easily engage in dispersed, undeveloped recreation such as hiking, photography, and sightseeing.  *See* Photographs #1-8; *see also* BLM Manual 6310.06(C)(2)(c)(ii) (guidance for determining the presence or absence of outstanding and unconfined type of recreation).  Visitors can hike along wash bottoms or natural desert ridges to isolated locations.  Given its expansive size, many draws, valleys, peaks and ridges, it is difficult for a visitor to *not* engage in outstanding primitive and unconfined type of recreation. As with solitude, outstanding opportunities for primitive and unconfined type of recreation need to be available only *somewhere* in the Addition.  BLM Manual 6310.06(C)(2)(c).

Finally, as with naturalness, BLM's inventory of the Addition must be done in compliance with Manual 6310 and Appendices A-D, regardless of any past inventory.

d. **Supplemental Values**

The Wilderness Act of 1964 allows for consideration of supplemental values including "ecological, geological, or other features of scientific, educational, scenic or historic value." 16 U.S.C. § 1131(c). The presence of supplemental values is not necessary for an area to be identified as lands with wilderness characteristics, but should be documented if they exist. *See* Manual 6310.06(C)(2)(d).

The Addition has supplemental values, especially ecological, geological and scenic values. *See* Photographs #1-8.

## CONCLUSION

The Addition has yet to be properly inventoried, or assessed for wilderness characteristics in compliance with Manual 6310. To the average visitor, the landscape appears natural and rugged; free of any significant human impact. The Addition also provides countless outstanding opportunities for solitude *and* primitive and unconfined type of recreation, as well as supplemental values.

Vernal BLM must consider this inventory and conduct a thorough on-the-ground examination of the unit. *See* 43 U.S.C. § 1711(a); Manual 6310.04(C)(4). The inventory must be done in accordance with Manual 6310, including Appendices A-D which differ from the old forms relied on by BLM to support its prior inventory. *See* Manual 6310.06(B)(4)(a). SUWA requests the opportunity to visit the Addition with BLM to help assist in disseminating the information provided.

# Attachment A - Detailed Wilderness Character Map
# Vernal BLM Wilderness Character Area
# Bad Land Cliffs Addition



Submitted by the
**Southern Utah Wilderness Alliance**
**July 14, 2014**

# Attachment B - Photographic Documentation
# Vernal BLM Wilderness Character Area
# Bad Land Cliffs Addition



Submitted by the
**Southern Utah Wilderness Alliance**
**July 14, 2014**

Legend:
- Utah BLM Wilderness Character Submission Area - Bad Land Cliffs Addition
- Utah BLM Identified Wilderness Character - Bad Land Cliffs
- Utah BLM Lands
- Utah Private Lands
- Utah State Lands

# Attachment C – Photographic Documentation
# Vernal BLM Wilderness Character Area
# Bad Land Cliffs Addition





**Photograph #1 – T11S R16E, Section 1 SW, looking south –** The Bad Land Cliffs Addition is truly spectacular. Its topography and abundant vegetation appear overwhelmingly natural, with man's work substantially unnoticeable. These characteristics are easily discernible when viewed from high ridges. As demonstrated in this photograph, the area is quite scenic and highly natural in appearance. Moreover, BLM's Bad Land Cliffs wilderness character area boundary arbitrary cuts across the landscape seen here, instead of following a substantially noticeable human impact.



**Photograph #2 – T11S R16E, Section 1 SW, looking southeast –** Taken from a high natural ridge, this photograph highlights the natural characteristics present. Moreover, BLM's Bad Land Cliffs wilderness character area boundary arbitrary cuts across the landscape seen here, instead of following a substantially noticeable human impact.



**Photograph #3 – T11S R17E, Section 7 SE, looking west –** The Bad Land Cliffs Addition remains wild and free; no substantially noticeable impact is present within its boundary, as submitted. BLM Manual 6310 states that outstanding opportunities for solitude can be found in areas lacking vegetation or topographic screening. Moreover, the average visitor can easily engage in primitive recreation in this untrammeled landscape, including hiking, camping, photography, or sightseeing for botanical, zoological, or geological features.



**Photograph #4 – T11S R16E, Section 20 NW, looking north –** The unit is quite remarkable and presents visitors within an overwhelming natural appearance. BLM Manual 6310 instructs that caution should be used in assessing the effects of relatively minor human impacts on naturalness. BLM is also advised to avoid an overly strict approach to assessing naturalness.



**Photograph #5 – T11S R16E, Section 19 NW, looking north –** The average visitor can enjoy outstanding solitude; screened from the sights, sounds, and evidence of others, in the many canyons or draws or pinion and juniper forests.  Similarly, she can easily engage in outstanding primitive and unconfined type of recreation including hiking, photography, and hunting.



**Photograph #6 – T11S R15E, Section 13 SW, looking east –** This photograph taken from a high vantage point provides an excellent view of a majority of the Bad Land Cliff Addition.  Notably, the reclaiming and seldom used ways are not visible – let alone, substantially noticeable – and no other human impact detracts from the naturalness.



**Photograph #7 – T11S R16E, Section 4 NW, looking east –** The Bad Land Cliffs Addition qualifies as a land having wilderness characteristics when viewed through the lens of Manual 6310. It is an expansive area, with many fields, ridges, draws and valleys. SUWA specifically tailored this submission to exclude all substantially noticeable human impacts.



**Photograph #8 – T11S R16E, Section 9 SW, looking northwest –** The Bad Land Cliffs Addition is an area yet to be inventoried in compliance with Manual 6310. It possesses sufficient size, naturalness, and outstanding opportunities for solitude and unconfined type of recreation. It also possesses supplemental values such as ecological, geological, or other features of scientific, educational, scenic, or historic value.



**Photograph #10 – T11S R16E, Section 9 NE, looking soutwest –** This abandoned and reclaiming route was arbitrarily used to form the western boundary of BLM's Bad Land Cliffs wilderness characteristics area.  As shown here, it has not been improved or maintained by mechanical means, or used relatively regularly or continuously.  It is therefore not a wilderness inventory road as defined in Manual 6310, and thus, cannot be used to form a boundary.



**Photograph #11 – T211S 16E, Section 3 NE, looking west –** This abandoned way located in a wash does not qualify as a wilderness inventory road under Manual 6310 and thus, cannot be used as a boundary or need to be removed from the Bad Land Cliffs Addition.  Moreover, it is not substantially unnoticeable, especially when viewed in context with the expansive surrounding landscape.



**Photograph #12 – T11S R17E, Section 7 NE, looking north –** This way also does not qualify as a wilderness inventory road under Manual 6310 because it has not been improved or maintained by mechanical means, or used relatively regularly or continuously.  Moreover, it is not substantially unnoticeable, especially when viewed in context with the expansive surrounding landscape.

*Southern Utah Wilderness Alliance v. U.S. Department of the Interior*
Case No. 2:23-cv-00804-TC-DBP

**Exhibit B** to Ray Bloxham Declaration

Map of Lands with Wilderness Characteristics



DUCHESNE COUNTY
Big Wash
Sheep Wash
Bad Land Cliffs
UINTAH COUNTY
Desolation Canyon
CARBON COUNTY
Wolf Point
EMERY COUNTY
GRAND COUNTY

White River 2016 Land Acquisitions
White River
Dragon Canyon
Lower Bitter Creek
COLORADO
Sunday School Canyon
Bitter Creek
Seep Canyon
Sweet Water

0 1.5 3 4.5 6 Miles



SOUTHERN UTAH WILDERNESS ALLIANCE

425 East 100 South
Salt Lake City, UT 84111
801 486 3161
www.suwa.org

Lands with Wilderness Characteristics & Wilderness Study Areas

 BLM-Identified Lands with Wilderness Characteristics

 Citizen-Identified Lands with Wilderness Characteristics

BLM Wilderness Study Areas

Leases by Date Offered

 December 2018

 March 2019



D. Callahan (10/18/2024) | Data: UGRC, BLM | Project #579

*Southern Utah Wilderness Alliance v. U.S. Department of the Interior*
Case No. 2:23-cv-00804-TC-DBP

**Exhibit C** to Ray Bloxham Declaration

Declaration of Ray Bloxham filed in *Rocky Mountain Wild v. Walsh*,
216 F. Supp. 3d 1234 (D. Colo. 2016)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:15-cv-00615-WJM

ROCKY MOUNTAIN WILD et al.,

        Plaintiffs,

v.

NOREEN WALSH, in her official capacity as
Regional Director of the Mountain-Prairie
Region of the U.S. Fish and Wildlife Service et al.,

        Defendants,

and

STATE OF UTAH et al.,

        Defendant-Intervenors.

---

**DECLARATION OF RAY BLOXHAM**

---

    I, RAY BLOXHAM, declare as follows:

    1.    I have personal knowledge of each of the facts set forth below, and if called upon to do so, could and would testify regarding the following.  This declaration is filed in support of Plaintiffs' petition in the above-captioned matter.

    2.    I am the Field Director for Southern Utah Wilderness Alliance ("SUWA") and have served in this position since 1999.  This position requires me to spend considerable time on-the-ground visiting public lands throughout Utah.  In this capacity I have traveled extensively through the public lands in Utah.

    3.    I am an active member of the SUWA and have been a member since 1999.

4.      I am an active member of the Grand Canyon Trust's ("Trust") and have been a member since 2008.

5.      SUWA, based in Salt Lake City, Utah, has more than 13,000 members and activists, many of whom reside in Utah. SUWA's mission is the preservation of the outstanding wilderness and other sensitive public lands at the heart of the Colorado Plateau and to advocate for management of these lands, and the associated natural and cultural resources, in their natural state for the benefit of all Americans. SUWA promotes local and national recognition of the region's unique character through research and public education; supports both administrative and legislative initiatives to permanently protect Utah's wild places within the National Park and National Wilderness Preservation System or by other protective designations where appropriate; builds support for such initiatives on both the local and national level; and provides leadership within the conservation movement through uncompromising advocacy for wilderness preservation.

6.      SUWA is frequently solicited for input and participation in state and Federal agencies' decision-making processes, and SUWA actively participates at all levels of these decision-making processes.

7.      The Trust works to protect and restore the Colorado Plateau – its spectacular landscapes, flowing rivers, clean air, diversity of plants and animals, and areas of beauty and solitude. The Trust works toward creating a region where generations of people and all of nature can thrive in harmony, with the vision that 100 years from now the Colorado Plateau region will be characterized by vast open spaces with restored, healthy natural areas and habitat for all native plants and animals, human communities enjoy a sustaining relationship with the natural

environment, and people who live and visit the region are willing, enthusiastic stewards of the region's natural resources and beauty.

8.      The Trust is frequently solicited for input and participation in state and Federal agencies' decision-making processes, and the Trust actively participates at all levels of these decision-making processes.

9.      SUWA and the Trust have participated in many administrative appeals and court cases involving federal and state land use planning and management issues affecting Graham's beardtongue (*Penstemon grahamii*) and White River beardtongue (*P. scariosus var. albifluvis*). This includes participating in the planning process for the 2014 Conservation Agreement at issue in the above-captioned matter by submitting comments on the proposed Agreement, among other things.  Moreover, for years SUWA and the Trust have actively participated (*e.g.*, commented on, protested, and litigated) state and/or federal agencies' approvals of site-specific projects, such as energy exploration and development, affecting Graham's beardtongue and White River beardtongue.

10.     Members of SUWA and the Trust use and enjoy the lands affected by the agency decision challenged in the above-captioned matter for numerous activities including, but not limited to, hiking, camping, and photographing wildlife and plants – including the Graham's beardtongue and White River beardtongue.

11.     The health, recreational, scientific, spiritual, educational, and aesthetic interests of members of SUWA and the Trust are harmed and impaired by the decision in the above-captioned matter because the decision fails to provide adequate protection for Graham's and White River beardtongues habitat.  It relies on speculative, future conservation measures that, even if implemented, apply to only a small fraction of the beardtongue habitat determined to be

essential to the conservation of the species.  The U.S. Fish and Wildlife Service's ("FWS")

decision to withdraw the proposed rule to list the species as threatened rather than list them under

the Endangered Species Act ("ESA") has resulted in less protections for Graham's and White

River beardtongue habitat and opened more land to unfettered energy exploration and

development activities, among other things.  The lesser protections for and increased threat of

development in the species' habitat has and will harm SUWA's and the Trust's members'

interests in the affected lands by impairing the lands' wilderness qualities and the members'

ability to find solitude, hike, camp, and photograph wildlife and plants – including Graham's and

White River beardtongue.

12.     The relief sought by SUWA and the Trust (as well as other plaintiffs) in this case

–orders by the court that (1) the FWS violated the ESA and Administrative Procedures Act

("APA") when it approved the Conservation Agreement and withdrawal of the proposed rule to

list the species as threatened and (2) that FWS reinstate its proposed rule to list the species as

threatened – would remedy the harms alleged herein.  Such an order from the court would

require the FWS to reconsider listing the Graham's and White River beardtongue as threatened

and to designate critical habitat under the ESA which would provide additional and much needed

protections for the species and their habitat as well as protect the wilderness qualities of the lands

at issue, among other things.

13.     I use and enjoy the public lands at issue in the above-captioned matter for many

purposes including, but not limited to, recreational, educational, and aesthetic.  I take great

pleasure from my visits to these areas and intend on returning to them as often as possible.  I

have concrete plans to visit beardtongue habitat covered by the Conservation Agreement in the

southern Uinta Basin within the next month.

14. Since at least 1999, I have visited, hiked, explored, photographed, camped, and otherwise appreciated public lands in Utah several dozen times per year. I have visited the public lands in Utah at issue in the above-captioned matter – and lands adjacent thereto – to document their wilderness characteristics, the adverse impacts of off-highway vehicles and energy development impacts, and for recreational purposes, among other things. For example, in September 2015 I visited the Desolation Canyon proposed wilderness area in the Uinta Basin to document the area's wilderness characteristics. I hiked, photographed, and explored the area – an area encompassed by the Conservation Agreement and Graham's and White River beardtongue habitat. *See, e.g.*, AR 5066. The Conservation Agreement designates only a small portion of Graham's and White River beardtongue habitat for protection and conservation in the Desolation Canyon region. *Id.* I have visited this area on several occasions before my 2015 visit, and have plans to return to this area within the next 12 months.

15. Similarly, in November 2013, May 2014, and June 2015, I visited the Sunday School Canyon, Dragon Canyon, and White River proposed wilderness areas in the Uinta Basin to document each area's wilderness characteristics, respectively. I hiked, photographed, and explored these areas – each of which is encompassed by the Conservation Agreement and Graham's and White River beardtongue habitat. *See, e.g.*, AR 5068-72. The Conservation Agreement designates only a small portion of Graham's and White River beardtongue habitat for protection and conservation in these areas. I have visited these areas on several occasions before the above-mentioned dates, and have plans to return to each area within the next 12 months.

16. My health, recreational, scientific, spiritual, educational, and aesthetic interests are harmed and impaired by the decision in the above-captioned matter because the decision fails to provide adequate protection for Graham's and White River beardtongues habitat. It relies on

speculative, future conservation measures that, even if implemented, apply to only a small fraction of the beardtongue habitat determined to be essential to the conservation of the species. The FWS' decision to withdraw the proposed rule to list the species as threatened rather than list them under the ESA has resulted in less protections for Graham's and White River beardtongue habitat and opened more land to unfettered energy exploration and development activities, among other things. The lesser protections for and increased threat of development in the species' habitat has and/or will harm my interests in the affected lands by impairing the lands' wilderness qualities and my ability to find solitude, hike, camp, and photograph wildlife and plants – including Graham's and White River beardtongue.

17.     An order by the court to set-aside and remand the decision challenged in the above-captioned matter would remedy the injuries and harms described herein by requiring the FWS to reconsider listing the Graham's and White River beardtongue as threatened and designating critical habitat under the ESA. Such an order would provide additional and much needed protections for the species and their habitat as well as protect the wilderness qualities of the lands at issue, among other things.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this _7_ day of June, 2016.

_____

Ray Bloxham