IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES BUREAU OF LAND MANAGEMENT, AND CHRISTINA PRICE, in her official capacity as Deputy State Director, Division of Land and Minerals<br><br>Defendants. | **ORDER AND MEMORANDUM DECISION GRANTING MOTION TO DISMISS**<br><br>Case No. 2:23-CV-00804-TC-DBP<br><br>Judge Tena Campbell<br><br>Chief Magistrate Judge Dustin B. Pead |

Before the court are motions to dismiss filed by Intervenor Defendants Anschutz Exploration Corporation (AEC) and the State of Utah. (ECF Nos. 42, 45.)[1] For the reasons stated below, the court grants those motions, dismissing the case without prejudice.

## BACKGROUND

I.   **Statutory and Regulatory Background**

This case involves a public land dispute between an environmental group, Plaintiff Southern Utah Wilderness Alliance (SUWA), the federal government, the State of Utah, and

---

[1] The State of Utah joined AEC's motion to dismiss in a separate filing. (ECF No. 45.)

1

private industry about how much and what type of environmental analysis the government is required to engage in before it can permit private industry to drill for oil and gas on federally owned land.

The National Environmental Policy Act (NEPA) requires federal government agencies, including Defendant the Bureau of Land Management (BLM),[2] to evaluate the direct, indirect, and cumulative impacts of oil and gas drilling on federal lands before taking official action or committing irretrievable resources to a project. Accordingly, the BLM must issue detailed environmental impact statements (EIS) that explore impacts and discuss ways to mitigate adverse impacts. See 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.14; Forest Guardians v. U.S. Fish & Wildlife Serv., 611 F.3d 692, 711 (10th Cir. 2010) ("[NEPA] requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives."). "If, after an EIS has been prepared, 'there are substantial changes to the proposal or significant new circumstances or information relevant to environmental concerns,' then a supplemental EIS must be prepared." Los Alamos Study Group v. U.S. Dep't of Energy, 692 F.3d 1057, 1061 (10th Cir. 2012) (citing 10 C.F.R. § 1021.314(a)). The government agency can alternatively prepare an environmental assessment (EA), which must "provide sufficient evidence" that the proposed action will have no significant impact on the environment. 40 C.F.R. § 1508.9(a)(1).

Similarly, the Endangered Species Act (ESA), 16 U.S.C. §§ 1531–44, requires that the BLM consult with the United States Fish and Wildlife Service (FWS) to "insure that any action

---

[2] The BLM manages most publicly owned minerals in the United States (nearly 700 million acres). About half of this federal mineral estate contains oil and/or natural gas, and over 23 million acres of federally managed lands are currently leased to private companies for oil and gas drilling. (See Am. Compl. ¶ 62.)

authorized, funded, or carried out by [the] agency… is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [the habitat] for such species." Id. § 1536(a)(2). Section 7(d) of the ESA prohibits the BLM from making any "irreversible or irretrievable commitment of resources" prior to the conclusion of consultation which would have "the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." Id. § 1536(d).

At the BLM's request, the FWS will examine whether any listed or proposed species may be present in the proposed action area. 16 U.S.C. § 536(c)(1); 50 C.F.R. § 402.12(c). If there is a possibility that listed or proposed species are present or that their habitat will be threatened, the BLM must prepare a biological assessment to determine what the effects will be. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c). If the action is likely to adversely affect one or more of these species, the agency must engage in "formal consultation" with FWS, 50 C.F.R. § 402.14(b)(1), after which the FWS will issue a "biological opinion." 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(g)(8) & (h). If the FWS concludes that the BLM's proposed action "will jeopardize the continued existence" of a listed species, the FWS will outline "reasonable and prudent alternatives." 16 U.S.C. § 1536(b)(3)(A).

The BLM manages onshore oil and gas development on federal lands through a three-stage process: 1) land use planning, 2) leasing, and 3) approval of drilling proposals. (Am. Compl. ¶ 49, ECF No. 16.) First, the BLM develops a land use plan, known as Resource Management Plan (RMP), specifying which lands will be open and which will be closed to oil and gas leasing, and stipulations and conditions that may be placed on any such development. 43 U.S.C. § 1712(a). Second, the BLM may, at its discretion, offer surface occupancy leases for the

development and drilling of tracts of public land. 43 C.F.R. §§ 1610.5-3, 3120–3120.7-3, 3101.1. Third, the BLM will process lessees' applications for permits to drill on the leased land. 43 C.F.R. § 3162.3-1(c).

## II. Factual Background[3]

This lawsuit challenges four leasing decisions made by the BLM from 2018 through 2019: the December 2018 Moab leases, the December 2018 Vernal leases, the March 2019 Vernal leases, and the September 2019 Moab leases. (Am. Compl. ¶ 53.) Across these four BLM leasing decisions, the BLM issued 145 oil and gas leases on public lands throughout eastern Utah's Book Cliffs and Uinta Basins regions, 54 of which were sold to Intervenor Defendant AEC. (Id. ¶¶ 1, 7, 53.)

SUWA alleges that before leasing these areas to AEC and others, the BLM failed to 1) issue an EIS or an EA on the environmental impacts of oil drilling, 2) adhere to the congressionally-required notice and comment procedure, 3) explore middle-ground alternatives to selling total surface development rights for the land, or 4) consult with the FWS on the threat to endangered or threatened species and their habitats. (Id. ¶ 53.)

Specifically, for its December 2018 Moab leasing decision, the BLM prepared a Determination of NEPA Adequacy without conducting a full NEPA analysis. The BLM also failed to provide the public an opportunity for notice and comment under the congressionally prescribed process, instead requiring the public to object to the leasing decision within just ten days. (Am. Compl. ¶ 54.) SUWA provided its objections to the December 2018 Moab leasing decision through the BLM's informal process.

---

[3] The court accepts the Complaint's allegations as true for the purposes of this order. See Albers v. Bd. of Cty. Comm'rs of Jefferson Cty., 771 F.3d 697, 700 (10th Cir. 2014).

For its December 2018 Vernal leasing decision, the BLM prepared an EA but again did not provide the public with an opportunity for formal notice and comment, giving the public just ten days to object. (Id. ¶ 55.) SUWA protested the BLM's December 2018 Vernal leases by submitting "scoping comments" on the BLM's Determination of NEPA Adequacy and EA. (Id. ¶ 56.)

For the March 2019 Vernal leasing decision and the September 2019 Moab leasing decision, the BLM prepared EAs and provided the public the ability for formal notice and comment on the proposed actions. (Id. ¶¶ 57–58.) SUWA submitted objections to both leasing decisions. (Id. ¶¶ 57–59.)

On September 12, 2019, SUWA challenged BLM's decision to issue a number of oil and gas leases, including the 2018 Moab and Vernal leasing decisions, in a separate Utah District Court case. See Complaint for Declaratory and Injunctive Relief, Living Rivers v. Hoffman, No. 4:19-cv-74-DN (D. Utah), ECF No. 2. After the lawsuit was filed, the BLM suspended the 2018 leases while it prepared a supplemental Greenhouse Gas Environmental Analysis (GHG EA). (Am. Compl. ¶ 74 (citing Unopposed Motion to Stay Case, Living Rivers, No. 4:19-cv-74-DN, ECF No. 15.) Based on the BLM's decision to suspend those leases and to prepare a supplemental GHG EA, SUWA voluntarily dismissed the Living Rivers lawsuit. (Id. ¶ 75.)

In January 2020, the BLM published its supplemental GHG EA summarizing the 2018 oil and gas leases' impact on climate change. (Am. Compl. ¶ 76.) The supplemental GHG EA explained that the BLM would, after allowing public notice and comment, decide whether to "1) lift the suspension on a particular lease, 2) modify a lease and lift the suspension, or 3) cancel a lease." (Id. ¶ 78.) SUWA issued comments objecting to the BLM's supplemental GHG leasing analysis, arguing that the BLM had failed to analyze and disclose the social costs of the GHG

emissions. (Id. ¶¶ 79–80.) Following its publication of the Supplemental GHG EA, and despite SUWA's objections, the BLM temporarily lifted its suspensions on the 2018 leases. (Id. ¶¶ 59, 82.)

The BLM's lease suspensions were reinstated after changes in the regulatory landscape and lawsuits filed by several environmental organizations, meaning that no development is currently in progress. For example, in January 2021, the Biden Administration revoked and rescinded all energy agency dominance agenda orders and directives that had been issued under the Trump Administration. (Id. ¶ 83 (citing Exec. Order No. 13990, 86 Fed. Reg. 7037, 7041 (Jan. 20, 2021) (revoking Executive Order No. 13783); Sec'y of the Interior, Order No. 3398 § 4 (Apr. 16, 2021) (revoking Secretarial Order No. 3354)).) The Interior Department also instituted a new policy in 2021 requiring the BLM to identify the social costs and benefits of oil and gas leases to taxpayers and outline alternative scenarios to lessen these costs. See U.S. Dep't of the Interior, Report on the Federal Oil and Gas Leasing Program, Prepared in Response to Executive Order 14008 at 3 (Nov. 2021) (concluding that the federal government's oil and gas leasing program had "fail[ed] to provide a fair return to taxpayers, even before factoring in the resulting climate-related costs that must be borne by taxpayers").

The BLM also agreed to suspend its oil and gas leases as a condition of settlement of similar lawsuits brought by WildEarth Guardians and others in the United States District Court for the District of Columbia (Nos. 1:16-cv-1724-RC, 1:20-cv-56-RC, and 1:21-cv-175-RC, the WEG Cases). In the WEG Cases, WEG alleged that the BLM had violated NEPA by not considering GHG emissions when issuing leases. WildEarth Guardians v. Haaland, 2022 WL 1773474, at *2–3 (D.D.C. June 1, 2022). Consistent with the WEG settlement, the BLM is conducting ongoing supplemental NEPA analyses of its leasing decisions. See Stipulated

Settlement Agreement at 3, <u>WildEarth Guardians</u>, No. 1:21-cv-175 (D.D.C.), ECF No. 71-1 (agreeing that "BLM will conduct additional NEPA analysis for the … leasing decisions challenged," and that "[u]pon completion of the additional NEPA analysis and related documentation, BLM will issue one or more decisions").[4]

The BLM's supplemental GHG EA has been posted for public notice and comment, but the BLM has not yet issued a decision about whether it will go ahead with, modify, or cancel the four leasing decisions at issue here. (ECF No. 42 at 3–4 ns. 1–2.) In the meantime, AEC has submitted fourteen Applications for Permits to Drill (APDs) on land included in its suspended leases. All fourteen of AEC's ADPs remain pending. (ECF No. 64-3.)

While the BLM's GHG Supplemental EA was pending, SUWA filed this action to challenge and enjoin all four of the BLM's leasing decisions, contending that the BLM violated NEPA and the ESA when it approved the lease sales without 1) fully analyzing the environmental, social, and direct, indirect, and cumulative impacts of the lessees' planned drilling on emissions, water resources, and animal species, 2) identifying a reasonable range of alternatives, and 3) consulting with FWS. (Am. Compl. ¶¶ 9–10.) SUWA contends that the challenged leases, if reinstated, will cause recreational and aesthetic harm to its members, who use the federal public lands for a variety of purposes, including solitude, viewing native flora and fauna, rafting and canoeing, cultural appreciation, and hiking and backcountry recreation. (<u>Id.</u> ¶¶ 9–10, 14.)

In May 2024, AEC, an independent oil-and-gas exploration and development company, intervened in the case, seeking to defend its leases. (Order Granting Motion to Intervene dated

---

[4] <u>See</u> BLM, Supplemental Environmental Assessment Analysis for Greenhouse Gas Emissions Related to Oil and Gas Leasing in Seven States from Feb. 2015 to Dec. 2020, available at: https://eplanning.blm.gov/eplanning-ui/project/2022218/570 (last accessed Jan. 23, 2025).

May 10, 2024, ECF No. 41.)  AEC moved to dismiss SUWA's claim for lack of subject matter jurisdiction.  (ECF No. 42.)  AEC was joined in its motion by the State of Utah.  (ECF No. 45.)

AEC and the State of Utah argue in their motions to dismiss that 1) SUWA's claims were not ripe when the group brought the action because the BLM was and is still conducting further environmental reviews pursuant to NEPA and has not yet made a final and therefore reviewable decision about whether it will reinstate the already issued leases and 2) SUWA lacks standing because it has not shown that its members will suffer concrete and particularized injuries from oil and gas development on the challenged leases.  (ECF Nos. 42, 45.)  The court held a hearing on the Defendants' motions on January 16, 2025.  (ECF No. 69.)

On January 17, 2025, AEC filed a Notice of Supplemental Authority to inform the court that the BLM had just published a Notice of "Intent to Prepare an Environmental Impact Statement for the Oil and Gas Leasing Decisions in Seven States From February 2015 to December 2020." (ECF No. 70 (citing 90 Fed. Reg. 4779 (Jan. 16, 2025)) (EIS Notice).)  AEC contends that "[t]he EIS Notice encompasses the leases that [SUWA] challenge[s] in this lawsuit" and will "provide a comprehensive analysis of the potential environmental impacts from these leases … including the impacts of [GHG] emissions."  (Id. at 2).  "Further, the EIS Notice initiates a 'public scoping process,' in which SUWA can participate."  (Id. at 3.)  The EIS Notice confirms that the BLM may affirm, modify, or cancel its leases at the conclusion of its administrative process.  (Id. at 3 (citing EIS Notice at 4780).)  In response to AEC's Notice of Supplemental Authority, SUWA reiterated its argument, as discussed below, that BLM's supplemental leasing analyses do not alter its standing or the ripeness of the organization's claim.  (Pl.'s Resp. Defs.' Suppl. Auth., ECF No. 71.)

8

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must plead facts sufficient to state a claim to relief that is plausible on its face." Slater v. A.G. Edwards & Sons, Inc., 719 F.3d 1190, 1196 (10th Cir. 2013) (internal punctuation omitted) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A claim is facially plausible when the complaint contains factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged. See Burnett v. Mortg. Elec. Registration Sys., Inc., 706 F.3d 1231, 1235 (10th Cir. 2013).

"Standing is determined as of the time the action is brought." Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005). When evaluating at the motion to dismiss stage whether plaintiffs have standing, the court must accept all well-pled allegations in the complaint as true and construe them in the light most favorable to the plaintiff. See, e.g., Albers, 771 F.3d at 700; Warth v. Seldin, 422 U.S. 490, 501 (1975). Courts must also "construe the statements made in the affidavits in the light most favorable to the petitioner." Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1089 (10th Cir. 2006) (internal quotation marks omitted). The court's function is "not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." Sutton v. Utah Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999) (quoting Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir. 1991)).

## ANALYSIS

Both "standing and ripeness present the threshold jurisdictional question of whether a court may consider the merits of a dispute." SUWA v. Palma, 707 F.3d 1143, 1152 (10th Cir. 2013) (citing Morgan v. McCotter, 365 F.3d 882, 887 (10th Cir. 2004) ("[J]usticiability focus[es] on the twin questions of whether Plaintiff has standing to maintain this action and whether the

case is ripe for judicial review.")). The court addresses each threshold issue in turn, finding, for the reasons discussed below, that this case must be dismissed because SUWA's claims are not yet ripe pending the BLM's final decision on its suspended oil and gas leases.

### III. Article III Standing

The Defendants argue that this action cannot yet be litigated because SUWA, as an association, lacks standing to bring its case by failing to demonstrate an imminent, concrete, and particularized injury. Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (citing Allen v. Wright, 468 U.S. 737, 751 (1984)). Without constitutional standing, federal courts lack jurisdiction. Summers v. Earth Island Inst., 555 U.S. 488, 492–93 (2009).

To satisfy Article III's standing requirements, a plaintiff must show:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth v. Laidlaw Env. Servs. Inc., 528 U.S. 167, 180–81 (2000) (citing Defenders of Wildlife, 504 U.S. at 560–61). "The purpose of the injury-in-fact requirement of Article III is to ensure only those having a 'direct stake in the outcome,' and not those having abstract concerns, may have access to the courts." Comm. to Save the Rio Hondo v. Lucero, 102 F.3d 445, 451 (10th Cir. 1996) (quoting Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 473 (1982)); see also SUWA v. Palma, 707 F.3d at 1155 (same).

### A. Concrete and Particularized Injury

"The relevant showing for standing in environmental cases is not injury to the environment but injury to the plaintiff." Comm. to Save the Rio Hondo, 102 F.3d at 449. "Where, as here, 'the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.'" SUWA v. Palma, 707 F.3d at 1155 (citing Defenders of Wildlife, 504 U.S. at 562). "An association [will have] standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, 528 U.S. at 181. "As a general rule, 'environmental [association] plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.'" SUWA v. Palma, 707 F.3d at 1155 (citing Friends of the Earth, 528 U.S. at 183; Sierra Club v. Morton, 405 U.S. 727, 735 (1972)). In simple terms, the Defendants' standing argument turns on whether SUWA's members and/or employees have adequately pled that they will experience some loss of enjoyment if industrial drilling proceeds on this land.

In SUWA v. Palma, the Tenth Circuit analyzed standing in an environmental impact case involving the same plaintiff as here, SUWA, as well as the same declarant, Mr. Ray Bloxham. Id. In that case, Mr. Bloxham submitted a similar declaration specifying his work and recreational activities on the leased-out federal land. Id. at 1156. The Tenth Circuit, analyzing this declaration, determined that Mr. Bloxham's declaration was sufficient to show SUWA's standing because Mr. Bloxham had recently visited and evidently planned to visit the land that

11

would be adversely affected by oil and gas drilling.  Id.  Accordingly, the Tenth Circuit set forth a general rule that an environmental organization, like SUWA, will have a concrete, particularized injury sufficient to show standing where one of its members has "repeatedly visited a particular site, has imminent plans to do so again, and [has] interests . . . harmed by a defendant's conduct."  Id.; see also SUWA v. Off. of Surface Mining Reclamation & Enf't, 620 F.3d 1227, 1234 (10th Cir. 2010) (finding injury in fact because "SUWA's amended complaint states that its members use the land affected by these permits for various purposes—scientific study, hunting, aesthetic appreciation, sightseeing, and solitude" and that "the proposed mining operations would impair many, if not all, of these uses").

      Here, as in SUWA v. Palma, the court finds that the declaration of Mr. Bloxham, a SUWA member and employee, is sufficient to demonstrate the organization's standing to challenge the government's leases.  Mr. Bloxham details his extensive travel in recent months and years throughout the areas where the proposed drilling will occur.  (See ECF No. 64-1, Bloxham Decl.)  Mr. Bloxham's position at SUWA undisputedly entails "spend[ing] considerable time on-the-ground visiting public lands in Utah."  (Id. ¶ 1.)  He, like many other SUWA members, "use[s] and enjoy[s] the public lands and natural resources on BLM-managed lands for many purposes including health, recreational, and aesthetic, and [has] used" and "intend[s] to return as often as possible but certainly within the next year."  (Id. ¶¶ 16–24.)  His specific recreational activities "on the public lands in and near the challenged leases" include rafting, camping, and hiking activities on and around the land.  (Id.)  Mr. Bloxham elaborates that "[t]he development of the leases at issue in this litigation will degrade naturalness, destroy opportunities for solitude, create dust and pollution, increase ambient background noise levels, degrade and destroy wildlife habitat, and consume hundreds of millions of gallons of water in

this arid high desert region." (Id. ¶ 25.) Accepting these factual allegations as true, the court finds Mr. Bloxham has sufficiently established his personal stake in the use of this land if the leases are reinstated—and therefore his organization's standing. E.g., SUWA v. Palma, 707 F.3d at 1155. SUWA's Amended Complaint cannot be dismissed on the basis that its member's injury is not concrete or particularized.

### B. Imminence of Injury

The Defendants also argue that SUWA lacks standing because the organization's injuries are "hypothetical," rather than imminent, given that the leases have been indeterminately suspended pending the BLM's final NEPA and supplemental EIS analysis, with no drilling or development permits issued or on the horizon.[5] (ECF No. 42 at 7; Joint Reply Mot. Dismiss, ECF No. 65 at 9, 10–12.) The Tenth Circuit requires that an injury be "certainly impending … to ensure that the alleged injury is not too speculative for Article III purposes." SUWA v. Palma, 707 F.3d at 1157 (citing Defenders of Wildlife, 504 U.S. at 564 n. 2). Similarly, as the court discusses below, to establish that a case is "ripe" for judicial review, SUWA must show that the agency has made a "final" decision not subject to change. See Los Alamos Study Group, 692 F.3d at 1065. The Tenth Circuit recognizes that "[t]he doctrines of standing and ripeness" substantially overlap where, as in SUWA v. Palma, "[t]he question . . . is not whether SUWA is a proper party to challenge BLM's decision, but when it can do so." 707 F.3d at 1157 (citing Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc); Wright & Miller, § 3532.1 Sources of Doctrine, 13B Fed. Prac. & Proc. Juris. § 3532.1 (3d ed.)

---

[5] As discussed below, Defendants argue that SUWA's Amended Complaint also lacks "ripeness" for the same reason. (ECF Nos. 42 at 7 & 65 at 11–12.)

("Both ripeness and mootness, moreover, could be addressed as nothing but the time dimensions of standing.")).

Given the overlap between the court's standing and ripeness inquiries, and because the court has, for the reasons discussed above, determined that SUWA is a "proper party to bring this action if this is the correct time to do so," the court finds that the question of whether SUWA's injury is "hypothetical" or "imminent" is more appropriately decided under the ripeness doctrine, which has been "characterized as standing on a timeline." Id. The court therefore turns to the question of whether SUWA's claims are ripe for adjudication, finding, for the reasons discussed below, that the BLM's decision is, at this stage "non-final."

## IV. Ripeness

Whether a case is "ripe" for judicial review turns on two factors: "(1) the fitness of the issue for judicial review, and (2) the hardship to the parties of withholding judicial review." United States v. Cabral, 926 F.3d 687, 693 (10th Cir. 2019) (citing Abbott Labs. v. Gardner, 387 U.S. 136, 148–49 (1967)) (internal quotation marks omitted). In examining the first issue, the fitness of the issue for judicial review, the Tenth Circuit considers four questions:

> (1) whether the issues in the case are purely legal; (2) whether the agency action involved is 'final agency action' …; (3) whether the action has or will have a direct and immediate impact upon the plaintiff and (4) whether the resolution of the issues will promote effective enforcement and administration by the agency.

SUWA v. Palma, 707 F.3d at 1158 (quoting Coal. For Sustainable Res., Inc. v. U.S. Forest Serv., 259 F.3d 1244, 1250 (10th Cir. 2001)). Here, the Defendants contest and the court examines only the "finality" of the BLM's leasing decisions because "the absence of final agency action is [case] dispositive." Los Alamos Study Group, 692 F.3d at 1065 (citing Friends of Marolt Park v. U.S. Dep't of Transp., 382 F.3d 1088, 1093–94 (10th Cir. 2004) ("[W]hether the issues are fit for review depends on whether the plaintiff challenges a final agency action."); Park Lake Res. Ltd.

14

Liab. Co. v. U.S. Dep't of Agric., 197 F.3d 448, 450 (10th Cir. 1999) (same, citing the APA, 5 U.S.C. § 704, which limits judicial review to final agency actions and actions made reviewable by statute)).

The Tenth Circuit explained that "[a]n agency's action is final if it satisfies two requirements: 'First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  Second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'"  Los Alamos Study Group, 692 F.3d at 1065 (citing Bennett v. Spear, 520 U.S. 154, 177–78 (1997); Ctr. for Native Ecosystems v. Cables, 509 F.3d 1310, 1329 (10th Cir. 2007)).

SUWA argues that the BLM's initial 2018 and 2019 leasing decisions are "final" because the agency has already issued the 2018 and 2019 leases and because BLM is now "actively working on" applications for permits to drill.  (ECF No. 64 at 5–8.)  The court acknowledges "that in a typical mineral leasing case, environmental plaintiffs do not have to wait until drilling permits have been issued" because "Federal courts have repeatedly considered the act of issuing a lease to be final agency action which may be challenged in court."  SUWA v. Palma, 707 F.3d at 1159 (citing New Mexico ex. rel. Richardson v. BLM, 565 F.3d 683, 683 (10th Cir. 2009); Conner v. Burford, 848 F.2d 1441 (9th Cir. 1988); Sierra Club v. Peterson, 717 F.2d 1409 (D.C. Cir. 1983)).  However, the facts here are notably distinct from cases SUWA relies on, such as Richardson v. BLM, where the BLM's lease issuance demonstrated a "final agency action" sufficient to show fitness for judicial review.  Here, by stark contrast, the BLM leases are currently—and have been for nearly three years—suspended.

On these undisputed facts, the court finds that this case is far more analogous to a nearly identical case which SUWA notably fails to distinguish,[6] SUWA v. Palma, where the Tenth Circuit found that the parties' dispute over already-issued leases was not ripe because the agency's federal land leases were suspended pending supplemental environmental analysis—meaning, like here, the already-issued leases could be reinstated, revoked, or modified. 707 F.3d at 1159. As the Tenth Circuit held in remanding SUWA v. Palma for dismissal, a suspended lease is non-final. 707 F.3d at 1159 (characterizing the suspended leases as an "interim decision"); see also Los Alamos Study Group, 692 F.3d at 1065 (finding decision-making process was ongoing, tentative, and interlocutory because the environmental analysis process was "still open to public participal and it was unclear what form [the decision] would take) (citing Ctr. for Biological Diversity v. U.S. Dep't of the Interior, 563 F.3d 466, 480 (D.C. Cir. 2009) (classifying challenge to first stage of a multistage lease program as "not ripe" when agency "would be conducting additional analyses in later stages that could scuttle the program")). Judicial action would therefore be premature because there has not been a consummation of the BLM's decision-making process sufficient to support litigation—even if, as SUWA contends, it is likely the agency wants to reinstate the leases and issue drilling permits. See, e.g., Gardner v. Salazar, No. 2:11-cv-719-BSJ, 2013 WL 1284343, at *3 (D. Utah Mar. 27, 2013) (agency decision deemed non-final where administrative appeal remained pending), aff'd sub nom. Gardner v. Jewell, 538 F. App'x 830 (10th Cir. 2013); Front Range Equine Rescue v. BLM, No. 16-cv-0969-WJM, 2017 WL 5885314, at *7 (D. Colo. Nov. 29, 2017) (noting that a

---

[6] SUWA instead relies on the Tenth Circuit's holding in SUWA v. Palma as support for its claim that the BLM has made a "final agency action" in issuing the now-suspended leases. (ECF No. 64 at 10.) But in SUWA v. Palma, the Tenth Circuit reached the opposite conclusion, finding the action should have been dismissed "[b]ecause SUWA's claims are not ripe." 707 F.3d at 1161.

concerned party cannot sustain an APA suit by arguing that "an inoperative decision record shows what an agency wants to do and therefore likely will do when the agency issues a new decision record" (emphasis omitted)).  As even SUWA acknowledges, "the [BLM's] final 7-State GHG EA" could "subsequently invalidate[] th[e] leases," a possibility which BLM is examining in its supplemental GHG EA and forthcoming supplemental EIS.  (ECF No. 69 at 9; see also ECF No. 70 at 3.)  Consistent with Tenth Circuit law, the BLM's suspension and active reconsideration of its leases mean that its decision is not yet "final."  See Coal. For Sustainable Res., Inc., 259 F.3d at 1251 (agency action not "final" within meaning of APA where Forest Service was actively considering the plaintiff's proposed course of action).

  Instead of distinguishing SUWA v. Palma, SUWA focuses on the differences between the present case and another case that the Defendants have relied on in support of dismissal, Los Alamos Study Group, where the Tenth Circuit found an agency's decision was "non-final" and therefore not ripe for adjudication because an agency's leases had not yet been issued pending the agency's ongoing supplemental EIS analysis.  (ECF No. 64 at 8–10 (citing 794 F. Supp. 2d at 1229 (D.N.M. 2011), aff'd, 692 F.3d 1057 (10th Cir. 2012)).  SUWA argues that the Tenth Circuit's holding in Los Alamos Study Group means that the converse must be true—in other words, that the agency's decision must be final if any leases have been issued.  (ECF No. 64 at 8–9.)  But the Tenth Circuit in Los Alamos Study Group never discussed whether an agency's decision would be deemed "final" if leases had been issued but then suspended.  In any event, for the reasons discussed above, the court finds that even though the BLM's leases here have already been issued, their issuance is largely immaterial to whether the BLM has made a "final decision" because they have been suspended with no imminent or certain reinstatement.  Accordingly,

SUWA's claim, like that of the plaintiff in Los Alamos Study Group, will not be ripe until the conclusion of the agency's supplemental EIS.

SUWA also argues that the BLM's decision is "final" because the agency is in the process of reviewing applications for permits to drill on the land covered by the now-suspended leases. (ECF No. 64 at 5–8.) This is unpersuasive. It is undisputed that BLM has not yet issued any drilling permits. (Id. at 6 ("As of the date of this filing, there are fourteen pending APDs on leases at issue in this case, all of which were submitted by AEC.").) And SUWA concedes that drilling cannot occur until the BLM concludes its NEPA Analysis and reinstates the leases. (Id. at 8.) The court cannot reasonably conclude that "AEC will have approved APDs and potentially already drilled on the leases at issue here even if the final 7-State GHG EA subsequently invalidates those leases." (ECF No. 64 at 9.) There is simply too much uncertainty about when and what type of drilling, if any, will occur on the land covered by the now-suspended leases. E.g., Wilderness Watch v. Ferebee, 445 F. Supp. 3d 1313, 1325 (D. Colo. 2020) (explaining that even though "evidence shows that defendants have considered" a proposed action, consideration alone is insufficient to confer jurisdiction). The court concludes that SUWA has raised an "abstract disagreement" that the court cannot now adjudicate because doing so "would disrupt the administrative process" and hamper the efficiency of the BLM's environmental analysis. Farrell-Cooper Min. Co. v. U.S. Dep't of the Interior, 728 F.3d 1229, 1234 (10th Cir. 2013) (citing Abbott Labs., 387 U.S. at 148; Bell v. New Jersey, 461 U.S. 773, 779 (1983)); see also Coal. For Sustainable Res., Inc., 259 F.3d at 1253 ("[R]esolution at this time would likely impede rather than promote an effective conservation program.").

Finally, SUWA has not established an alternative basis for the court to intervene and find this dispute ripe for adjudication because the court can identify no injury or hardship to SUWA if

18

review is delayed until the leases are, if ever, reinstated. The status quo, as it has stood for the last five to six years, creates no rights or obligations regarding the public land: the lessees, including AEC, cannot presently drill, and SUWA's members are still able to enjoy the untouched natural environment.

The court finds, in dismissing the claims as not ripe, that SUWA "will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain"—for example, if the BLM decides to uphold some or all the leases after it has completed its NEPA Analysis and supplemental EIS. Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 734 (1998).

## CONCLUSION

For these reasons, the Intervenor Defendants' motions to dismiss (ECF Nos. 42, 45) are GRANTED. This case is dismissed without prejudice.

DATED this 4th day of February, 2025.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge