# EXHIBIT D

 

*Comments submitted via ePlanning*

August 16, 2024

Vernal Field Office
Bureau of Land Management
170 S 500 E
Vernal, UT 84078

> RE:    *Comments on Anschutz Exploration Corporation's Proposed Drumlin Well Pad,
> DOI-BLM-UT-G010-2024-0064-EA*

Greetings:

The Southern Utah Wilderness Alliance ("SUWA") and Living Rivers Colorado Riverkeeper ("Living Rivers") appreciate the opportunity to submit comments on the environmental assessment ("EA") for the Applications for Permit to Drill ("APD") on the Drumlin Well Pad (DOI-BLM-UT-G010-2024-0064-EA) ("Drumlin EA").

## I.    BLM Should Defer a Decision on the Drumlin APD Until Pending Litigation is Resolved

As an initial matter, SUWA and Living Rivers note that one of the target leases (UTU-093659) is currently being challenged in *Southern Utah Wilderness Alliance v. United States Department of the Interior*, 2:23-cv-00804-TC-DBP (D. Utah) ("*SUWA v. DOI*"). *See* Compl. Ex. 1 (ECF No. 1). UTU-093659's lessee (and Drumlin Project proponent), Anschutz Exploration Corporation ("AEC"), is a defendant-intervenor in this lawsuit and well-aware of the pending status of this litigation. *See generally*, Order and Mem. Decision on Mot. to Intervene (ECF No. 41).

This case is currently stayed until September 16, 2024 to allow parties to explore and negotiate the potential for settlement. *See* Order Granting Mot. for 90-Day Stay (ECF. No. 58). However, regardless of whether the litigation is resolved through settlement or a decision on the merits, it is probable, given the strength of SUWA's claims, that all or some of the leases at issue (including UTU-093659) may be vacated and/or APD approvals on any surviving leases will be suspended until supplemental NEPA analysis is conducted. *C.f.*, *WildEarth Guardians,* 368 F. Supp. 3d 41, 85 (D.D.C. 2019("[T]he Court enjoins BLM from issuing any APDs from the Wyoming Leases while the agency works to substantiate its EAs and FONSIs."); *W. Watersheds Project*, 543 F. Supp. 3d 958, 996 (D. Idaho 2021); ("[T]he Court will enjoin BLM from (1) issuing any new APDs for the Phase Two leases, and (2) any further surface disturbing activities thereon . . . ."); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 2:17-cv-372, 2021 WL 855938, at *2-4 (S.D. Ohio Mar. 8, 2021) (enjoining the issuance of new APDs and further surface disturbance pending additional NEPA analysis); *Wilderness Society v. Wisely*, 524 F. Supp. 2d 1285, 1305-06 (D. Colo. 2007) (enjoining activity on the leases pending further consultation under the Endangered Species Act (ESA)); *Mont. Wilderness Ass'n v. Fry*, 408 F.

SUWA & Living Rivers
Comments on the Proposed Drumlin Well Pad
DOI-BLM-UT-G010-2024-0064-EA
August 16, 2024

Supp. 2d 1032, 1038 (D. Mont. 2006) (enjoining surface disturbing activities on oil and gas leases pending compliance with NEPA and the ESA). In light of the current state of pending litigation and this potential outcome, it would conserve the time and resources of all the entities involved (BLM, AEC, and SUWA) if BLM defers a decision on the Drumlin APD until *SUWA v. DOI* is fully resolved.

## II.    The Drumlin EA Fails to Analyze a Range of Reasonable Alternatives

The National Environmental Policy Act ("NEPA") requires BLM to consider a range of reasonable alternatives to the proposed action. 42 U.S.C. § 4332(2)(H). This requirement applies regardless if BLM prepares an environmental assessment or environmental impact statement. In the Tenth Circuit, BLM's range of alternatives—including publicly recommended alternatives—is judged by the "rule of reason" standard.

> The reasonableness of the alternatives considered is measured against two guideposts: First . . . an alternative is reasonable only if it falls within the agency's statutory mandate. Second, reasonableness is judged with reference to an agency's objectives for a particular project.

*N.M. ex. rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 709 (10th Cir. 2009) (citations omitted). *See also High Country Conserv. Advocates v. U.S. Forest. Serv.*, 951 F.3d 1217, 1224 (10th Cir. 2020) (same). This standard requires BLM to demonstrate that it took a "hard look" at alternatives to the proposed action—a "thoughtful and probing reflection of the possible impacts associated with the proposed project" so as to "provide a reviewing court with the necessary factual specificity to conduct its review." *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 781 (10th Cir. 2006).

The range of alternatives an agency must analyze in an EA depends on its purpose and need statement. *See Davis v. Mineta*, 302 F.3d 1104, 1119 (10th Cir. 2002). "Alternatives that do not accomplish the purpose of an action are not reasonable." *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1041 (10th Cir. 2001). Stated differently, "[i]t is the BLM purpose and need for action that will dictate the range of alternatives and provide a basis for the rationale for eventual selection of an alternative in a decision." Bureau of Land Mgmt., Nat'l Env't Pol'y Act, Handbook H-1790-1 § 6.2 (Jan. 2008) ("BLM NEPA Handbook"). After "defining the objectives of an action," the agency must "provide legitimate consideration to alternatives that fall between the obvious extremes." *Colo. Env't. Coal. v. Dombeck*, 185 F.3d 1162, 1175 (10th Cir. 1999).

Notably, "[t]he broader the purpose and need statement, the broader the range of alternatives that must be analyzed." BLM NEPA Handbook §§ 6.2.1, 6.6.1. "In determining the alternatives to be considered, the emphasis is on what is 'reasonable' rather than on whether the proponent or applicant likes or is itself capable of implementing an alternative." *Id.* § 6.6.1.

SUWA & Living Rivers
Comments on the Proposed Drumlin Well Pad
DOI-BLM-UT-G010-2024-0064-EA
August 16, 2024

### A.    BLM established a broad purpose and need in the Drumlin EA

BLM's stated purpose and need for the Drumlin EA is broad:

> The BLM purpose for action is to respond to the Applications for Permits to Drill and the application for amendment of a right-of-way. The BLM need for action under 43 CFR 3171 is to review and provide a decision for Applications for Permits to Drill to develop valid, existing mineral lease(s) on lands under its jurisdiction. The BLM need for action under Title V of the Federal Land Policy and Management Act of October 21, 1976, as amended through September 1999, (90 Stat. 1776; 43 U.S.C. 1761), is to review and provide a decision for the right-of-way application.

Drumlin EA at 5. BLM's decision to be made is whether to approve or deny each of the APDs[1] "with their associated surface-disturbing activities," as well as the application to amend the right-of-way ("ROW"). *Id.*  These broad objectives govern BLM's range of alternatives and dictate the reasonableness of recommended alternatives, including those proposed herein by SUWA and Living Rivers.

### B.    Recommended alternatives

SUWA and Living Rivers recommend the following middle-ground alternatives, which are within BLM's statutory mandate and would accomplish BLM's stated objectives.

- <u>Four (4) APD Approvals</u>. Under this alternative, BLM would approve four of the APDs and deny the remainder of the APDs. Development of the approved APDs would follow a modified version of the phased development approach described in the proposed action wherein one initial well would be drilled and tested for productivity in phase one, and if AEC determined that well was successful, the remaining three wells may be drilled during phase two. The remainder of the proposed action would remain unchanged by this suggested alternative. This alternative would not prevent AEC from reaching both target leases, as AEC could choose which four out of the current eight wells to drill.

- <u>Wildlife Protection</u>. Under this alternative, BLM would apply, as conditions of approval, a modified version of the following stipulations that would not allow for exceptions, modifications, or waiver: UT-S-218, UT-S-230, UT-S-247, UT-S-325, regardless of whether the proposed action, alternative C, or the Four APD Approvals alternative is selected.[2]

---

[1] AEC is proposing to drill up to eight gas wells from one well pad and submitted a separate APD for each proposed well. *Id.*

[2] BLM could apply the modified versions of the stipulations to both UTU-065371 and UTU-093659, regardless of whether the stipulations were attached at the leasing stage because they would be conditions of approval for the Drumlin Project, not new/revised stipulations on the leases. Conditions of approval are project-specific and intended

SUWA & Living Rivers
Comments on the Proposed Drumlin Well Pad
DOI-BLM-UT-G010-2024-0064-EA
August 16, 2024

Among other benefits, the Four APD Approvals alternative would reduce the Drumlin Project's greenhouse gas ("GHG") emissions and water use, in accordance with NEPA's implementing regulations. *See* 40 C.F.R. § 1500.2(e) ("Federal agencies shall to the fullest extent possible… [u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment, <u>such as alternatives that will reduce climate change-related effects</u>…") (emphasis added). Similarly, the Wildlife Protection alternative would ensure important habitat for Utah prairie dogs, elk, mule deer, and raptors is protected, thereby minimizing adverse effects to the environment.

These recommended alternatives satisfy the rule of reason standard and therefore must be analyzed in the Drumlin EA. Importantly, as BLM considers these alternatives it must not "confuse[] the power to act with the requirement to analyze." *Rocky Mountain Wild v. Bernhardt*, 506 F. Supp. 3d 1169, 1186 (D. Utah 2020). Rather, in the context of preparing an EA, "BLM is required to analyze all reasonable alternatives to the proposed action, which includes those alternatives that are significantly distinguishable from the alternatives already considered." *Id.* (citations and quotations omitted).

Here, BLM must analyze both alternatives for the following reasons. *First*, they are indisputably within the agency's broad statutory mandate and authority under the Federal Land Policy and Management Act ("FLPMA"). *N.M. ex rel. Richardson*, 565 F.3d at 709-10 (when reviewing an agency's consideration (or failure to consider) recommended alternatives, the first question for the court is "whether [the alternative] falls within BLM's statutory mandate for land management"). Specifically, FLPMA requires that BLM "take any action necessary to prevent unnecessary or undue degradation" ("UUD") of public lands. 43 U.S.C. § 1732(b). Analyzing, and potentially selecting the Four APD Approvals alternative and/or the Wildlife Protection Alternative is one way BLM is able to comply with its statutory obligation to prevent UUD primarily because the Four APD Approvals alternative will result in reduced water and climate impacts compared to the proposed action and the Wildlife Protection Alternative will protect wildlife habitat beyond what is currently contemplated in by the proposed action.

*Second*, the Four APD Approvals and Wildlife Protection alternatives would unquestionably satisfy BLM's stated purpose and need for the project, *see N.M. ex rel. Richardson*, 565 F.3d at 709 (the rule of reason "is judged with reference to an agency's objectives for a particular project"), because they respond to AEC's proposal and would allow oil and gas development to proceed in a more environmentally responsible manner. Additionally, both recommended alternatives are significantly distinguishable from the proposed action. *See High Country Conserv. Advocates*, 951 F.3d at 1227) (holding that the United States Forest Service violated NEPA when it declined to consider and analyze plaintiffs' recommended alternative despite the fact that it was "significantly distinguishable" from the analyzed alternatives); *cf. Rocky Mountain Wild*, 506 F. Supp. 3d at 1186 ("BLM is required to analyze all reasonable alternatives

---

to "limit or amend the specific actions proposed by the operator." *See* 43 C.F.R. § 3171.4 (definition of "Condition of Approval"). Here, SUWA and Living Rivers refer to the suggested conditions of approval as modified versions of the referenced stipulations simply to identify for BLM the language and types of protections recommended under the Wildlife Protection alternative.

SUWA & Living Rivers
Comments on the Proposed Drumlin Well Pad
DOI-BLM-UT-G010-2024-0064-EA
August 16, 2024

to the proposed action, which includes those alternatives that are significantly distinguishable from the alternatives already considered…Simply stating that it has the power to choose to lease fewer than all of the parcels under consideration is not analysis") (quotations and citations omitted).

Because the Four APD Approvals alternative is a reasonable, significantly-distinguishable alternative that falls within the two extremes analyzed in the Drumlin EA (*i.e.,* approve all eight APDs in either the proposed action or alternative C, or approve no APDs in the no-action alternative), BLM must include it for analysis. *Cf. id.* at 1185-86 (holding that alternatives that would lease some, but not all, of the proposed parcels were significantly distinguishable from the no-action (lease nothing) and proposed action (lease everything) alternatives). BLM should likewise analyze the Wildlife Protection alternative because it is reasonable, distinguishable, and well-within BLM's decisionmaking authority. *See* 43 C.F.R. § 3171.13(a)(2) ("The approved APD will contain Conditions of Approval that reflect necessary mitigation measures…The BLM will incorporate any mitigation requirements, including Best Management Practices, identified through the APD review and appropriate NEPA and related analyses, as Conditions of Approval to the APD.").

Indeed, other BLM field offices in Utah have included non-waivable, non-modifiable wildlife conditions of approval for other energy development projects. *See, e.g.*, Bureau of Land Mgmt., Long Canyon Helium Processing Facility Env't Assessment and Decision Record, DOI-BLM-UT-Y010-2022-0062-EA, App. D (Nov. 2023). BLM should follow suit here.

## III.    The Drumlin EA Fails to Take a Hard Look at Environmental Impacts

The primary purpose of NEPA is two-fold: (1) "[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "it…guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Thus, while "NEPA itself does not mandate particular results, but simply prescribes the necessary process," *id.* at 350, agency compliance with NEPA's action-forcing statutory and regulatory mandates helps federal agencies ensure that they are adhering to NEPA's purpose and policies. *See* 42 U.S.C. §§ 4321, 4331.

NEPA imposes "action-forcing procedures…require[ing] that agencies take a 'hard look' at environmental consequences." *Robertson*, 490 U.S. at 350 (citations omitted). These "environmental consequences" or "effects" may be direct, indirect, or cumulative. 40 C.F.R. § 1508.1(i). Direct effects "are caused by the action and occur at the same time and place." *Id.* § 1508.1(i)(1). Indirect effects

> are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population

SUWA & Living Rivers
Comments on the Proposed Drumlin Well Pad
DOI-BLM-UT-G010-2024-0064-EA
August 16, 2024

> density or growth rate, and related effects on air and water and other natural
> systems, including ecosystems.

*Id.* § 1508.1(i)(2). And cumulative effects

> are effects on the environment that result from the incremental effects of the action
> when added to the effects of other past, present, and reasonably foreseeable actions
> regardless of what agency (Federal or non-Federal) or person undertakes such other
> actions. Cumulative effects can result from actions with individually minor but
> collectively significant effects taking place over a period of time.

*Id.* § 1508.1(i)(3).

### A.    Failure to Conduct Site-Specific Analysis Promised by the Leasing EA

The EA for BLM's December 2018 Competitive Oil and Gas Lease Sale for the Vernal Field
Office, which supported the decision to lease UTU-093659 deferred site-specific analysis for
many resource values to the drilling stage. *See* Bureau of Land Mgmt., Environmental
Assessment, December 2018 Competitive Oil and Gas Lease Sale, DOI-BLM-UT-G010-2018-
0044-EA, App. E at 2, 6, 7, 9-14, 17 (Feb. 2019) ("Leasing EA"). For instance, the Leasing EA
declined to analyze vegetation because "[d]evelopment within leased parcels would require site-
specific analysis and mitigation which would be conducted as these projects are proposed." *Id.* at
6. Likewise, impacts to soils were not analyzed at the leasing stage because "the majority of the
parcels have different soil types and biological soil crust across them" but would be analyzed
"[w]ith the submission of site specific surface disturbance plans." *Id.* at 7. However, now at the
APD stage the Drumlin EA fails to perform the promised analysis. *See* Drumlin EA App. A at 6-
7 (plants), 8 (soils) (declining to analyze both resources in detail).

The Drumlin EA also fails to analyze impacts to water resources and recreation (specifically as it
pertains to the White River) in detail, despite BLM committing to do in the Leasing EA. *See*
Leasing EA App. E at 7 (recreation), 9-13 (water). These resources are discussed in further detail
below. To be clear, BLM made similar mistakes for many other resource values but SUWA
provides these examples to illustrate the larger problem.

### i.    Water Resources

Water is one of the most critical environmental resources that when compromised and consumed,
detrimentally affects the quality of the environment, and hinders the environment's ability to
thrive. Thus, to fully comply with NEPA, BLM must (as it committed to do in the Leasing EA)
analyze water-related impacts the proposed action will have on the surrounding ecosystem. This
necessarily includes addressing the impacts from the proposed action and its alternatives on
surface water, water quantity, groundwater, and the impacts of that water use on the surrounding
environment. *See* 40 C.F.R. § 1508.1(i). To this end, the Tenth Circuit has been clear that BLM

SUWA & Living Rivers
Comments on the Proposed Drumlin Well Pad
DOI-BLM-UT-G010-2024-0064-EA
August 16, 2024

must take a hard look at water resources when evaluating a site-specific oil and gas APD.[3] *See, e.g., Diné Citizens Against Ruining Our Env't v. Bernhardt* ("*Diné CARE I*"), 923 F.3d 831, 856-59 (10th Cir. 2019) ("[W]ater use is an important aspect of the environmental impacts associated with well drilling."); *Diné Citizens Against Ruining Our Env't v. Haaland* ("*Diné CARE II*"), 59 F.4th 1016, 1044-45 (10th Cir. 2023).

Indeed, for the various water resources (*e.g.*, groundwater, stormwater, streams, riparian wetlands, floodplains, and surface water), the Leasing EA repeatedly states that "[s]ite-specific effects cannot be analyzed until an exploration or development application is received, after leasing has occurred," thus deferring analysis of water resources to the APD stage. Leasing EA App. E at 9-13. Additionally, SUWA has previously informed the Vernal Field Office of the *Diné CARE* cases and the need to analyze and disclose water quantity impacts. *See generally*, Letter from S. Utah Wilderness All., to Bureau of Land Mgmt., *Re: BLM's Repeated Failure to Analyze and Disclose Water Quantity Impacts of Oil and Gas Development in the Vernal Field Office*, (May 29, 2024) ("Water Letter") (attached).

However, the Drumlin EA—which purports to be a site-specific analysis of the impacts from the drilling proposal—likewise does not analyze these effects in detail, despite having the data and information available to do so. Currently, the Drumlin EA only addresses water in the context of analyzing how water depletions from the White River would affect threatened and endangered fish.[4] *See* Drumlin EA at 49-54. Nowhere in the Drumlin EA does BLM analyze how the project would impact the aforementioned water resources. Instead, BLM briefly discusses water impacts in the Interdisciplinary Team ("IDT") Checklist.[5] *See* Drumlin EA App. A at 9-13. In doing so, BLM mentions data such as the project's estimated water use, water use in the counties, etc. but goes on to state—without support—that the various design features would "reduce impacts to these resources below a level requiring detailed analysis." *Id.*

This conclusion is arbitrary and in violation of NEPA, especially considering Tenth Circuit precedent and BLM's own prior statement indicating that it would (and must) analyze impacts to water resources during the APD stage.

ii.    **Recreation**

The White River area provides superb opportunities for both land- and water-based recreation in an area that brings beauty and biodiversity to this unique desert landscape. Of the 1.7 million acres of BLM land in the Vernal planning area, a very small percentage includes areas where visitors can appreciate a lush river corridor and the variety of life it brings. The sandstone walls

---

[3] This is not to say that BLM is excused from first analyzing water resources at the leasing stage. To the contrary, the Tenth Circuit has also held that BLM must do so if relevant data and information is available. *See N.M. ex. rel. Richardson*, 565 F.3d at 713-15. Regardless, BLM cannot use the *shell game* (committing to analyze these impacts at the APD stage but then never doing so) to avoid this work.

[4] As explained in further detail below, with regard to cumulative impacts, this analysis is inadequate and fails to meet NEPA's hard look standard.

[5] Because IDT Checklist merely serves as an explanation of why BLM believes resources do or do not require detailed analysis, such explanations alone do not satisfy NEPA's hard look standard.

SUWA & Living Rivers
Comments on the Proposed Drumlin Well Pad
DOI-BLM-UT-G010-2024-0064-EA
August 16, 2024

have been eroded and arranged into fascinating pinnacles, ridgelines and towers. Large cottonwood galleries dominate the meanders of the river providing wildlife habitat and numerous protected campsites. To the observer, the canyon is a continuous unit of wild lands. *See generally* Bureau of Land Mgmt., *Floating the White River* (undated).[6]

Opportunities for the public to experience high quality and unique recreational activities in river-canyon settings, such as the White River Canyons, is increasingly limited in the Vernal Planning Area. In 2019, the Dinosaur National Monument River Office received more than 10,000 applications for only 300 private permits. By 2022 the number of applications nearly doubled to 18,325. Email from Cody Perry to Michael Earles, Nat'l Park Serv. Dinosaur River Office (Aug. 8, 2023) ("White River Permits Email") (attached). Similar trends for launch permits are seen for Desolation Canyon where the amount of applications for approximately 400 private launch permits has more than doubled; from 4,919 in 2019, to 11,325 in 2023. Email from Cody Perry to Jaydon Mead, Bureau of Land Mgmt. Price Field Office (Nov. 30, 2023) (attached). Finally, approximately 40,000 user days for private boaters were recorded on the unpermitted A, B, and C sections of the Upper Green in 2023. Email from Cody Perry to Aaron Selig, U.S. Forest Serv., Ashley Nat'l Forest (Dec. 1, 2023) (attached). Trends clearly indicate that demand for recreation in river-canyon settings has grown rapidly in the planning area, yet the Vernal Field Office has failed to manage for those resources along the White River natural area, or White River Canyon viewshed.

To ensure the continued availability of these rare and high-quality recreational experiences the BLM must take a hard look at the impacts to the recreational values of the White River viewshed and the White River natural area. Local communities in Utah and Colorado deserve the maximum economic benefit from recreation, maintain equitable access to the resource, and agency and partner capacity is directed toward recreation and landscape protection. It is often assumed that the quality of experience for water-based activities are focused solely on flow-related values, but that is far from the case. Visiting the White River, be it on water or designated route is a trip into the surrounding landscape. The method of travel can vary, but all visitors crane their heads upward and outward at the geology, wildlife or riparian systems. Simply put, solitude requires a setting. Unfortunately, such recreational experiences are impaired by the encroachment of industrial oil and gas development, physical impacts to viewsheds, safety concerns related to recreation and industrial activity occurring in close proximity.

BLM recognized as much in the Leasing EA by observing that "[p]otential impacts to recreationist floating the White River due to oil and gas development include noise, and visual impacts from the sights and sounds of oil and gas development and production" and stating

> [f]uture detailed analysis of proposed development plans would be necessary in order to mitigate the impact to river recreationists by considering proposed locations, topography, equipment, distance from the river, and timing drilling and

---

[6] Available at: https://www.blm.gov/sites/default/files/documents/files/white%20river%20for%20web.pdf (last visited Aug. 15, 2024).

SUWA & Living Rivers
Comments on the Proposed Drumlin Well Pad
DOI-BLM-UT-G010-2024-0064-EA
August 16, 2024

> construction operations to occur during times of the year when recreationists are likely to not be on the river.

Leasing EA App. E at 7. But the Drumlin EA considers no such information and contains no analysis of how the Drumlin Project would affect the recreational experience on the White River. *See* Drumlin EA at 6 (the "Identification of Issues" section does not include recreation). Indeed, the full extent of BLM's consideration of recreational impacts is contained in the following IDT Checklist paragraph:

> Per GIS review, there are no developed or undeveloped recreation resources within the project area. Impacts to dispersed recreation would be near imperceptible due to the availability of similar dispersed recreation opportunities in adjacent areas. While it is present, recreation would not be affected to a degree that detailed analysis is required.

Drumlin EA App. A at 8. Not only is the first sentence of this statement inaccurate, as rafting the White River is a recognized and sought-after recreational activity, *see* Leasing EA at 23, App. E at 7; White River Permits Email, but it directly contradicts BLM's prior statement in the Leasing EA that detailed analysis of recreation impacts is necessary—and would be conducted—at the APD stage.

Had the Drumlin EA considered recreation impacts in detail, as BLM committed to do, its analysis likely would have shown that river recreationists and dispersed campers would be adversely affected by the Drumlin Project. For instance, recreationists may be able to hear noise from the drilling and operations of the Drumlin well pad, thereby detrimentally impacting their river rafting and/or dispersed camping experiences. *See* S. Utah Wilderness All., Map – Anschutz Drumlin Well Pad Project Sound Propagation Model (2024) (attached). Similarly, the project will be visible from portions of the White River Natural Area and White River BLM-identified lands with wilderness characteristics ("LWC") unit.[7] Thus, recreationists seeking a wilderness experience (including naturalness, solitude, and primitive, unconfined recreation) in those areas will be adversely affected by the presence of the project. *See*, S. Utah Wilderness All., Map – Anschutz Drumlin Well Pad Project Viewshed Analysis (2024) (attached).

Furthermore, the Drumlin EA claims that visual impacts will be mitigated by the use of "Dark Sky-friendly" lighting "unless superseded by safety needs." Drumlin EA at 49. However, the EA doesn't explain what "Dark Sky-friendly" lighting is, nor how it will minimize impacts to the darkness of the night skies in the region. Without evidence to the contrary, it is reasonable to expect that campers and stargazers in the White River area will be adversely affected by the Drumlin Project's artificial lighting.

---

[7] While the Drumlin EA purports to analyze visual resources in detail, *see* Drumlin EA at 47-49, it does not include a viewshed analysis, nor any discussion of how recreationists utilizing the White River, White River Natural Area, and/or White River LWC would be impacted by the visual effects of the project. Rather, BLM's analysis is arbitrarily limited to a one-mile buffer around the project location (SUWA's viewshed model shows visual impacts extend beyond one mile away from the drill site) and is confined to discussing how the project fits within the existing visual resource management classifications.

SUWA & Living Rivers
Comments on the Proposed Drumlin Well Pad
DOI-BLM-UT-G010-2024-0064-EA
August 16, 2024

In sum, BLM's complete failure to address how the Drumlin Project will impact recreationists to the White River area is arbitrary, capricious, and in violation of NEPA.

**B.    Failure to Analyze Cumulative Impacts**

The Drumlin EA does not satisfy the Tenth Circuit standard for a cumulative impacts analysis:

> [A] meaningful cumulative impact analysis must identify five things: (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1056 (10th Cir. 2011) (citation omitted). In particular, the Drumlin EA's cumulative impacts analyses do not satisfy factors 3-5. For the third factor, the EA lists only generic <u>types</u> of past, present, and reasonably foreseeable projects (*e.g.*, mining, oil and gas development, urbanization, agricultural activities) and does not include any actual projects that fall within the cumulative impacts analysis areas ("CIAA"). *See* Drumlin EA at 23 (air quality), 44 (migratory birds), 46 (natural areas), 47 (LWC), 54 (fish).[8]

However, there are numerous projects that fall within BLM's CIAAs that have impacted or will impact the same resource values as the Drumlin Well Pad proposal, including but not limited to:

- Oil and gas development in the Glacier (Deep) Unit (UTUT106367776), including drilling the obligation well(s), to the extent that the Drumlin Project does not satisfy the Glacier Unit's obligations.[9] As part of the approved unit agreement, BLM knows the

---

[8] The Drumlin EA does not contain <u>any</u> cumulative impacts analysis for visual resources. *See id.* at 47-49 (describing the environmental consequences to visual resources without any mention of cumulative impacts).

[9] While the Drumlin EA notes that "the project location is located on a federal oil and gas lease in the Glacier Unit…in <u>Section 30 Township 10 South, Range 24 East, Section 6 Township 11 South, Range 24 East, and Sections 25 and 36, Township 10 South, Range 23 East</u>, Uintah County, Utah" it does not specify whether any of the Drumlin Project wells are obligation wells for the Glacier (Deep) Unit. Drumlin EA at 5 (emphasis added). BLM stated in an email that Drumlin Fed 10-24-30-5-13 MCH would constitute an obligation well for the Unit. Email from Joel Ward, Bureau of Land Mgmt. to Hanna Larsen, S. Utah Wilderness All. (Aug. 13, 2024) (attached). However, BLM's June 2024 decision identifying and approving an "obligatory well" for the Glacier (Deep) Unit specifies a horizontal test well located in <u>Section 31 of Township 10 South, Range 24 East and Section 5 of Township 11 South, Range 24 East</u>…as the required obligatory well for the Glacier (Deep) Unit. Letter from Bureau of Land Mgmt. to Anshutz Exploration Corp., *Re: Request for Expansion of Glacier (Deep) Unit (UTUT106367776) Agreement and an Obligatory Well Drilling Approval, Uintah County, Utah*, 2 (June 24, 2024) (emphasis added) (attached). Based on this decision, which identifies a different location for the obligation well, it appears that the Drumlin Project does not fulfill obligation requirements for the Glacier (Deep) Unit. Regardless of whether it does or does not, BLM should clarify and incorporate into its analysis the existence and role of the Glacier (Deep) Unit in relation to the Drumlin Project.

SUWA & Living Rivers
Comments on the Proposed Drumlin Well Pad
DOI-BLM-UT-G010-2024-0064-EA
August 16, 2024

Section, Township, and Range in which the obligation well(s) will be drilled and thus,
this activity is reasonably foreseeable even if no APD has been submitted;

- Oil and gas development in the Canvas (Deep) Unit (UTUT106353986), including
drilling the obligation well(s). As part of the approved unit agreement, BLM knows the
Section, Township, and Range in which the obligation well(s) will be drilled and thus,
this activity is reasonably foreseeable even if no APD has been submitted;

- Oil and gas development in the Tarn (Deep) Unit (UTU-95797X), including drilling the
obligation well(s). As part of the approved unit agreement, BLM knows the Section,
Township, and Range in which the obligation well(s) will be drilled and thus, this activity
is reasonably foreseeable even if no APD has been submitted;

- The RW 33-22 Well Pad, DOI-BLM-UT-G010-2023-0116-EA;

- The Middle Fork Five RW Well Pads and Trunkline, DOI-BLM-UT-G010-2024-0006-
EA;

- The Middle Fork RW 32-23 Well Pad, DOI-BLM-UT-G010-2023-0115-EA;

- The Dobby Well Pad, DOI-BLM-UT-G010-2023-0071-EA;

- The Bierstadt Fed 1123-16 Pad, DOI-BLM-UT-G010-2023-0017-EA;

- The reasonably foreseeable wells predicted in the Leasing EA for the lease at issue
(parcel 155), as well as nearby leases (*e.g.*, parcels 152-54, 156, 180, 233-34, all of which
were sold). *See* Leasing EA App. F at unpag. 6-8. Collectively, there are at least 64
reasonably foreseeable wells in the immediate vicinity of the Drumlin well pad, including
the ten predicted wells on parcel 155. *Id.*

These projects—and any other relevant projects in the CIAAs, including Utah Trust Lands
projects—must be identified and, as explained below, analyzed in the Drumlin EA because
"simply listing all relevant actions is not sufficient." *Great Basin Res. Watch v. Bureau of Land
Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016).

The Drumlin EA likewise falls short on the fourth and fifth factors. It does not analyze the
impacts from these other projects (factor four) nor does it analyze and disclose the overall impact
that can be expected from those projects when viewed together with the Drumlin proposal (factor
five). Instead, the Drumlin EA takes a similar approach for each resource value analyzed in the
EA: first, it defines the CIAA; second, it lists a few generic types of actions that may be in the
CIAA; third, it references the direct and indirect impacts of the Drumlin Project; and finally, it
provides a conclusory statement (without analysis or explanation) that the Drumlin Project
would, at most, incrementally contribute to cumulative effects within the area. *See* Drumlin EA
at 44 (migratory birds), 46 (natural areas), 47 (LWC), 54 (fish).

SUWA & Living Rivers
Comments on the Proposed Drumlin Well Pad
DOI-BLM-UT-G010-2024-0064-EA
August 16, 2024

For example, the grand total of the Drumlin EA's cumulative impacts analysis for the White River Natural Area is contained in the following statement:

> The alternatives would be expected to incrementally contribute to the cumulative level of adverse effects from other actions in the analysis area described in section 3.4.1 for the temporal scope of the direct and/or indirect effects disclosed in sections 3.4.3 and 3.4.4. However, the cumulative level of effects after the incremental contribution of the proposed development would be unlikely to result in a change in wilderness characteristics that would cause them to no longer meet the minimum definitional criteria for wilderness characteristics.

*Id.* at 46. This is not a cumulative impacts analysis. Among other shortcomings, it does not describe the impacts of operating the existing pipeline or maintaining the existing Southam Cyn 10-24-13-30 well pad (the only two actions identified in the White River Natural Area CIAA), nor does it discuss the overall impacts of the Drumlin Project when viewed together with the other two identified projects.

Likewise, the Drumlin EA's entire cumulative impacts analysis for the White River LWC unit is as follows:

> Both action alternatives would be expected to incrementally contribute equally to the cumulative level of adverse effects from other actions in the analysis area described in section 3.5.1 for the temporal scope of the direct and indirect effects disclosed in section 3.5.3. However, the cumulative level of effects after the incremental contribution of the proposed development would be unlikely to result in a change in wilderness characteristic that would cause them to no longer meet the minimum definitional criteria for wilderness characteristics.

*Id.* at 47. But the EA does not list any other actions in the analysis area. Rather, it states only that "[p]ast, present and reasonably foreseeable actions in the White River lands with wilderness characteristics include development of oil and gas infrastructure." *Id.* at 46. The Drumlin EA does not list any specific actions, does not describe the (generic) impacts of developing oil and gas infrastructure, and does not explain how BLM came to the conclusion that the impacts of the Drumlin Project, when added to the impacts of other (unidentified) oil and gas development, would not result in a change to wilderness characteristics.

To be clear, the Drumlin EA makes these same mistakes for all resource values analyzed, in addition to completely failing to consider impacts to recreation (and therefore failing to account for the cumulative effects of various projects on recreation). Particularly, as noted above, to fully comply with NEPA, BLM must analyze any water-related impacts, including cumulative impacts the proposed action will have on the surrounding ecosystem. Yet the Drumlin EA fails to do so.

SUWA & Living Rivers
Comments on the Proposed Drumlin Well Pad
DOI-BLM-UT-G010-2024-0064-EA
August 16, 2024

**A.    BLM must quantify and analyze cumulative water quantity impacts from
exploration and development of other known energy and minerals projects.**

In *Diné CARE II*, the Tenth Circuit established the minimum threshold that BLM must meet to
satisfy its NEPA hard look obligation regarding cumulative impacts to water quantity in site-
specific drilling EAs. There, BLM's analysis in the relevant EA addendum took a "quantitative-
comparative" approach. *Diné CARE II*, 59 F.4th at 1045. That is, for both the approved APDs
and the wells projected in the applicable Reasonably Foreseeable Development Scenario
("RFDS"), BLM

> considered how much water was likely to be used, including if all wells employed
> the most water-intensive methods. It then compared that water consumption to the
> total amount of water projected to be used in the region…

*Id.* at 1044. In other words, BLM calculated the per-well impact based on the type of well and
included the "aggregated direct impact of developing all wells associated with the proposed
action, including all drilling, workover, and plugging." Bureau of Land Mgmt., *Diné CARE*
Env't Assessment Add., 33 (Feb. 2020) ("*Diné CARE* EA Addendum") (attached). BLM then
compared this aggregated total water usage from the proposed action to the total estimated water
use in the relevant hydrologic region. *Id.* Because "there is a finite amount of water supporting
the various water uses in a specific region," the Tenth Circuit found BLM's quantitative-
comparative analysis approach sufficient to satisfy NEPA's hard look requirement. *Diné CARE
II* at 1045.

The following table compares the information provided/analysis conducted by BLM in the *Diné
CARE II* EA Addendum and the information scattered throughout the Drumlin EA:[10]

---

[10] Because the Drumlin EA does not analyze water resources in detail, there is no analysis associated with this
information.

SUWA & Living Rivers
Comments on the Proposed Drumlin Well Pad
DOI-BLM-UT-G010-2024-0064-EA
August 16, 2024

| Type of Information/Analysis | *Diné CARE II* | Drumlin EA |
|---|:---:|:---:|
| Water Use in Basin/Hydrologic Unit by Category | ✓ | ✓* |
| Potential Water Sources | ✓ | ✓ |
| Water Disposal | ✓ | ✓ |
| Direct Water Impact by Well Type | ✓ | ✓ |
| Comparison of Direct Water Use to Total Water Use in Basin/Hydrologic Unit | ✓ | ✓* |
| Identify Past, Present, and Reasonably Foreseeable Future Actions | ✓ | |
| Cumulative Water Use Based on Well Type | ✓ | |
| Cumulative Water Use Based on Drilling Technique | ✓ | |
| Comparison of Cumulative Water Use to Total Water Use in Basin/Hydrologic Unit | ✓ | |
| Mitigation Measures & Residual Impacts | ✓ | |

*only discussed in the IDT Checklist, which by definition is not NEPA analysis

The Drumlin Project is expected to use 528 acre-feet of water from the White River and obtained via four existing water rights. Drumlin EA at 13. The IDT Checklist further observes that total water use in Daggett, Duchesne, and Uintah Counties is 645,688 acre-feet/year, of which 5,342 acre-feet/year is attributable to oil and gas operations and mining. *Id* App. A at 9-10. However, because water resources are not analyzed in detail, the Drumlin EA does not identify a CIAA for water resources,[11] nor identify any past, present, or reasonably foreseeable actions that have or will impact water quantity.

Importantly, BLM has the tools and information available to analyze water usage in a manner that comports with *Diné CARE II*.[12] For example, in just the last year, the Vernal Field Office has approved at least six projects totaling 34 gas wells within the Lower White watershed, HUC 14050007,[13] that are cumulatively estimated to use over 1,000 acre-feet of water. Water Letter at 6-7, 9. This is not a trivial amount and does not include pending projects within the Lower White watershed. BLM can and must quantify and <u>analyze</u> the cumulative impacts of this water usage on the environment (not just the threatened and endangered Colorado River fish), including comparing this water use to the total anticipated water use in the Lower White watershed. The failure to do so would violate NEPA.

---

[11] Unless it is to be assumed that the CIAA encompasses the entirety of Daggett, Duchesne, and Uintah Counties.
[12] The attached BLM water report further demonstrates that BLM has information available and is capable of analyzing water quantity impacts in a manner sufficient to meet NEPA's hard look requirement. Indeed, this report was created for the express purpose of incorporating water resources data into site-specific NEPA analyses for proposed oil and gas development in New Mexico. *See* Bureau of Land Mgmt., Water Support Document for Oil and Gas Development in New Mexico, 4 (2020) (attached). There is no reason why the BLM Utah office cannot develop a similar report.
[13] The Drumlin well pad is also located in the Lower White watershed. *See S. Utah Wilderness All.*, Map – Watersheds (HUC8) (2024) (attached).

SUWA & Living Rivers
Comments on the Proposed Drumlin Well Pad
DOI-BLM-UT-G010-2024-0064-EA
August 16, 2024

      **B.**      **BLM must quantify and analyze cumulative impacts of the Vernal Field Office's Reasonably Foreseeable Development Scenario.**

NEPA's requirement that BLM analyze all reasonably foreseeable cumulative impacts, 40 C.F.R. § 1508.1(i)(3), includes future wells identified in a reasonably foreseeable development scenario ("RFDS"). *Diné CARE I*, 923 F.3d at 853. Specifically, BLM's cumulative impact analysis of RFDS wells must include studying the cumulative impacts all wells will have on water quantity and the environment. *Id.* at 850, 856-57 (holding that BLM needed to analyze the "cumulative impacts of water resources" associated with the wells identified in the RFDS).

The Vernal Field Office Resource Management Plan ("RMP") initially predicted an RFDS where 6,530 wells would be drilled. *See* Bureau of Land Mgmt., App. A Oil and Gas Development Potential (undated).[14] Since then, BLM updated its RFDS for this region to anticipate 28,417 wells (more than four times as many as was originally predicted). Bureau of Land Mgmt., Greater Uinta Basin Oil and Gas Cumulative Impacts Technical Support Document, at 10, tbl. 3-2 (March 2012) (attached). The Tenth Circuit has held that such wells are reasonably foreseeable and must be analyzed in BLM's site-specific drilling analyses, including their cumulative water resources impact. *See Diné CARE I*, 923 F.3d at 853 ("we conclude that once the . . . RFDS issued, the . . . wells predicted in that document were 'reasonably foreseeable future actions'") (citing 40 C.F.R. § 1508.7 (1978)); *id.* at 854 ("The BLM therefore had to consider the cumulative impacts of all 3,960 wells when it conducted its site-specific EAs").

Therefore, BLM must revise the Drumlin EA to analyze water resources in detail. In doing so, BLM must comply with the requirements set forth in *Diné CARE I* and *II*.

***

In order to cure these NEPA deficiencies, BLM must 1) analyze at least one more environmentally-friendly alternative, and 2) take a hard look at the Drumlin Project's direct, indirect, and cumulative impacts, as detailed above. In particular, BLM must pay careful attention to water and recreation impacts. Finally, regardless of how BLM chooses to modify the Drumlin EA, it should defer any such decision on the project until *SUWA v. DOI* is fully resolved.

SUWA and Living Rivers appreciate your consideration of these comments.

Sincerely,

/s/Hanna Larsen                /s/John Weisheit
Hanna Larsen                   John Weisheit
Landon Newell                 Cody Perry
Southern Utah Wilderness Alliance     Living Rivers Colorado Riverkeeper

---

[14] Available at
https://eplanning.blm.gov/public_projects/lup/68145/86644/103816/Appendix_A_Oil_&_Gas_Dev2.pdf (last visited Aug. 15, 2024).