# EXHIBIT E



Landon Newell
Hanna Larsen
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, Utah 84111
Telephone: 801-486-3161

*Attorneys for Appellants*
*Southern Utah Wilderness Alliance & Living Rivers Colorado Riverkeeper*

## BEFORE THE UTAH BLM STATE DIRECTOR

| | |
|---|---|
| **SOUTHERN UTAH WILDERNESS ALLIANCE** and **LIVING RIVERS COLORADO RIVERKEEPER,** | |
| Appellants, | In the Matter of the Drumlin Well Pad Project, DOI-BLM-UT-G010-2024-0064-EA |
| v. | |
| **GERALD KENCZKA,** in his official capacity as Assistant Field Manager for Lands and Minerals, Vernal Field Office, Bureau of Land Management; **BUREAU OF LAND MANAGEMENT,** | **REQUEST FOR STATE DIRECTOR REVIEW** |
| Appellees. | |

In accordance with 43 C.F.R. § 3165.3(b), the Southern Utah Wilderness Alliance

("Alliance") and Living Rivers (collectively, "SUWA") timely request an immediate State

Director Review ("SDR") of the Bureau of Land Management ("BLM") Vernal Field Office's

Environmental Assessment ("EA"), Finding of No Significant Impact ("FONSI") and Decision

Record ("DR") for the Drumlin Well Pad Project, DOI-BLM-UT-G010-2024-0064-EA

("Drumlin Project").[1]

---

[1] Available at: https://eplanning.blm.gov/eplanning-ui/project/2032124/510 (last visited February 13, 2025).

BLM's decision to approve eight applications for permits to drill ("APDs") into four target leases, along with a right-of-way application for a lay-flat pipeline is arbitrary and capricious for two reasons. *First,* four of the APDs cannot be drilled because the leases they target were unlawfully authorized. *Second,* BLM's decision violates the National Environmental Policy Act ("NEPA") because the Final EA (1) failed to take a hard look at impacts to various resources including soils, vegetation, water quantity, and recreation; and (2) failed to analyze a reasonable range of alternatives.

The Alliance and Living Rivers are proper parties to maintain and pursue this request for SDR because "[a]ny adversely affected party that contests a...decision of the authorized officer issued under the regulations in this part, may request an administrative review, before the State Director." 43 C.F.R. § 3165.3(b). The Alliance and Living Rivers both meet these requirements. *See* Decl. of Ray Bloxham (attached as Ex. 1).

## BACKGROUND

### I.    General Project Setting

The Drumlin Project is located in eastern Utah's Uinta Basin adjacent to the White River Natural Area and just south and east of the White River. *See* Final EA at 17, 11, 51. It is also located just south of the White River BLM-identified Lands with Wilderness Characteristics ("LWC") unit. *Id.* at 51. The greater White River area is an incredibly beautiful and unique desert landscape teeming with biodiversity. The river itself is a "floater's and paddler's paradise" that meanders through the high desert of the Colorado Plateau before reaching its confluence with the Green River. *White River Recreation Area*, Bureau of Land Mgmt., https://www.blm.gov/visit/white-river-recreation-area (last visited Feb. 13, 2025) ("White River Rec Area Website"). Sandstone walls have been eroded and arranged into fascinating pinnacles,

2

ridgelines and towers. Large cottonwood galleries dominate the meanders of the river providing

wildlife habitat and numerous protected campsites. To the observer, the canyon is a continuous

unit of wild lands. *See generally* Bureau of Land Mgmt., *Floating the White River* (undated).[2]



*Photo 1: The White River. © Ray Bloxham/Southern Utah Wilderness Alliance*

## II.    The 2018 Leasing Process

Two of the Drumlin Project's target leases, UTU-93656 and UTU-93659, were sold as

part of BLM's December 2018 lease sale for the Vernal Field Office. Prior to issuing the leases

and in support of the lease sale, BLM prepared an EA but did not provide a public comment

period. *See generally*, Bureau of Land Mgmt., Environment Assessment, December 2018

Competitive Oil and Gas Lease Sale, DOI-BLM-UT-G010-2018-0044-EA (Sept. 2018)

---

[2] Available at:
https://www.blm.gov/sites/default/files/documents/files/white%20river%20for%20web.pdf (last
visited Feb. 13, 2025).

("Leasing EA").[3] The Leasing EA purported to analyze the environmental consequences of leasing the 67 parcels proposed for sale. *Id.* at 5. However, the Leasing EA deferred site-specific analysis for many resource values, including soils, vegetation, recreation, and water, to the drilling approval stage. *See id.* App. E at 2, 6, 7, 9-14, 17.

Although BLM did not hold a public comment period on the Leasing EA, the Alliance submitted "scoping comments" to the agency regarding the proposed lease sale and SUWA protested the Leasing EA and its accompanying FONSI and DR during the truncated ten-day protest period. BLM denied SUWA's protest. Subsequently, the Alliance filed suit challenging the 2018 Lease Sale, along with several other leasing decisions from 2018 and 2019 on the bases that BLM violated NEPA and the Endangered Species Act. *See generally*, First Amend. Compl., *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, 2:23-cv-00804-TC-DBP (D. Utah) (ECF No. 16) (attached as Ex. 2).

## III.    The Drumlin Project

As noted above, the Drumlin Project proposes a total of eight wells targeting four leases, as well as a lay-flat water pipeline and an upgraded gas pipeline operated by Utah Gas Corporation. Final EA at 5, 9. One of the proposed wells, Drumlin Fed 10-24-30-5-13 MCH, serves as the obligation well for the Glacier (Deep) unit. *Id.* at 5.

BLM released the Drumlin Project's draft EA for a 30-day public comment period in July 2024. The draft EA analyzed three alternatives: (1) the proposed action, as described above, (2) the no action alternative, and (3) an alternative that would move the upgraded Utah Gas Corp. pipeline to the east side of Asphalt Wash Road in order to avoid the White River Natural Area.

---

[3] Available at: https://eplanning.blm.gov/public_projects/nepa/116589/166216/202535/2019-02-08_VFO_Final_EA.pdf (last visited Feb. 13, 2025).

*See* Bureau of Land Mgmt., Draft Env't Assessment, Drumlin Well Pad Project, DOI-BLM-UT-G010-2024-0064-EA, at 7-9 (July 2024) ("Draft EA"). The draft EA analyzed how these three alternatives would impact air quality, greenhouse gas emissions and climate change, migratory birds, the White River Natural Area, the White River LWC, visual resources, and the threatened or endangered fish of the Colorado River system. *Id.* at 6.

Despite the White River's recognized recreational value, *see Floating the White River*; White River Rec Area Website, the draft EA declined to analyze impacts to recreation on the grounds that "there are no developed or undeveloped recreation resources within the project area." Draft EA App. A at 8. Similarly, despite knowing how much water the Drumlin Project expects to use and where it will come from, *see* Draft EA at 9, BLM declined to analyze water quantity impacts. *Id.* App. A at 9-10. BLM declined to do so despite being on notice of the 10th Circuit's standards for analyzing water use in the context of an APD approval prior to the draft EA's release for public comment. *See generally*, Letter from Landon Newell, S. Utah Wilderness All. to Christina Price *et al.*, Bureau of Land Mgmt., *RE: BLM's Repeated Failure to Analyze and Disclose Water Quantity Impacts of Oil and Gas Development in the Vernal Field Office* (May 29, 2024).

SUWA submitted timely comments on the draft EA informing BLM of SUWA's position that two of the target leases were unlawfully issued, highlighting the need for a more robust range of alternatives, and explaining why BLM erred by not analyzing impacts to soils, vegetation, recreation, and water resources in detail. *See generally*, S. Utah Wilderness All., *Comments on Anschutz Exploration Corporation's Proposed Drumlin Well Pad, DOI-BLM-UT-G010-2024-0064-EA* (Aug. 16, 2024) (attached as Ex. 3) ("SUWA Comments"). BLM released the final EA, FONSI, and DR on January 30, 2025, approving the Drumlin Project "as described

5

in the [final EA]." DR at unpag. 1.[4] In other words, BLM selected the proposed action

alternative. This request for SDR followed.

### ARGUMENT

### I.    Four APDs are Unlawful Because Two of the Target Leases Were Illegally Authorized

A valid lease is an inherent prerequisite to a valid APD. 30 U.S.C. § 226(g); *N.M. ex rel.*

*Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 689 n.1 (10th Cir. 2009) (explaining the

three-stage process for oil and gas development on public lands: (1) land use planning, (2)

leasing, and (3) permitting and drilling).

As noted above, the Alliance challenged the leasing decisions that issued UTU-93656

and UTU-93659, and informed BLM of this litigation in its Drumlin Project comments.[5] *See*

SUWA Comments at 1-2. SUWA maintains that the four APDs[6] targeting leases UTU-93656

and UTU-93659 are unlawful because those leases were illegally authorized for the reasons

stated in its First Amended Complaint. *See generally*, First Amend. Compl. Because these leases

are unlawful, BLM had no authority to approve APDs targeting those leases.

### II.    The Drumlin EA Violates NEPA

"NEPA requires federal agencies to pause before committing resources to a project and

consider the likely environmental impacts of the preferred course of action as well as reasonable

---

[4] The FONSI and DR are contained in the same PDF but are distinct documents without labeled page numbers. Therefore, citations to the DR refer to the appropriate page of the DR itself, not the PDF page number.

[5] Despite SUWA raising this point in its comments, the final EA does not mention that two of the leases were at issue in *Southern Utah Wilderness Alliance v. United States Department of the Interior*. Instead, BLM only states that those leases were at issue in *WildEarth Guardians v. Bernhardt*, 1:21-cv-00175 (D.D.C.) (2021). Final EA at 5, 9.

[6] Drumlin Fed 10-24-30-6-15 MCH, Drumlin Fed 10-24-30-6-16 MCH, Drumlin Fed 10-24-30-24-1 MCH, and Drumlin Fed 10-24-30-24-2 MCH.

alternatives." *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 703 (10th Cir. 2009). NEPA's "twin aims" require agencies to consider every significant aspect of the environmental impact of a proposed action and to facilitate public involvement. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

### A.    Failure to Take a Hard Look at Environmental Impacts

NEPA creates "a set of action-forcing procedures that require that agencies take a hard look at environmental consequences, and that provide for broad dissemination of relevant environmental information." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (cleaned up); *see also Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1990) (NEPA is intended to ensure that an "agency will not act on incomplete information only to regret its decision after it is too late to correct.").

These "action-forcing procedures...require that agencies take a 'hard look' at environmental consequences." *Robertson*, 490 U.S. at 350 (citations omitted). Such "environmental consequences" or "effects" may be direct, indirect, or cumulative. 40 C.F.R. § 1508.1(i). Direct effects "are caused by the action and occur at the same time and place." *Id.* § 1508.1(i)(1). Indirect effects

> are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

*Id.* § 1508.1(i)(2). And cumulative effects

> are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative effects can result from actions with individually minor but collectively significant effects taking place over a period of time.

*Id.* § 1508.1(i)(3).

7

### i.    Failure to conduct the site-specific analyses promised at the leasing stage

"NEPA requires a full evaluation of site-specific impacts...when the agency proposes to

make an irreversible and irretrievable commitment of the availability of resources to a project at

a particular site."[7] *Jayne v. Sherman*, 706 F.3d 994, 1007-08 (9th Cir. 2013). "Such a site-

specific evaluation must include 'data-gathering and analysis of system-wide impacts.'" *W.

Watershed Proj. v. Bernhardt*, 543 F. Supp. 3d 958, 987 (D. Idaho 2021) (quoting *Friends of

Yosemite Valley v. Norton*, 348 F.3d 789, 801 (9th Cir. 2003)).

Here, the Leasing EA deferred analysis of multiple resources, including soils, vegetation,

and recreation to the APD approval stage. Leasing EA App. E at 2, 6, 7. For instance, the

Leasing EA declined to analyze vegetation because "[d]evelopment within leased parcels would

require site-specific analysis and mitigation which would be conducted as these projects are

proposed." *Id.* at 6. Likewise, impacts to soils were not analyzed at the leasing stage because "the

majority of the parcels have different soil types and biological soil crust across them" but would

be analyzed "[w]ith the submission of site-specific surface disturbance plans." *Id.* at 7. However,

now at the APD stage, BLM again failed to perform the deferred analyses, despite being

reminded of its obligation to do so. *See* SUWA Comments at 6; Final EA App. A at 5-7

(Interdisciplinary Team ("IDT") Checklist declining to analyze soil and vegetation resources in

detail).

Specifically, although BLM noted the type of soil present at the project location and how

much of it would likely be disturbed, BLM concluded—without any support—that mitigation

---

[7] It is settled law that the issuance of an oil and gas lease constitutes an "irretrievable
commitment of resources." *N.M. ex. rel. Richardson*, 565 F.3d at 718 (citing *N. Alaska Env't.
Ctr. v. Kempthorne*, 457 F.3d 969, 973, 977-78 (9th Cir. 2006); *Sierra Club v. Peterson*, 717
F.2d 1409, 1415 (D.C. Cir. 1983)).

8

measures "would reduce potential impacts to soils in disturbed areas until final reclamation is

accomplished" and thus "[i]mpacts to soils would not occur to an extent where additional

analysis would be required." Final EA App. A at 6-7. BLM provided the same type of cursory

explanation and unsupported conclusion when it declined to analyze vegetation in detail. *Id.* at 5.

BLM's <u>perfunctory</u> descriptions of potential direct soils and vegetation impacts in the IDT

Checklist[8] are not site-specific analyses. *Friends of Yosemite Valley*, 348 F.3d at 801. There is

also no discussion of the Drumlin Project's <u>indirect</u> or <u>cumulative</u> impacts to soils and

vegetation. These omissions violate NEPA.

      The Final EA also failed to include a site-specific analysis of impacts to recreation

(specifically as it pertains to the White River) in detail, again despite BLM committing to do so

in the Leasing EA. *See* Leasing EA App. E at 7 (recreation). BLM responded to SUWA's

comments highlighting this error, *see* SUWA Comments at 7-10, by analyzing this issue "in

brief" and still declining to conduct a detailed recreation analysis *See* Final EA App. E at 5

("recreation will not be carried forward for detailed analysis"). Specifically, BLM explained the

Drumlin Project's proximity to the White River and concluded

> [t]he ever-present ambient noise of the river would dominate any residual noise
> from the Proposed Action if it were to carry that far. However, it is extremely
> unlikely that sounds from the Proposed Action would carry that distance with the
> existing topography and vegetation.

*Id.* BLM did not support this statement with any data or analysis such as identifying the Drumlin

Project's expected average decibel levels or preparing a sound propagation model.[9] Nor did

---

[8] Because IDT Checklist merely serves as an explanation of why BLM believes resources do or
do not require detailed analysis, such explanations alone do not satisfy NEPA's hard look
standard.

[9] In its comments, SUWA provided BLM with a sound propagation model that BLM apparently
declined to utilize or engage with. *See* SUWA Comments at 9 (referencing the S. Utah
Wilderness All., Map – Anschutz Drumlin Well Pad Project Sound Propagation Model (2024)
attached to the comments). Contrary to BLM's assertion, SUWA's sound propagation model

BLM explain the Project's indirect or cumulative impacts on recreation. Consequently, as with soils and vegetation, BLM's recreation impacts "analysis" does not constitute a site-specific analysis. *Friends of Yosemite Valley*, 348 F.3d at 801.

***

In sum, BLM violated NEPA because the Final EA failed to include required site-specific analyses for the soils, vegetation, and recreation resources that analyze the Drumlin Project's direct, indirect, and cumulative impacts to those resources.

### ii.     Failure to disclose and analyze cumulative impacts

The Final EA also violates NEPA because (1) BLM failed to disclose and analyze reasonably foreseeable cumulative impacts for all resource values "analyzed" in the EA and (2) did not conduct a water resources cumulative impacts analysis that meets Tenth Circuit standards.

#### 1.     *Failure to identify and analyze specific past, present, and reasonably foreseeable future actions*

In the Tenth Circuit:

> [A] meaningful cumulative impact analysis must identify five things: (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1056 (10th Cir. 2011) (citation omitted).

The Final EA's cumulative impacts analyses for all resources "analyzed in detail" (*i.e.*,

air quality, GHG emissions and climate, migratory birds and raptors, BLM natural areas, LWC,

---

shows that recreationists on the White River may be able to hear noise from the Drumlin Project. *See* S. Utah Wilderness All., Map – Anschutz Drumlin Well Pad Project Sound Propagation Model (2024).

visual resources, and fish) do not satisfy *San Juan* factors three, four, and five. With regard to

factor three, the Final EA lists only generic <u>types</u> of past, present, and reasonably foreseeable

projects such as mining, oil and gas development, urbanization, and agricultural activities. *See*

Final EA at 27-33 (air quality), 41-45 (GHG emissions and climate), 48 (migratory birds and

raptors), 54 (natural areas), 55 (LWC), 57 (visual resources),[10] 62-63 (fish). The final EA does

not identify any actual projects that fall within the cumulative impacts analysis areas ("CIAA").

*See ids.*

However, in its comments SUWA identified multiple projects that fall within some or all

of BLM's CIAAs and that impact the same resource value(s) as the Drumlin Well Pad. *See*

SUWA Comments at 10-11. BLM rejected the inclusion of these projects largely on the basis

that all of the listed projects are not within the various CIAAs for migratory birds and raptors,

Natural Areas, LWC, and visual resources.[11, 12] *See* Final EA App. D at 2-3. While that may be

the case for other known drilling projects such as the RW 33-22 Well Pad, the Middle Fork Five

RW Well Pads and Trunkline, the Middle Fork RW 32-23 Well Pad, the Dobby Well Pad and

the Bierstadt Fed 1123-16 Pad, *see* Final EA App. D at 2-3, it is not true for the ten reasonably

---

[10] The cumulative impacts section for visual resources does not identify any past, present, or
reasonably foreseeable activities and effects to visual resources. Instead, the section mentions
activities listed in section 3.4.1 (White River LWC). Final EA at 57.

[11] With regard to fish, BLM declines to incorporate the enumerated projects into its cumulative
impacts analysis on the basis that BLM was relying on a water use report from 2015 and
withdrawals from the enumerated projects did not occur in 2015 so they were not considered for
analysis in the Drumlin EA. Final EA App. D at 3. This rationale is arbitrary. Many of
enumerated projects are reasonably foreseeable future actions that have not yet occurred and
therefore <u>could not</u> be included in the 2015 report. That does not excuse BLM from its obligation
to consider such projects in a cumulative impacts analysis.

[12] SUWA mentioned these projects because they are undoubtedly within the CIAAs for air
quality, GHG emissions and climate, and, arguably, the appropriate CIAA for water resources,
had BLM included a cumulative impacts analysis for water (which, as explained *infra*, BLM was
obligated to do).

foreseeable wells predicted in the Leasing EA for lease UTU-093659, nor the ten reasonably

foreseeable wells predicted for lease UTU-093656. Both of these leases are target leases for the

Drumlin Project and therefore part of the project area. Furthermore, they are both adjacent to

UTU-065371, which is the lease that the well pad will actually be constructed on. It is thus

arbitrary for BLM to decline to include these reasonably foreseeable wells in its cumulative

impacts analyses. Consequently, the Final EA violates the third *San Juan* factor.

The Final EA likewise falls short on the fourth and fifth *San Juan* factors. It does not identify

the impacts from these other projects (factor four) nor does it analyze and disclose the overall impact

that can be expected from those projects when viewed together with the Drumlin Project (factor

five). Instead, the Final EA takes a similar approach for each resource value analyzed in the EA: first,

it defines the CIAA; second, it lists a few generic types of actions that may be in the CIAA; third, it

references the direct and indirect impacts of the Drumlin Project; and finally, it provides a conclusory

statement (without analysis or explanation) that the Drumlin Project would, at most, incrementally

contribute to cumulative effects within the area. *See* Final EA at 48 (migratory birds and raptors),

54 (natural areas), 55 (LWC), 57 (visual resources), 62-63 (fish).

For example, the grand total of the Final EA's cumulative impacts analysis for the White

River Natural area is contained in the following statement:

> [p]ast, present, and reasonably foreseeable activities and their effects to the BLM
> Natural Area were listed in Section 3.4.1. Overall impacts to the White River Natural
> Area would not change when combined with the well pad and facilities under
> Alternatives A or C as they are proposed outside of the White River Natural Area
> boundary. Under the Proposed Action the proposed upgraded gas pipeline would
> replace and use the same corridor as the existing operational pipeline. Therefore, no
> changes in wilderness characteristics that would cause the area to no longer meet the
> minimum definitional criteria for wilderness characteristics are expected. No impacts
> would accumulate under the No Action or Alternative C from the pipeline upgrade.

*Id.* at 54. This is not a cumulative impacts analysis. Among other shortcomings, it does not describe

the impacts of maintaining the existing Southam Cyn 10-24-13-30 well pad (the only two actions

12

identified in the White River Natural Area CIAA), nor does it discuss the overall impacts of the Drumlin Project when viewed together with the other two identified projects.

Likewise, the Final EA's entire cumulative impacts analysis for the White River LWC unit is the following:

> [p]ast, present, and reasonably foreseeable activities and their effects to the White River wilderness characteristics inventory unit were listed in Section 3.4.1.[13] Overall impacts to the would not change when combined with the Proposed Action or Alternative C as the well pad and facilities proposed are outside of the unit boundary and the upgraded gas pipeline would replace and use the same corridor as the existing operational pipeline. Therefore, no changes in wilderness characteristics that would cause the area to no longer meet the minimum definitional criteria for wilderness characteristics are expected. No impacts would accumulate under the No Action.

*Id.* at 55. But the EA does not list any other actions in the analysis area. Rather, it states only that "[p]ast, present and reasonably foreseeable actions in the White River lands with wilderness characteristics include non-motorized recreation activities. There are no other past, present, or reasonably foreseeable actions in the analysis area."[14] *Id.* at 54. The Final EA does not list any specific actions, does not describe the (generic) impacts of non-motorized recreation activities, and does not explain how BLM came to the conclusion that the impacts of the Drumlin Project, when added to the impacts of other (unidentified) non-motorized recreation would not result in a change to wilderness characteristics.

---

[13] Reference to Section 3.4.1 is incorrect. The Final EA mentions "past, present, and reasonably foreseeable actions in the White River [LWC] in Section 3.5.1. *See* Final EA at 54.

[14] This statement inexplicably differs from that in the draft EA, which stated "[p]ast, present and reasonably foreseeable actions in the White River lands with wilderness characteristics include development of oil and gas infrastructure. Current land use trends such as industrial development, [off-highway vehicle] traffic, and recreation activities will continue and may result in changes to the wilderness characteristics regardless of this BLM decision." Draft EA at 46 (emphasis added). It is unclear why, in the Final EA, BLM no longer includes the development of oil and gas infrastructure as a reasonably foreseeable action.

To be clear, the Final EA makes these same mistakes for all resource values analyzed, in addition to completely failing to consider impacts to soils, vegetation, and recreation (and therefore failing to account for the cumulative effects of various projects on soils, vegetation, and recreation).

2. *Failure to analyze the cumulative impacts to water resources*

The Tenth Circuit has been particularly clear that BLM must take a hard look at water resources when evaluating a site-specific oil and gas APD.[15] *See, e.g., Diné Citizens Against Ruining Our Env't v. Bernhardt* ("*Diné CARE I*"), 923 F.3d 831, 856-59 (10th Cir. 2019) ("[W]ater use is an important aspect of the environmental impacts associated with well drilling."); *Diné Citizens Against Ruining Our Env't v. Haaland* ("*Diné CARE II*"), 59 F.4th 1016, 1044-45 (10th Cir. 2023). NEPA's requirement that BLM analyze all reasonably foreseeable cumulative impacts, 40 C.F.R. § 1508.1(i)(3), includes future wells identified in a reasonably foreseeable development scenario ("RFDS"). *Diné CARE I,* 923 F.3d at 853. Specifically, BLM's cumulative impact analysis of RFDS wells must include studying the cumulative impacts all wells will have on water quantity and the environment. *Id.* at 850, 856-57 (holding that BLM needed to analyze the "cumulative impacts of water resources" associated with the wells identified in the RFDS). Furthermore, in *Diné CARE II*, the Tenth Circuit established the minimum threshold that BLM must meet to satisfy its NEPA hard look obligation regarding cumulative impacts to water quantity in site-specific drilling EAs. There, BLM's analysis in the relevant EA addendum took a "quantitative-comparative" approach. *Id.* 50 F.4th

---

[15] This is not to say that BLM is excused from first analyzing water resources at the leasing stage. To the contrary, the Tenth Circuit has also held that BLM must do so if relevant data and information is available. *See N.M. ex. rel. Richardson*, 565 F.3d at 713-15. Regardless, BLM cannot use the shell game (committing at the leasing stage to analyze impacts at the APD stage but then never doing so) to avoid this work.

at 1045. That is, for both the approved APDs <u>and</u> the wells projected in the applicable RFDS, BLM

> considered how much water was likely to be used, including if all wells employed the most water-intensive methods. It then compared that water consumption to the total amount of water projected to be used in the region…

*Id.* at 1044. In other words, BLM calculated the per-well impact based on the type of well and included the "aggregated direct impact of developing all wells associated with the proposed action, including all drilling, workover, and plugging." Bureau of Land Mgmt., *Diné CARE Env't Assessment Add.*, 33 (Feb. 2020) ("*Diné CARE* EA Addendum") (attached as Ex. 4). BLM then compared this aggregated total water usage from the proposed action to the total estimated water use in the relevant hydrologic region. *Id.* Because "there is a finite amount of water supporting the various water uses in a specific region," the Tenth Circuit found BLM's quantitative-comparative analysis approach sufficient to satisfy NEPA's hard look requirement. *Diné CARE II* at 1045.

Here, although the Final EA includes more information on the Drumlin Project's impacts to water resources relative to the Draft EA, *see* Final EA App. E at 1-4,[16] it nonetheless still fails to quantify and evaluate the cumulative impacts of the Vernal Field Office's RFDS. The Vernal Field Office Resource Management Plan ("RMP") initially predicted an RFDS where 6,530 wells would be drilled. *See* Bureau of Land Mgmt., App. A Oil and Gas Development Potential (undated) (attached as Ex. 5). Since then, BLM updated this RFDS to anticipate 28,417 wells (more than four times as many as was originally predicted). Bureau of Land Mgmt., Greater Uinta Basin Oil and Gas Cumulative Impacts Technical Support Document, at 10, tbl. 3-2

---

[16] This information is contained in a section titled "Issues Analyzed in Brief" and does not include a water resources analysis for the alternatives considered for the Drumlin Project. Consequently, the information included in this section does not meet NEPA's hard look standard. *See* 42 U.S.C. 4332(2)(C).

(March 2012) (attached as Ex. 6). The Tenth Circuit has held that once identified, such wells are reasonably foreseeable and must be analyzed in BLM's site-specific drilling analyses, including their cumulative water resources impacts. *See Diné CARE I*, 923 F.3d at 853 ("we conclude that once the . . . RFDS issued, the . . . wells predicted in that document were 'reasonably foreseeable future actions'") (citing 40 C.F.R. § 1508.7 (1978)); *id.* at 854 ("The BLM therefore had to consider the cumulative impacts of all 3,960 wells when it conducted its site-specific EAs").

Because BLM did not consider the Vernal Field Office RFDS in accordance with the Tenth Circuit's standards, the Final EA fails to take a hard look at the cumulative impacts to water resources, in violation of NEPA.

### B.    Failure to Analyze a Range of Reasonable of Alternatives

The reasonableness of BLM's range of alternatives—including publicly recommended alternatives—is judged through the lens of the "rule of reason" standard.

> The reasonableness of the alternatives considered is measured against two guideposts: First . . . an alternative is reasonable only if it falls within the agency's statutory mandate. Second, reasonableness is judged with reference to an agency's objectives for a particular project.

*N.M. ex. rel. Richardson*, 565 F.3d at 709 (citations omitted); *see also High Country Conserv. Advocates v. U.S. Forest. Serv.*, 951 F.3d 1217, 1224 (10th Cir. 2020) (same). This standard requires BLM to demonstrate that it took a "hard look" at alternatives—a "thoughtful and probing reflection of the possible impacts associated with the proposed project" so as to "provide a reviewing court with the necessary factual specificity to conduct its review." *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 781 (10th Cir. 2006).

The range of alternatives an agency must analyze in an EA depends on its purpose and need statement. *See Davis v. Mineta*, 302 F.3d 1104, 1119 (10th Cir. 2002). "Alternatives that do not accomplish the purpose of an action are not reasonable." *Custer Cnty. Action Ass'n v.*

*Garvey*, 256 F.3d 1024, 1041 (10th Cir. 2001). Stated differently, "[i]t is the BLM purpose and need for action that will dictate the range of alternatives and provide a basis for the rationale for eventual selection of an alternative in a decision." Bureau of Land Mgmt., Nat'l Env't. Pol'y Act, Handbook H-1790-1 § 6.2, p. 36 (Jan. 2008) ("BLM NEPA Handbook").[17] After "defining the objectives of an action," the agency must "provide legitimate consideration to alternatives that fall between the obvious extremes." *Colo. Env't. Coal. v. Dombeck*, 185 F.3d 1162, 1175 (10th Cir. 1999). Notably, "[t]he broader the purpose and need statement, the broader the range of alternatives that must be analyzed." BLM NEPA Handbook § 6.2.1, p. 36; *see also id.* § 6.6.1 at 49-50. "In determining the alternatives to be considered, the emphasis is on what is 'reasonable' rather than on whether the proponent or applicant likes or is itself capable of implementing an alternative." *Id.* § 6.6.1, p. 50.

Applying these standards here, BLM's alternatives analysis in the Final EA violated NEPA.

### i.     BLM established a broad purpose and need for the Drumlin Project

BLM's broadly stated purpose and need for the Drumlin Project's Final EA is the following:

> The BLM need is to respond to Anschutz's eight Applications for Permits to Drill in the Glacier (Deep) Unit, Anschutz's lay-flat waterline right-of way application, and Utah Gas Corporation's application for amendment to right-of-way UTU-73643 in accordance with 43 CFR 3171 and Title V of the Federal Land Policy and Management Act of October 21, 1976, as amended through September 1999, (90 Stat. 1776; 43 U.S.C. 1761). The BLM's purpose is to protect other resources in compliance with applicable law, regulation, and policy.

---

[17] Available at:
https://www.blm.gov/sites/blm.gov/files/uploads/Media_Library_BLM_Policy_Handbook_h1790-1.pdf (last visited Feb. 13, 2025).

Final EA at 7. BLM's decision to be made is "whether to deny or approve (with appropriate terms and conditions) the [APDs] with their associated surface-disturbing activities and the application to amend the right-of-way." *Id.* These broad objectives govern BLM's range of alternatives and dictate the reasonableness of recommended alternatives, including those proposed by the public.

SUWA recommended two middle-ground alternatives: (1) a "Four APD Approvals" alternative and a "Wildlife Protection" alternative. *See* SUWA Comments at 3. As explained in SUWA's comments, both of these proposed alternatives would reduce the Drumlin Project's environmental impact—the Four APD Approvals alternative would utilize less water and emit fewer GHG emissions while the Wildlife Protection alternative would minimize adverse impacts to nearby wildlife habitat. *Id.* at 4. However, neither recommended alternative was analyzed in detail. *See* Final EA at 18 (dismissing the Four APD Approvals alternative from analysis); *id.* App. D at 8-9 (BLM's comment response to the components of the Wildlife Protection alternative).[18]

### ii.    BLM arbitrarily dismissed the Four APD Approvals alternative

When considering alternatives to a proposed action, including publicly recommended alternatives, BLM must not "confuse[] the power to act with the requirement to analyze." *Rocky Mountain Wild v. Bernhardt*, 506 F. Supp. 3d 1169, 1186 (D. Utah 2020). Rather, in the context of preparing an EA, "BLM is required to analyze all reasonable alternatives to the proposed

---

[18] Although BLM responded to the components of SUWA's comments suggesting the Wildlife Protection alternative, no aspect of the Wildlife Protection alternative is included in the Final EA Section 2.4, which discusses alternatives dismissed from further analysis. *See* Final EA at 16-18. Thus, it appears that BLM did not even consider the Wildlife Protection alternative despite its demonstrated reasonableness.

action, which includes those alternatives that are significantly distinguishable from the alternatives already considered." *Id.* (citations and quotations omitted).

BLM rejected the Four APDs Approval alternative primarily on the grounds that "it is substantially the same as the other Alternative s [sic]," explaining that the surface impacts would remain the same while air and water impacts would be half of the totals predicted for the Proposed Action. Final EA at 18. This explanation both contradicts itself and misses the point. *First*, an alternative that eliminates fifty percent of a project's estimated emissions and water use is not "substantially the same" as the proposed action. Instead, it is a significantly-distinguishable middle-ground alternative that falls between the two "polar opposite" alternatives (the Proposed Action and the No Action alternatives). *Cf. Rocky Mountain Wild*, 506 F. Supp 3d at 1185-86 (finding that publicly-recommended alternatives that would lease some oil and gas parcels but not others were significantly distinguishable, reasonable alternatives that fell in the range established by the proposed action to lease all parcels, and the no action alternative to lease no parcels. The court held that BLM violated NEPA by failing to consider middle-range alternatives that would lease only some parcels); *High Country Conserv. Advocates.*, 951 F.3d at 1226-27 (holding that the U.S. Forest Service violated NEPA by declining to analyze an alternative that would have protected nearly thirty percent less land and allowed access to thirty-five percent more coal).

*Second*, by declining to analyze the Four APD Approvals alternative, BLM "confused the power to act with the requirement to analyze." *Rocky Mountain wild*, 506 F. Supp. 3d at 1186. As explained in SUWA's comments, the Four APD Approvals alternative is both reasonable and significantly distinguishable, thereby obligating BLM to analyze it. *See* SUWA Comments at 4-5. Specifically, it is indisputably within the agency's broad statutory mandate and authority

under the Federal Land Policy and Management Act ("FLPMA"). *N.M. ex rel. Richardson*, 565 F.3d at 709-10 (when reviewing an agency's consideration (or failure to consider) recommended alternatives, the first question for the court is "whether [the alternative] falls within BLM's statutory mandate for land management"). Specifically, FLPMA requires that BLM "take any action necessary to prevent unnecessary or undue degradation" ("UUD") of public lands. 43 U.S.C. § 1732(b). Analyzing, and potentially selecting the Four APD Approvals alternative and/or the Wildlife Protection Alternative is one way BLM is able to comply with its statutory obligation to prevent UUD primarily because the Four APD Approvals alternative will result in reduced water and climate impacts compared to the Proposed Action. Further, the Four APD Approvals alternative would unquestionably satisfy BLM's stated purpose and need for the Drumlin Project,[19] *see N.M. ex rel. Richardson*, 565 F.3d at 709 (the rule of reason "is judged with reference to an agency's objectives for a particular project"), because it responds to the project proposal and would allow oil and gas development to proceed in a more environmentally responsible manner.

Additionally, the Four APD Approvals alternative is significantly distinguishable from the Proposed Action. *See High Country Conserv. Advocates*, 951 F.3d at 1227) (holding that the United States Forest Service violated NEPA when it declined to consider and analyze plaintiffs'

---

[19] As an alternative rationale, BLM dismisses the Four APD Approvals alternative because it "would not meet the purpose and need of the [Glacier (Deep)] unit agreement." Final EA at 18. This rationale is irrelevant. The Tenth Circuit is clear that it is BLM's purpose and need for a project that determines whether an alternative is reasonable. *N.M. ex rel. Richardson*, 565 F.3d at 709. Moreover, the purpose and need of the Glacier (Deep) unit agreement has no bearing on whether the Four APD Approvals alternative is reasonable because the Four APD Approvals alternative, as contemplated by BLM, would not preclude drilling the Glacier (Deep) unit's obligation well, Drumlin Fed 10-24-30-5-13 MCH. *See* Final EA at 18. Therefore, BLM's argument that the Four APDs Approval alternative is inconsistent with the Glacier (Deep) unit agreement is a red herring.

recommended alternative despite the fact that it was "significantly distinguishable" from the analyzed alternatives); *cf. Rocky Mountain Wild*, 506 F. Supp. 3d at 1186 ("BLM is required to analyze all reasonable alternatives to the proposed action, which includes those alternatives that are significantly distinguishable from the alternatives already considered...Simply stating that it has the power to choose to lease fewer than all of the parcels under consideration is not analysis") (quotations and citations omitted).

Finally, the Four APD Approvals alternative is reasonable because it would permit oil and gas development on uncontested leases while precluding development on leases that are invalid. Although, as BLM notes, the fact that a lease is being challenged does not <u>require</u> the alternative, Final EA at 18, it does not mean BLM should not still <u>analyze</u> a reasonable, significantly distinguishable alternative that would prevent development on challenged leases that may ultimately be deemed unlawful. *See* Bureau of Land Mgmt., PIM 2022-001, National Environmental Policy Act Compliance for Applications for Permit to Drill where the National Environmental Policy Act prepared to support the authorizing lease is under review related to litigation (Oct. 14, 2021) ("BLM offices should take particular care when processing APDs on leases for which the underlying environmental analysis is under further review").

In sum, because the Four APD Approvals alternative is a reasonable, significantly-distinguishable alternative that falls within the two extremes analyzed in the Final EA (*i.e.,* approve all eight APDs in either the Proposed Action or Alternative C, or approve no APDs in the no-action alternative), BLM was required to analyze it in detail. BLM's failure to do so is arbitrary and in violation of NEPA.

21

## CONCLUSION

For the foregoing reasons, SUWA respectfully requests that the State Director remand the Vernal Field Office's decision to authorize the Drumlin Project and grant the eight APD approvals for failure to comply with NEPA. Pursuant to 43 C.F.R. § 3165.3(d), we look forward to your decision within ten (10) business days (on or before March 3, 2025).

DATED:        February 14, 2025

*/s/ Hanna Larsen*
Hanna Larsen
Landon Newell

*Attorneys for the Southern Utah Wilderness Alliance and Living Rivers Colorado Riverkeeper*