IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES BUREAU OF LAND MANAGEMENT, AND CHRISTINA PRICE, in her official capacity as Deputy State Director, Division of Land and Minerals<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER ALTERING DECISION AND DENYING INTERVENOR DEFENDANTS' MOTIONS TO DISMISS**<br><br>Case No. 2:23-CV-00804-TC-DBP<br><br>Judge Tena Campbell<br><br>Magistrate Judge Dustin B. Pead |

Plaintiff Southern Utah Wilderness Alliance (SUWA) filed this action under the

Administrative Procedure Act (APA), 5 U.S.C. §§ 552–559, 702–706, against the United States

Department of the Interior, the United States Bureau of Land Management (BLM), and Christina

Price, the Deputy State Director of the Division of Land and Minerals, alleging three causes of action for violations of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370h.

Intervenor Defendants Anschutz Exploration Corporation (AEC), an independent oil-and-gas exploration and development company, and the State of Utah moved to dismiss on the basis that SUWA lacked standing and its claims were not ripe for adjudication. (ECF Nos. 42, 45.) On February 4, 2025, the court issued its Memorandum Decision and Order granting those motions and dismissing the case in its entirety without prejudice, finding that SUWA's claims were not yet ripe. (ECF No. 73.) Now before the court is SUWA's motion to alter or amend judgment, which asks the court to reconsider its decision to dismiss the case. (ECF No. 78.) For the reasons discussed below, the court grants SUWA's motion, therefore reversing its grant of dismissal and reopening the case.

## BACKGROUND AND PROCEDURAL HISTORY

This APA challenge involves a public land dispute between an environmental group (SUWA), the federal government, the State of Utah, and private industry about how much and what type of environmental analysis the government is required to engage in before it can permit private industry to drill for oil and gas on federally owned land.

Specifically, SUWA challenges four leasing decisions made by the BLM between 2018 through 2019: the December 2018 Moab leases, the December 2018 Vernal leases, the March 2019 Vernal leases, and the September 2019 Moab leases. (Am. Compl., ECF No. 16 at ¶ 53.)

The BLM manages onshore oil and gas development on federal lands through a three-stage process: 1) land use planning, 2) leasing, and 3) approval of drilling proposals. (Am. Compl. ¶ 49, ECF No. 16.) Through these BLM leasing decisions, the BLM issued 145 oil and

gas leases on public lands throughout eastern Utah's Book Cliffs and Uinta Basin regions, 64 of which were sold to AEC. (Id. ¶¶ 1, 7, 53; ECF No. 78 at 3 n.1.)

The National Environmental Policy Act (NEPA) requires federal government agencies, including the BLM, to evaluate the direct, indirect, and cumulative impacts of oil and gas drilling on federal lands before taking official action or committing irretrievable resources to a project. Accordingly, the BLM must issue detailed environmental impact statements (EIS) that explore impacts and discuss ways to mitigate adverse impacts. See 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.14; Forest Guardians v. U.S. Fish & Wildlife Serv., 611 F.3d 692, 711 (10th Cir. 2010) ("[NEPA] requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives."). "If, after an EIS has been prepared, 'there are substantial changes to the proposal or significant new circumstances or information relevant to environmental concerns,' then a supplemental EIS must be prepared." Los Alamos Study Grp. v. U.S. Dep't of Energy, 692 F.3d 1057, 1061 (10th Cir. 2012) (citing 10 C.F.R. § 1021.314(a)). The government agency can alternatively prepare an environmental assessment (EA), which must "provide sufficient evidence" that the proposed action will have no significant impact on the environment. 40 C.F.R. § 1508.9(a)(1).

Similarly, the Endangered Species Act (ESA) requires that the BLM consult with the United States Fish and Wildlife Service (FWS) to "insure that any action authorized, funded, or carried out by [the] agency… is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [the habitat] for such species." 16 U.S.C. §§ 1531–44; id. § 1536(a)(2). Section 7(d) of the ESA prohibits the BLM from making any "irreversible or irretrievable commitment of resources"

3

before the conclusion of consultation which would have "the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." Id. § 1536(d).

On September 12, 2019, SUWA challenged BLM's decision to issue a number of oil and gas leases, including the 2018 Moab and Vernal leasing decisions, in a separate case. See Compl., Living Rivers v. Hoffman, No. 4:19-cv-74-DN (D. Utah), ECF No. 2. After the lawsuit was filed, the BLM suspended those leases while it prepared a supplemental Greenhouse Gas Environmental Analysis (GHG EA). (Am. Compl. ¶ 74 (citing Unopposed Mot. Stay, Living Rivers, No. 4:19-cv-74-DN, ECF No. 15.) Based on the BLM's decision to suspend those leases and to prepare a supplemental GHG EA, SUWA voluntarily dismissed the Living Rivers lawsuit. (Id. ¶ 75.)

In January 2020, the BLM published its supplemental GHG EA summarizing the 2018 oil and gas leases' impact on climate change. (Am. Compl. ¶ 76.) The supplemental GHG EA explained that the BLM would, after allowing public notice and comment, decide whether to "1) lift the suspension on a particular lease, 2) modify a lease and lift the suspension, or 3) cancel a lease." (Id. ¶ 78.) SUWA issued comments objecting to the BLM's supplemental GHG leasing analysis, arguing that the BLM had failed to analyze and disclose the social costs of the GHG emissions. (Id. ¶¶ 79–80.) Following its publication of the Supplemental GHG EA, and in spite of SUWA's objections, the BLM temporarily lifted its suspensions on the 2018 leases. (Id. ¶¶ 59, 82.)

Some of the BLM's leases were again suspended after changes in the regulatory landscape and several environmental organizations filed lawsuits, meaning that no development in these areas is currently in progress. The BLM agreed to suspend certain oil and gas leases as a

condition of settlement of similar lawsuits brought by WildEarth Guardians (WEG), an environmental group, and others. See WEG v. Haaland, No. 1:16-cv-1724-RC; WEG, v. Haaland, No. 1:20-cv-56-RC; WEG v. Haaland, No. 1:21-cv-175-RC (the WEG Cases). In the WEG Cases, WEG alleged that the BLM had violated NEPA by not considering GHG emissions when issuing leases. See WildEarth Guardians v. Haaland, 2022 WL 1773474, at *2–3 (D.D.C. June 1, 2022). Consistent with the WEG settlement, the BLM is conducting ongoing supplemental NEPA analyses of its leasing decisions. See Stipulated Settlement Agreement at 3, WEG, No. 1:21-cv-175 (D.D.C.), ECF No. 71-1 (agreeing that "BLM will conduct additional NEPA analysis for the … leasing decisions challenged," and that "[u]pon completion of the additional NEPA analysis and related documentation, BLM will issue one or more decisions").[1] The BLM's supplemental NEPA analysis has been posted for public notice and comment, but the BLM has not yet issued a decision about whether it will go ahead with, modify, or cancel the four leasing decisions at issue here. (See ECF No. 42 at 3–4 ns. 1–2.)

In the meantime, AEC and other leaseholders submitted Applications for Permits to Drill (APDs) on their leased land. (ECF No. 64-3.) SUWA filed this action to challenge and enjoin all four of the BLM's leasing decisions, contending that the BLM had violated NEPA and the ESA when it approved the lease sales without 1) fully analyzing the environmental, social, and direct, indirect, and cumulative impacts of the lessees' planned drilling on emissions, water resources, and animal species; 2) adhering to the congressionally-required notice and comment procedure; 3) identifying a reasonable range of alternatives; and 4) consulting with FWS. (Am. Compl. ¶¶ 9–10, 53.) It is undisputed that many of the leases—including at least eleven held by

---

[1] See BLM, Supplemental Environmental Assessment Analysis for Greenhouse Gas Emissions Related to Oil and Gas Leasing in Seven States from Feb. 2015 to Dec. 2020, available at: https://eplanning.blm.gov/eplanning-ui/project/2022218/570 (last accessed Jan. 23, 2025).

5

AEC—are not currently suspended, meaning that development can proceed despite the pending supplemental NEPA analysis. SUWA contends that the challenged leases and accompanying drilling activities will cause recreational and aesthetic harm to its members, who use the federal public lands for a variety of purposes, including solitude, viewing native flora and fauna, rafting and canoeing, cultural appreciation, and hiking and backcountry recreation. (Id. ¶¶ 9–10, 14.)

In May 2024, AEC intervened in this case, seeking to defend its leases. (Order Granting Mot. to Intervene dated May 10, 2024, ECF No. 41.) AEC moved to dismiss SUWA's claim for lack of subject matter jurisdiction (ECF No. 42) and was joined by the State of Utah. (ECF No. 45.) AEC and the State of Utah argued in their motions to dismiss that 1) SUWA's claims were not ripe when the group brought the action because the BLM was and is still conducting further environmental reviews under NEPA and has not yet made a final and therefore reviewable decision about whether it will reinstate the already issued leases; and 2) SUWA lacks standing because it has not shown that its members will suffer concrete and particularized injuries from oil and gas development on the challenged leases. (See ECF Nos. 42, 45.) The court held a hearing on the Defendants' motions on January 16, 2025. (ECF No. 69.)

On January 30, 2025, the BLM approved eight of AEC's APDs for its Drumlin Well Pad Project. (See BLM Decision Record, ECF No. 72-1.) SUWA informed the court of this development later that day in a Notice of Supplemental Authority. (See Not. Suppl. Authority, ECF No. 72.) As a result, AEC can now begin to drill.

Just days later, on February 4, 2025, the court issued its Memorandum Decision and Order (ECF No. 73) granting without prejudice the Intervenor Defendants' motions to dismiss. (ECF Nos. 42, 45.) Specifically, the court held that SUWA's claims should be dismissed because they were not ripe due to a lack of final agency action. In reaching its decision, the

court relied heavily on two factual determinations which it now concedes are inaccurate: (1) that all of the BLM leases at issue in the cases were suspended; and (2) there were no BLM-approved APDs on any of the leases. (See ECF No. 73 at 15 ("[T]he BLM leases are currently—and have been for nearly three years—suspended."); id. at 18 ("It is undisputed that BLM has not yet issued any drilling permits.").) The court acknowledges that it inadvertently overlooked SUWA's Notice of Supplemental Authority when it issued its February 4, 2025 decision.

On February 25, 2025, SUWA filed a motion to alter judgment under Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure, arguing that because nearly half of the challenged leases are active and because the BLM had approved certain APDs on January 30, 2025, SUWA's case is ripe for adjudication. (ECF No. 78.) While the Intervenor Defendants concede that these two factual determinations from the court's prior decision are inaccurate, they oppose SUWA's motion to alter, arguing that the matter is still not ripe because the BLM's pending supplemental NEPA analysis could eventually lead the agency to cancel or modify the at-issue leases. (ECF Nos. 79, 80.) The court held a hearing on SUWA's motion to alter on May 6, 2025. (ECF No. 84.)

## LEGAL STANDARD

A motion to alter or amend is a type of motion for reconsideration that can be brought under either Federal Rule of Civil Procedure 59(e) or 60(b). A Rule 59(e) motion allows a party to "request[] a substantive change in the district court's judgment or otherwise question[] its substantive correctness." Nelson v. City of Albuquerque, 921 F.3d 925, 928 (10th Cir. 2019) (citing Yost v. Stout, 607 F.3d 1239, 1243 (10th Cir. 2010)). "Grounds warranting a motion to alter or amend the judgment pursuant to Rule 59(e) 'include … the need to correct clear error or prevent manifest injustice.'" Alpenglow Botanicals, LLC v. United States, 894 F.3d 1187, 1203

7

(10th Cir. 2018) (quoting Servants of the Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000)). Rule 60 allows a motion for reconsideration for any equitable reason that justifies relief. See Fed. R. Civ. P. 60(b)(6); McGraw v. Barnhart, 450 F.3d 493, 505 (10th Cir. 2006); Pelican Prod. Co. v. Marino, 893 F.2d 1143, 1147 (10th Cir. 1990). Under either Federal Rule, "a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law." Alpenglow Botanicals, 894 F.3d at 1203 (citing Servants of the Paraclete, 204 F.3d at 1012).

Because the court is reconsidering its decision to dismiss the case, it restates the relevant pleading standards under Rule 12(b)(6). To survive a motion to dismiss, a complaint "must plead facts sufficient to state a claim to relief that is plausible on its face." Slater v. A.G. Edwards & Sons, Inc., 719 F.3d 1190, 1196 (10th Cir. 2013) (internal punctuation omitted) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). A claim is facially plausible when the complaint contains factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged. See Burnett v. Mortg. Elec. Registration Sys., Inc., 706 F.3d 1231, 1235 (10th Cir. 2013). The court's function is "not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." Sutton v. Utah Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999) (quoting Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir. 1991)).

## ANALYSIS

Because the court acknowledges the factual errors contained in its February 4, 2025 decision, it must now determine whether the court must alter its analysis of SUWA's standing and the case's ripeness for adjudication, matters which "present the threshold jurisdictional question of whether a court may consider the merits of a dispute." SUWA v. Palma, 707 F.3d

8

1143, 1152 (10th Cir. 2013) (citing Morgan v. McCotter, 365 F.3d 882, 887 (10th Cir. 2004) ("[J]usticiability focus[es] on the twin questions of whether Plaintiff has standing to maintain this action and whether the case is ripe for judicial review.")). The court addresses standing and ripeness in turn, finding, for the reasons discussed below, that dismissal was not warranted because SUWA's claims are ripe and its injuries are realized or imminent. Accordingly, the court alters its February 4, 2025 decision and denies the Intervenor Defendants' motions to dismiss.

### I.   Article III Standing

The Defendants argue in their motion to dismiss that this action cannot yet be litigated because SUWA, as an association, lacks standing to bring its case because it has failed to demonstrate an imminent, concrete, and particularized injury.

Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (citing Allen v. Wright, 468 U.S. 737, 751 (1984)). Without constitutional standing, federal courts lack jurisdiction. Summers v. Earth Island Inst., 555 U.S. 488, 492–93 (2009). When evaluating whether plaintiffs have standing at the motion to dismiss stage, the court must accept all well-pled allegations in the complaint as true and construe them in the light most favorable to the plaintiff. See, e.g., Albers, 771 F.3d at 700; Warth v. Seldin, 422 U.S. 490, 501 (1975). Courts must also "construe the statements made in the affidavits in the light most favorable to the petitioner." Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1089 (10th Cir. 2006) (internal quotation marks omitted).

To satisfy Article III's standing requirements, a plaintiff must show:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly

9

> traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth v. Laidlaw Env. Servs. Inc., 528 U.S. 167, 180–81 (2000) (citing Defenders of Wildlife, 504 U.S. at 560–61).

The Defendants argue that SUWA's injuries are "hypothetical," not concrete and particularized, citing the BLM's ongoing supplemental NEPA analysis and the fact that no drilling permits had been issued when the parties submitted their briefing on these motions.[2] (See ECF No. 42 at 7; Joint Reply Mot. Dismiss, ECF No. 65 at 9, 10–12.) The court reiterates its prior finding that SUWA has shown a concrete and particularized injury. (See ECF No. 73 at 11–12.) As for AEC's challenge to the imminence of SUWA's injuries, the court previously explained that, under Tenth Circuit law, there is substantial overlap between the doctrines of standing and ripeness. Accordingly, the court again considers this question under the "ripeness doctrine, which has been 'characterized as standing on a timeline.'" (See ECF No. 73 at 13–14 (citing SUWA v. Palma, 707 F.3d at 1157).) For the reasons discussed below, the court finds that SUWA has standing because the leasing decision poses imminent, definite harm to SUWA's members and employees.

## II.     Ripeness

Whether a case is "ripe" for judicial review turns on two factors: "(1) the fitness of the issue for judicial review, and (2) the hardship to the parties of withholding judicial review." United States v. Cabral, 926 F.3d 687, 693 (10th Cir. 2019) (internal quotation marks omitted) (citing Abbott Labs. v. Gardner, 387 U.S. 136, 148–49 (1967)).

---

[2] As discussed below, the Intervenor Defendants argued that SUWA's Amended Complaint also lacks "ripeness" for the same reason. (ECF Nos. 42 at 7; ECF No. 65 at 11–12.)

### A. Fitness for Judicial Review

In examining the first prong of the ripeness test, the Tenth Circuit considers four questions:

> (1) whether the issues in the case are purely legal; (2) whether the agency action involved is 'final agency action' …; (3) whether the action has or will have a direct and immediate impact upon the plaintiff and; (4) whether the resolution of the issues will promote effective enforcement and administration by the agency.

SUWA v. Palma, 707 F.3d at 1158 (quoting Coal. for Sustainable Res., Inc. v. U.S. Forest Serv., 259 F.3d 1244, 1250 (10th Cir. 2001)).  Here, the Defendants contest and the court examines only the "finality" of the BLM's leasing decisions because "the absence of final agency action is [case] dispositive." Los Alamos Study Group, 692 F.3d at 1065 (citing Friends of Marolt Park v. U.S. Dep't of Transp., 382 F.3d 1088, 1093–94 (10th Cir. 2004) ("[W]hether the issues are fit for review depends on whether the plaintiff challenges a final agency action."); Park Lake Res. Ltd. Liab. Co. v. U.S. Dep't of Agr., 197 F.3d 448, 450 (10th Cir. 1999) (same, citing the APA, 5 U.S.C. § 704, which limits judicial review to final agency actions and actions made reviewable by statute)).

"Whether federal conduct constitutes final agency action within the meaning of the APA is a legal question." Colo. Farm Bureau Fed. v. U.S. Forest Serv., 220 F.3d 1171, 1173 (10th Cir. 2000); see also Farrell-Cooper Mining Co. v. U.S. Dep't of Interior, 864 F.3d 1105, 1109 (10th Cir. 2017) (same).  The Supreme Court sets forth a two-factor test for whether agency actions are final:

> First, the action must mark the "consummation" of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow[.]"

Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (citations omitted); see also Los Alamos Study Group, 692 F.3d at 1065; Ctr. for Native Ecosystems v. Cables, 509 F.3d 1310, 1329 (10th Cir. 2007)).

There is no dispute that the second factor of the Bennett test for final agency action has been met. (Defs.' Opp'n, ECF No. 79 at 4.) The BLM's issuance of leases and APDs has definite legal consequences, namely, that lessees like AEC can now drill and are starting to work on their leased land. Indeed, SUWA includes in its motion photographic evidence of AEC's construction on the Drumlin Project.[3] AEC does not dispute it has begun construction on its leasehold. What AEC contests is whether the BLM's issuance of these leases marks the "consummation" of the BLM decision-making process given the fact that the BLM's supplemental NEPA analysis could modify or cancel these leases. See Mobil Exploration, 180 F.3d at 1197–99 (holding that "tentative or interlocutory action" does not represent "the consummation of the agency's decisionmaking process" and therefore is not final agency action for APA purposes).

Turning to the first Bennett test factor, the consummation of the government's decision-making process occurs when "the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury." Farrell-Cooper Mining Co., 864 F.3d 1114 (citation omitted). In the context of "a typical mineral leasing case," federal courts consider the act of issuing an "active," non-suspended lease to be final agency action ripe for judicial review regardless of whether the agency plans to conduct further analysis after the lease is issued. See Pennaco Energy, Inc. v. U.S. Dep't of Interior, 377 F.3d 1147, 1151 (10th Cir. 2004) (affirming

---

[3] This evidence also demonstrates that SUWA's harm is "imminent" in the context of the court's evaluation of SUWA's standing.

that challenges to the BLM's auctioning of oil and gas leases were ripe even though the BLM was conducting further analysis of the environmental impacts); Sierra Club v. Peterson, 717 F.2d 1409 (D.C. Cir. 1983) (holding that an agency "may delay preparation of an EIS provided that it reserves both the authority to preclude all activities pending submission of site-specific proposals and the authority to prevent proposed activities if the environmental consequences are unacceptable"); Bd. of Cnty. Commissioners of Cnty. of San Miguel v. U.S. Bur. of Land Mgmt., 584 F. Supp. 3d 949, 966–67 (D. Colo. 2022) (finding claims challenging leasing decisions were ripe for adjudication because "the contested leases convey an interest in federal land, allow surface occupancy, allow commercial use of BLM roads, intensify activity in a region where oil and gas and uranium development is ongoing, allow activities that do not require additional approval, and foreclose the BLM's ability to prohibit development on these leases") (cleaned up); WildEarth Guardians v. Zinke, 368 F. Supp. 3d 41, 65 (D.D.C. 2019) (collecting cases) (finding oil and gas leases constitute final agency action despite the BLM's plan to conduct EIS in the future because "an agency cannot defer analyzing the reasonably foreseeable environmental impacts of an activity past the point when that activity can be precluded").

In its prior decision dismissing SUWA's claims, this court determined that SUWA's circumstances were distinct from the "typical" mineral leasing cases cited above, finding that this case was instead more in line with the facts of SUWA v. Palma. (See ECF No. 73 at 15–16.)  In SUWA v. Palma, the Tenth Circuit determined that the plaintiff's NEPA and APA claims were not ripe for adjudication because the challenged oil and gas leases were suspended pending further environmental analysis—meaning that the private corporations leasing public lands were not able to drill.  The court's analogy to SUWA v. Palma was based on its mistaken

13

understanding that AEC's leases were all presently suspended with no imminent or actual development activity taking place or drilling permits issued. But, upon re-examination of the February 4, 2025 decision's misstatement of the facts, the court now finds that AEC and other lessees can take concrete steps to develop and disturb their leased land, which means the BLM's leasing decisions are "final." Although the court acknowledges that the BLM's leasing decisions may change in the future at the conclusion of its supplemental NEPA analysis, the law is clear that the appropriate time for preparing environmental review required by statute is when the government "reaches the critical stage of a decision which will result in irreversible and irretrievable commitments of resources to an action that will affect the environment." WildEarth Guardians, 368 F. Supp. 3d at 64 (citing Wyo. Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 49 (D.C. Cir. 1999); Mobil Oil Corp. v. FTC, 562 F.2d 170, 173 (2d Cir. 1977)). Because that time has passed, allowing construction that cannot be reversed to commence, the BLM's leases are "final" within the meaning of the APA.

More specifically, the Tenth Circuit in SUWA v. Palma elaborated on its reason for deciding that most agency leasing decisions are "final" agency action, noting that the government's issuance of "oil and gas leases issued on public lands [usually] give[s] a lessee legal incentives to begin development with haste because generally a lessee must diligently develop the leasehold or else the lease will expire at the end of its primary term." SUWA v. Palma, 707 F.3d at 1159 (citing 30 U.S.C. § 226(e)). Because the BLM's leasing decisions are currently in effect, allowing and providing incentives for lessees to begin construction, the BLM's leasing decision must be regarded as final. Under this same logic, the Supreme Court has recognized that agencies can avoid "finality" by ensuring that their decisions do not go into effect pending a required administrative appeals process. See Darby v. Cisneros, 509 U.S. 137

(1993) (explaining that because "[t]he finality requirement is concerned with whether the <u>initial decisionmaker</u> has arrived at a definitive position on the issue that inflicts an actual, concrete injury … [and so] [a]gencies may avoid the finality of an initial decision … [if they] mak[e] [the decision] inoperative pending appeal").  The Tenth Circuit has adopted the Supreme Court's dicta from <u>Darby</u> as binding.  See, e.g., <u>Gaylor v. United States</u>, 74 F.3d 214, 217 (10th Cir. 1996); <u>Farrell-Cooper Mining Co.</u>, 864 F.3d at 1114; <u>see also</u> <u>Conner v. Burford</u>, 848 F.2d 1441 (9th Cir. 1988) (granting plaintiff summary judgment because issuance of leases without "no surface occupancy" stipulations required filing of environmental impact statement).

       The court's altered ripeness finding is consistent with Supreme Court and Tenth Circuit precedent interpreting "the 'finality' element in a pragmatic way" so that  "if an agency has issued a definitive statement of its position, determining the rights and obligations of the parties, [then] the agency's action is [considered] final notwithstanding the possibility of further proceedings in the agency on related issues, so long as judicial review at the time would not disrupt the administrative process." <u>Ctr. for Native Ecosystems v. Cables</u>, 509 F.3d 1310, 1329 (10th Cir. 2007) (cleaned up) (citing <u>FTC v. Standard Oil of Cal.</u>, 449 U.S. 232, 239 (1980).  Here the BLM's leases are a definitive statement that the lessees can start work on the leased land.  And the BLM has not asserted—nor can the court discern—how this action would disrupt or hamper the efficiency of the agency's ongoing supplemental NEPA analysis.

       The court's altered decision is also consistent with public policy considerations and the congressional intent behind the passage of NEPA and the APA.  These two statutes were passed to require that the government follow certain procedures when assessing the environmental impact of agency action before allowing such actions to cause appreciable harm.  See <u>Catron Cnty. Bd. of Comm'rs, N.M. v. U.S. Fish & Wildlife Serv.</u>, 75 F.3d 1429, 1437 (10th Cir. 1996)

("NEPA ensures that a federal agency makes informed, carefully calculated decisions when acting in such a way as to affect the environment."). The APA provides a private enforcement mechanism for these procedures. E.g., id. Were AEC's interpretation of "final agency action" correct, then agency decisions impacting the environment would be shielded from any judicial review so long as the government announced some ongoing supplemental review process of an indeterminate duration. Similarly, any APA case would be mooted if an agency determined that it might one day reconsider its actions, regardless of the effects of drilling in the meantime. Put simply, AEC's approach must be rejected because it would render the NEPA effectively unenforceable.

      The court is further persuaded that the BLM's decision is final within the meaning of the APA because the agency has not separately moved for dismissal on ripeness grounds or otherwise disputed that AEC and other lessees can now begin to clear and drill on their leased land. If the BLM viewed its leasing decisions as merely interlocutory or tentative, then surely the agency would treat AEC's construction as an issue of trespass. Instead, the BLM has actively encouraged AEC to act and rely on its leases by approving drilling permits for the Drumlin Project. In other words, because the BLM has acted like its decision is final, the court should treat it as such.

      AEC argues that the BLM's approval of its APDs should not change the court's ripeness inquiry because SUWA can and is currently challenging the approvals by submitting a request for state-director review, which is now pending. (ECF No. 79 at 6.) But the court rejects this argument for the same reason that AEC's argument about the leasing decision's finality fails. Because AEC can disturb the land pending the outcome of its challenges to drilling permits, the

BLM's decision causes real, imminent, and irreversible harm, and is therefore final. See, e.g., Darby, 509 U.S. at 137.

In sum, upon reexamination of the undisputed facts, this case cannot be classified as an abstract disagreement. The court has sufficient certainty about when and what type of drilling will occur on the land covered by the leases—indeed, AEC's construction is evident. (See ECF Nos. 80, 81.)

### B. The Parties' Hardship

In its motion to dismiss, AEC argued that SUWA faced no hardship because "no oil and gas development will occur ... until AEC receives … drilling permits on the suspended leases[.]" (ECF No. 65 at 8–10 (citations omitted).) This argument is now moot in light of the drilling permits issued on January 30, 2025. (ECF No. 72.) SUWA has adequately pled ripeness on the basis that it will face hardship absent judicial intervention.

### CONCLUSION

For these reasons, the Plaintiff's motion to reconsider (ECF No. 78) is GRANTED and the Intervenor Defendants' motions to dismiss (ECF Nos. 42, 45) are DENIED.

DATED this 19th day of May, 2025.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge